IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMY SMITH, JULIE ANN NITSCH, and | § | |
| MARINA CONNER, each individually | § | |
| and as representatives of all others | § | |
| similarly situated | § | |
| | § | |
| v. | § | CASE NO. 1:18-cv-505 |
| | § | |
| CITY OF AUSTIN, TRAVIS COUNTY | § | |
| DISTRICT ATTORNEY MARGARET | § | |
| MOORE, FORMER TRAVIS COUNTY | § | |
| DISTRICT ATTORNEY ROSEMARY | § | |
| LEHMBERG, AUSTIN POLICE CHIEF | § | |
| BRIAN MANLEY, FORMER AUSTIN | § | |
| POLICE CHIEF ART ACEVEDO, | § | |
| TRAVIS COUNTY SHERIFF SALLY | § | |
| HERNANDEZ, and TRAVIS COUNTY, | § | |
| TEXAS | § | |

## ORIGINAL CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE OF THIS COURT:

NOW COME, Plaintiffs Amy Smith, Julie Ann Nitsch, and Marina Conner, collectively the "**Named Plaintiffs**"), who on their own behalf and on behalf of others similarly situated (the "**Class**"), file this Original Class Action Complaint against the City of Austin, Travis County District Attorney Margaret Moore, former Travis County District Attorney Rosemary Lehmberg, Austin Police Chief Brian Manley, former Austin Police Chief Art Acevedo, Travis County Sheriff Sally Hernandez, and Travis County, Texas (collectively, "**Defendants**") and respectfully show this Court the following:

### I.    INTRODUCTION

For years, female victims of sexual assault in Austin and Travis County have been denied equal access to justice and equal protection of the law.  At the Austin Police Department, the Travis

County Sheriff's Office, the Travis County District Attorney's Office, and many steps in between, women who have survived these violent crimes have been subjected to policies, customs, and practices that discriminate against them based on their gender.  In short, the women of Travis County have been failed by the people sworn to protect them—the government officials and actors who have instead disbelieved, dismissed, and denigrated female victims of sexual assault, failed to have DNA evidence tested for years at a time, and refused to investigate or prosecute cases of sexual assault against female survivors because juries purportedly do not like "he said, she said" cases.

Women who survive sexual assault in Travis County therefore endure multiple traumas; first, the criminal assault itself; second, an  investigation—assuming one  even occurs—that puts the victims under a microscope and subjects them to invasive physical exams with little to no urgency for justice; and finally, the additional trauma of watching their cases and hopes for justice languish and ultimately vanish, due to the inaction and refusal to act by the law enforcement personnel charged with obtaining justice for them.  The result of Defendants' unconstitutional and discriminatory policies, customs, and practices is that while over 1,000 women in Travis County are the victims of violent sexual crimes each year and report those crimes to law enforcement, less than 10 cases of sexual assault are prosecuted in Travis County each year.  And according to public reports, in the year-long period between the summer of 2016 and the summer of 2017, only a single case of sexual assault—against a male victim—was prosecuted through trial.  For female victims of sexual assault in Travis County, there is overwhelmingly no justice at all, and their offenders therefore walk freely to rape again, subjecting even more women—who are disproportionately the victims of sexual assault—to these heinous, traumatic, and violent crimes.

As described in more detail below, Defendants' (a) actions, (b) patterns of behavior, (c) history of decision-making, and (d) departures from normal procedures in the treatment of female victims of sexual assault, evidence ongoing, intentional discrimination against the Named Plaintiffs and the Putative Class Members on the basis of their gender.  Specifically, Defendants have committed constitutional violations by implementing, promoting, or maintaining policies, practices, and/or customs that:

a.     Refuse to implement and/or ignore proper training and supervision of government employees handling sexual assault cases or evidence;

b.     Allocate more resources to other violent crimes than to sexual assault against female victims;

c.     Fail to submit and/or timely test Sexual Assault Kits ("**SAKs**");

d.     Prioritize the submission or testing of DNA evidence from other violent crimes over SAKs;

e.     Purposely and/or knowingly use or contract with labs that do not have the capacity to timely and accurately test and/or analyze the SAKs;

f.     Purposely and/or knowingly use labs with known contamination and competency issues for the testing and/or analysis of SAKs;

g.     Ignore or refuse to utilize SAKs results to prevent additional rapes and sexual assaults;

h.     Knowingly omit from communications with victims of sexual assault that it is unlikely their SAKs will be timely tested and that the investigation will not be completed in the absence of those results;

i.      Fail to arrest and charge known perpetrators of sexual assault against female victims;

j.      Disproportionately dismiss cases or refuse to prosecute sexual assault cases when the victim is female;

k.      Re-victimize women by refusing to treat their testimony as adequate evidence regarding lack of consent;

l.      Over-emphasize or focus on unfounded professed concerns about lack of DNA or credibility, when such concerns are not applied to: (a) other crimes violent crimes, like robbery, non-sexual assault, and homicide; or (b) to sexual assaults committed against male victims;

m.      Intentionally and/or knowingly subject women to invasive collection of DNA with actual or constructive knowledge that such DNA will not be used to apprehend or prosecute their attackers;

n.      Subject victims and other women to future assaults by failing to act on, investigate, or prosecute prior sexual assaults against women;

o.      Disproportionately refuse prosecution in cases involving sexual assault against female victims without DNA evidence;

p.      Treat sexual assault cases involving female victims without the same urgency and importance afforded to other types of violent crimes;

q.      Inadequately staff the investigations and prosecutions of sexual assault cases involving female victims; and

r.       Treat female victims of sexual assault without the same respect and attention to their cases as male victims, as applied to both sexual assaults and other crimes (collectively referred to herein as the "**Policies**").[1]

Defendants' unconstitutional and discriminatory conduct subjects female victims of sexual assault in Travis County and all women of Travis County to continued risk at the hands of perpetrators who are never held accountable.  Accordingly, Plaintiffs now bring this action seeking damages for violations of civil rights under color of law, injunctive relief requiring Defendants to change the methods, polices, customs, and practices used to investigate sexual assault, and an award of attorneys' fees and costs under 42 U.S.C. § 1988.

## II.      PARTIES

1.       Named Plaintiff (and Putative Class Representative) Amy Smith (pseudonym)[2] is an adult female, resident of Texas, and may be served with pleadings and process in this proceeding through the undersigned counsel.

2.       Named Plaintiff (and Putative Class Representative) Julie Ann Nitsch is an adult female, resident of Texas, and may be served with pleadings and process in this proceeding through the undersigned counsel.

3.       Named Plaintiff (and Putative Class Representative) Marina Conner is an adult female, resident of Texas, and may be served with pleadings and process in this proceeding through the undersigned counsel.

---

[1] The Policies are not the only discriminatory customs, policies, and practices implemented by the Defendants.

[2] Ms. Smith must use a pseudonym in this suit because her attacker, while known to Defendants and apprehended, he was never tried for the sexual assaults he committed in Travis County and was ultimately released.  Ms. Smith fears for her safety and the safety of her family.  Additionally, the details of Ms. Smith's assault are intimate and sensitive, and Ms. Smith wishes to avoid unnecessary public scrutiny after her ten-year struggle.

4.      Defendant City of Austin is a municipal entity located in Travis County, Texas, and is recognized by the State of Texas as a properly organized and legal municipal entity.  Defendant City of Austin operates and is responsible for all the actions of the Austin Police Department (the "**Police**" or "**APD**") and the Austin Police Department Forensic Science Division's DNA Section ("**APD DNA Lab**").  The City may be served through the City Clerk at Austin City Hall, 301 W. Second Street, Austin, Texas 78701.

5.      Defendant Travis County District Attorney Margaret Moore (the "**DA**" or "**DA Moore**") may be served at the Travis County District Attorney's Office, 509 West 11th Street, Suite 1.700, Austin, Texas 78701.

6.      Defendant former Travis County District Attorney Rosemary Lehmberg (the "**Former DA**" or "**DA Lehmberg**") may be served at 2606 Deerfoot Trail, Austin, Texas 78704.

7.      Defendant Austin Police Chief Brian Manley (the "**Police Chief**" or "**Chief Manley**") may be served at 715 East 8th Street, Austin, Texas 78701.

8.      Defendant former Austin Police Chief Art Acevedo (the "**Former Police Chief**" or "**Chief Acevedo**") may be served at 1200 Travis Street, Houston, Texas 77002.

9.      Defendant Travis County Sheriff Sally Hernandez (the "**Sheriff**") may be served at 5555 Airport Boulevard, Austin, Texas 78751.

10.     Defendant Travis County is a political subdivision of the State of Texas.  Travis County is responsible for the actions of the Travis County Sheriff's Office (the "**TCSO**").  Defendant Travis County can be served through Judge Sarah Eckhardt, 700 Lavaca Street, Suite 2.300, Austin, Texas 78701.

11.     Named Plaintiffs bring this class action on behalf of all women who have been subjected to sexual assault in Travis County, Texas, reported their assault and/or underwent

invasive testing in the preparation of a SAK, and were adversely affected by the Defendants' Policies (collectively, the "**Class**" and each a "**Putative Class Member**").  The Class may be divided into the following subclasses (collectively, the "**Subclasses**"):

    a.    All women who were sexually assaulted in Travis County, Texas, reported their assault, and were adversely impacted by the Policies (the "**Reported Assault Subclass**").

    b.    All women who were sexually assaulted in Travis County, Texas, underwent invasive testing in the preparation of a SAK, and were adversely impacted by the Policies (the "**Invasive Testing Subclass**").

### III.     JURISDICTION AND VENUE

12.     The jurisdiction of this lawsuit is proper in the United States District Court for the Western District of Texas – Austin Division pursuant to 28 U.S.C. §§ 1331 and 1343. Supplemental jurisdiction is also proper pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events giving rise to the causes of action in this lawsuit occurred within the Western District of Texas within the parameters of the Austin Division.  Venue is also proper pursuant to 28 U.S.C. § 1391 because Defendants' violations under color of law, acts, and/or omissions occurred in this district.

14.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1985, and 1988, and various other state laws and common law.

## IV.    FACTS OF THE CASE

**A.    Each of the Named Plaintiffs was Personally Subjected to Unconstitutional, Discriminatory, and Unfair Treatment by Defendants**

### (1)    Named Plaintiff Amy Smith

15.    On October 8, 2008, Named Plaintiff Amy Smith (pseudonym) was a college student at the University of Texas at Austin.  Following an evening out with friends on Sixth Street, she walked toward Fourth Street to hail a cab.  In that short distance, before she found a cab, a man in a white car began harassing her from his vehicle.  She ignored him and continued walking, but before she was able to get away, he jumped out of his car, grabbed her, and threw her in the backseat.

16.    Once in the backseat of this stranger's vehicle, Ms. Smith had no way to escape. The driver had engaged the child lock feature on the backseat doors.  With no other options, she began screaming, in an effort to grab the attention of a bystander or police in the area, but the man turned the radio up loud enough to drown out her screams.

17.    The stranger drove to a hotel with a red sign, while Ms. Smith feared for her life. Once there, he pulled her out of the backseat and carried her into a room where he raped her repeatedly and humiliated her in other ways.  Afterwards, the attacker put Ms. Smith in the front seat of the white car and said he was going to drive her somewhere.  At the red light at St. John's Avenue—and because the front seat was not equipped with child locks—Ms. Smith threw herself out of the car before her attacker could stop her, and began running.  She ran as fast as she could and then hid in bushes and waited for the light to change and for the car to drive away.  After some time had passed, Ms. Smith emerged from her hiding place and banged on the windows of other cars stopped at the intersection, begging for help.  Finally, a driver stopped and took her to a nearby hospital.

18.     While this marked the end of Ms. Smith's sexual assault, it was only the beginning of the ten-year trauma and struggle that followed.  At the hospital, Ms. Smith underwent a sexual assault forensic exam—an invasive and intimate experience—to collect DNA samples for the Police to send to their DNA lab for analysis.  The Police took a report of her rape, wherein she described her attacker as a heavy set, black man with dreadlocks driving a white vehicle, possibly a Dodge Charger or Chrysler 300.

19.     Following an alert issued to Police on patrol describing the suspect and vehicle, Police stopped at a local hotel on Interstate 35, where a similar vehicle was parked.  The hotel room was registered to a Hispanic man who, when questioned by Police, offered that he had consensual sex that night with a woman named Erica.  He agreed to a DNA test, and Police took the sheets from his hotel bedroom for additional analysis.  He did not match the description that Ms. Smith had provided.

20.     The Police asked Ms. Smith whether her DNA would be found on the Hispanic man, and she said no.

21.     Four months later, the results of the DNA collected from the Hispanic man were returned from the APD DNA Lab.  The analyst there purportedly found a three DNA mixture—the Hispanic man, an unknown woman, and Ms. Smith.  Despite telling Police detectives that it was impossible for her DNA to be on the Hispanic man, the Police began to question her truthfulness.  The Police repeatedly questioned Ms. Smith about other men she may have had sex with that night or whether she had a boyfriend.

22.     Ms. Smith's rape kit results were returned from the APD Lab and showed a two-person DNA mixture—hers and that of an unknown man.  When Police entered the unknown man's DNA profile into the Combined DNA Index System ("**CODIS**"), the results showed a match

to Tyrone Robinson, a convicted thief.  Robinson matched the description Ms. Smith had given

the Police on the night of her attack.  Hotel records confirmed Robinson had checked into a hotel

with a red sign off of Interstate 35, and that he had rented a white Chrysler 300, just as Ms. Smith

had told the Police.  In April 2009, Robinson was arrested and charged with kidnapping and raping

Ms. Smith.  He bonded out of jail and went to Houston.

23.      For four years, nothing happened to further the case against Robinson for the

kidnapping and rape Ms. Smith endured.

24.      Finally, in 2013, DA Lehmberg's office indicted Robinson, but then in 2014,

dropped the charges against Robinson in order to send all of the DNA to an outside lab for

retesting.  Two outside labs excluded the Hispanic man as a person of interest and confirmed that

the DNA found on Ms. Smith belonged to Robinson.  Charges against Robinson were refiled in

2014, but DA Lehmberg did not aggressively pursue the case, upon information and belief, to

avoid having to explain the initial flawed DNA analysis to a jury.

25.      While the case against Robinson in Travis County languished for years, Robinson

committed at least two additional sexual assaults in Houston and was charged in Harris County.

26.      Three years later (and nine years after raping Ms. Smith), in late 2017, DA Moore's

office dismissed the charges against Robinson for Ms. Smith's kidnapping and rape, telling her

that Robinson would get justice in Houston based on the charges against him in Harris County,

and that Ms. Smith  may be able to testify in the punishment phase there.  Upon information and

belief, the Harris County charges against Robinson are unlikely to result in jail time and may be

dismissed altogether.

27.      Ten years have now passed since Ms. Smith was kidnapped and raped in Travis

County, and given the status of her case—which has been dismissed by the DA—it is unlikely Ms.

Smith will ever have a day in court to bring her rapist to justice.   The delay was caused by the specific actions and inactions by APD and the DA and the Former DA, with assistance from the abject incompetence of the APD DNA Lab, which was ultimately shuttered at the end of 2016.

28.     In the intervening ten years since she was kidnapped and attacked, Ms. Smith has endured serious effects of multiple traumas.   There was, of course, the trauma of being kidnapped and raped.   But after that, there were additional and repeated re-victimizations at the hands of Defendants: the contamination of her DNA samples; adversarial interrogation about her sexual partners; pleading with APD detectives for years to take action; learning her rapist had been released on bail; learning that he had raped again—at least twice—after his release; waiting for years for the Police, the Former DA, and the DA to pursue the case; repeatedly having to call and meet with them to push the case forward; and, ultimately, learning by phone that her case was dismissed by the DA (nine years after her rape).   These repeated insults amounted to a final conclusion for Ms. Smith: justice is unavailable to her and she has endured years of trauma at the hands of the Defendants for nothing.

29.     The trauma she has experienced since 2009 prevented Ms. Smith from having any kind of normal life.   She was unable to work outside her home due to crippling anxiety associated with leaving, and her interpersonal relationships were impacted and, in some cases, dissolved. Ms. Smith was forced to relive her attack time-after-time, year-after-year, as she pleaded with Defendants to protect her.   She finally experienced the despair and emotional distress of living with the knowledge that her rapist would never be held accountable for his acts, and nothing was stopping him from assaulting others like he had Ms. Smith.

30.     For Ms. Smith, despite immediately reporting her rape to the authorities, despite being truthful and accurate in her account of the attack, despite subjecting herself to invasive

exams, despite being questioned by Police regarding her veracity with regard to other sexual partners, despite DNA matching and identifying her attacker, despite pleading with Defendants for years to take some action on her case, despite charges being filed (but never pursued), and despite the fact that her attacker raped *again* even after he was arrested on charges for kidnapping and rape in her case, there will be no justice because of the Defendants' Polices and their conduct (and inaction) consistent with those Policies.

### (2) Named Plaintiff Julie Ann Nitsch

31.     In 2010, Named Plaintiff Julie Ann Nitsch was walking home to her apartment in South Austin after attending a party near her neighborhood.  She did not notice anything unusual on her way home, and she entered her apartment and got ready for bed.

32.     After she had settled in for the night and fallen asleep, Ms. Nitsch awoke to find a man on top of her, pinning her down to her bed and licking her face.  She did not recognize the man who was sexually assaulting her, and she screamed repeatedly and tried to escape.  But her attacker kept her pinned down on her own bed, in her own room, in her own home.

33.     Ms. Nitsch's roommate could hear her screaming from the next room, but the attacker had used cords to prevent the roommate from being able to leave her room to get to Ms. Nitsch.

34.     After Ms. Nitsch woke up and the altercation ensued, the assailant left the premises. Nitsch's roommate immediately called 911.

35.     Upon their arrival, the Police entered Ms. Nitsch's apartment as though there was an active shooter inside.  Once they concluded that Ms. Nitsch's attacker had escaped, they took a report of the assault.  During the questioning of Ms. Nitsch, the Police asked her how much she

had to drink that night, what she had been wearing, and why she lived in a bad neighborhood.  No victim services personnel was present.

36.     Though there was physical evidence at the scene that the Police could have collected and tested for DNA—like the cords used by the assailant to lock Ms. Nitsch's roommate in her room, broken locks, and the glass sliding door used by the assailant for entry—the Police did not collect anything for testing to identify a suspect.

37.     Following the interview, an APD police officer took Ms. Nitsch to the hospital for a sexual assault forensic exam.  A victim services counselor arrived at the hospital, and the officer left.

38.     In the weeks and months that followed, Ms. Nitsch never heard from the Police again.  She does not know whether her rape kit was ever tested, or what the results were.  She does not know whether her case was closed and she was never apprised of the status of the investigation at any point.  She does not know whether any investigation was done at all, whether a suspect was identified, or whether the Former DA's or DA's office was ever involved in the process.

39.     Though Ms. Nitsch grew frustrated with the lack of contact from Defendants, she tried to move on.  In the ensuing years, other friends of hers were raped and had similar experiences with the criminal justice system in Travis County.  Two of those friends (who would also be members of the Class had they lived) committed suicide or died of accidental overdoses in the years following their own attacks.

40.     Ms. Nitsch's own experience and the experiences of her friends with Defendants have been so negative, and there has been so little improvement, that she doubts reporting an assault today in Travis County would lead to any meaningful action by Defendants.  She has testified at Austin City Council meetings in support of funding to help address the backlog of

thousands of SAKs in Travis County that have been held, but not tested, for years.  She does not know if her kit is one of those.

        **(3)**       **Named Plaintiff Marina Conner**

41.     On August 9, 2015, Named Plaintiff Marina Conner was a college student at the University of Texas at Austin, and spent the evening on Sixth Street with friends.  She had been drinking, and was with a friend waiting for a ride home when a man approached and offered drugs to them.

42.     Ultimately, the man—who was accompanied by two friends—led Ms. Conner into a nearby parking garage.  There, he slammed Ms. Conner's head and face against the garage wall and raped her both vaginally and anally.

43.     During the attack, Ms. Conner's cell phone called her friend, who did not answer, and the voicemail recorded Ms. Conner's cries for help and screams of resistance.  Ms. Conner also called her best friend, sister, and mother, but none of them answered.

44.     The assailant's friends stood by and watched the physical attack, restraint, and violent rape of Ms. Conner, although they did not otherwise participate in the assault.

45.     After she had been raped and left in the parking garage, Ms. Conner somehow convinced a nearby stranger to drive her home.

46.     Once home, Ms. Conner immediately showered to remove the presence and smell of her attacker.  Ms. Conner told a friend about the attack, and the friend referred her to SAFE, Austin's shelter for domestic violence and sexual assault survivors, and its sexual assault services.  Ms. Conner went to SAFE less than 24 hours after the attack to report the rape and figure out what to do next.

47.     Showering can remove an attacker's DNA from a victim's body, although Ms. Conner did not know that until after she arrived at the shelter.  A nurse examiner performed a sexual assault forensic exam on Ms. Conner.  Pictures were taken of her black eye and head injury. The nurse did not take Ms. Conner's ring from a lip piercing for possible evidence or testing. Ms. Conner, not knowing they would be helpful for possible DNA evidence, had not brought the clothes she was wearing when she was attacked.  The nurse told her not to worry about going home to get them.  The rape kit documentation misspelled her name throughout.

48.     At SAFE, Ms. Conner spoke on the phone to an APD detective, who indicated he would come to meet her.  He did not.  After that, Ms. Conner was reluctant to meet with the detective because he was male and a stranger, and she was traumatized and in shock.

49.     Two days later, Ms. Conner received a text from a number she did not recognize. The sender asked if she was the one he sold cocaine to on the night of the attack.  She said no and then took the message directly to APD, believing it came from her attacker.

50.     Ms. Conner also had the message that was recorded by her friend's voicemail during the rape, in which she was screaming "no" and sobbing.  The detective at APD—while she was very respectful and kind with Ms. Conner—did not feel it was necessary to obtain a copy of that message.

51.     With the phone number from the text message to Ms. Conner, the Police were able to arrange a fake drug deal and arrest her attacker.  After his arrest and upon interrogation about the night of Ms. Conner's assault, he admitted to having sex with her and described her accurately to the Police.

52.     Ms. Conner was told by the Police that her rape kit would be tested and returned within ten months, or around June 2016.  She began calling APD after six months, around February

2016, and again nine months after her rape, around May 2016, and at intervals thereafter, calling anyone and everyone who might listen to her.  She was put off time and again.  As described in more detail below, the APD DNA Lab was temporarily closed in June 2016, after an audit revealed widespread incompetence and failures to adhere to standard protocol in DNA testing.  Ms. Conner was told by Police that the results of her rape kit would not be tested or returned for another year or two following the closure of the lab.  In December 2016, the APD DNA Lab was permanently closed.  When Ms. Conner called APD to inquire about her rape kit, she was told APD had no clue when she would get her results.

53.     In 2017, after the APD DNA Lab had been permanently closed, it was discovered that mold had been allowed to grow on hundreds of SAKs in storage.  Ms. Conner could not find anyone who could or would tell her if her SAK was one of the affected kits.

54.     At one point during her years of calling and pleading for someone to help push her case along, Ms. Conner's rapist "checked in" on Facebook at the University of Texas campus.  As a student at the University of Texas, this plunged Ms. Conner into terror and despair.  She felt incredibly unsafe on campus and grew distracted from her schoolwork, fearing that she would run into her attacker at any moment.  Ms. Conner also began to experience debilitating panic attacks and developed post-traumatic stress disorder.  She was unable to communicate more than one-word sentences to those closest to her; she could not sleep, for fear that every noise she heard was her attacker.  Eventually, Ms. Conner withdrew from school.  After withdrawing, she did not leave bed for days at a time.  She was unable to care for herself, so much so that she developed knots in her hair from the time she laid in bed unable to function.  She felt like her rapist was protected, while she was not.  Finally, she was able to obtain counseling and trauma care, which is helping her to cope.

55.     In 2017, two years after her rape and the ensuing events, Ms. Conner re-enrolled as a student at the University of Texas.  Just before the semester started, she called APD yet again to check on the status of her case.  In a five-minute telephone conversation, the detective informed Ms. Conner that APD and the DA would not be pursuing her case any further because there was no DNA present in her rape kit.  Ms. Conner demanded a meeting with APD and the prosecutor assigned to her case.

56.     Ms. Conner arrived at the meeting with the detective and the assistant district attorney (ADA) prepared with a statement about how much the assault and Defendants' lack of diligence and care in her case had traumatized her over the previous two years.  The ADA told Ms. Conner that her case was not moving forward due to the so-called "CSI effect"—according to the ADA, unless a jury has DNA evidence linking the defendant to the victim, the jury will not convict.

57.     Notably, even though Ms. Conner's rape kit did not have DNA evidence, her rapist acknowledged in text messages to Ms. Conner and in statements to the Police that he had sex with her on the night of the rape and that he had tried to sell her drugs on the street, consistent with her post-incident account to APD.  Moreover, Ms. Conner's physical injuries from the incident, including a bashed forehead and evidence of forcible vaginal and anal penetration, substantiated her account of the non-consensual intercourse.  Nonetheless, Ms. Conner was told that, without DNA, the DA could not—or would not—prosecute her case.

58.     Ms. Conner reached out to the DA's office several additional times over the ensuing months—including calls and messages to DA Moore.  These calls were never returned or even acknowledged.  Ms. Conner became a vocal advocate, speaking at city council meetings and giving interviews, to lend a voice to survivors and future survivors.  Ms. Conner's case has been dismissed, and her rapist walks free with the confidence that he can rape other women with no

repercussions.  There will be no justice for Ms. Conner because the DA's office refuses to try sexual assault cases without DNA evidence.

**B.      Thousands of Women in Travis County Have Been, and Continue to Be, Subjected to the Same Types of Unconstitutional, Discriminatory, and Unfair Treatment by Defendants**

59.      In addition to Named Plaintiffs in this matter, there are thousands of other female victims of sexual assault in Travis County that share the experiences of: (1) being disbelieved, dismissed, and discriminated against when they report the crimes committed against them; and (2) seeing their cases languish for years or be refused/dismissed, despite evidence that could be used to prove the assault or identify the assailant.  Likewise, there are thousands of women whose SAKs were not timely processed or analyzed, or even afforded the minimum diligence of care in storage and handling.  And there are thousands of women in Travis County who have been subjected to Defendants' unconstitutional and discriminatory Policies.  Thousands of women in Travis County have been, and continue to be, impacted because, as alleged in more detail below, Defendants' conduct is systemic.

**(1)      Sexual Assault is a Violent Crime that Disproportionately Affects Women**

60.      A 2012 national study by the Centers for Disease Control and Prevention found that one in five adult American women (or 20%) will be raped in their lifetime.  One in 71 men (or 1.4%) will also be victims of sexual assault.  In Texas, a 2015 study by the Institute on Domestic Violence and Sexual Assault at the University of Texas at Austin found that approximately two in five Texas women (or 40%) will experience sexual violence in their lifetime, with only nine percent reporting it to police.

61.      According to the National Sexual Violence Resource Center and data from the U.S. Department of Justice, 9% of all sexual assault victims are male, while 91% are women.

62.     The numbers in Travis County are similar.

63.     Thus, sexual assault is a violent crime that overwhelmingly impacts women.

**(2)     Sexual Assault is Rarely Prosecuted, Particularly when the Victim is a Woman**

64.     End Violence Against Women International reports that only an estimated 5 to 20% of rapes are reported to police, only 0.4 to 5.4% are prosecuted, and only 0.2 to 5.2% result in a conviction.

65.     The numbers for prosecution and conviction are on the very lowest end or worse than the national average in Travis County, according to Defendants' own data.

66.     According to data gathered by the Travis County Sexual Assault Response and Resource Team (of which all Defendants, other than the DA, are currently  members), between July 2016 and June 2017, APD received 1,268 calls for assistance on sexual assault cases.  Of those cases, 1,161 were investigated, and only 96 arrests were made.

67.     During the same period, the Travis County District Attorney's Office received 224 case referrals for prosecution.  The DA receives referrals from agencies other than the APD, like other police departments in the county and the TCSO.  The DA accepted 77 of those 224 cases for prosecution.  Ten were pled to a lower charge, ten were dismissed in their entirety, eight defendants pleaded as charged, seven pleaded to a different felony, and only one— – a case involving the rape of a male victim by a serial rapist who had previously raped multiple women in Travis County— went to trial.  The rest of the cases remained active after June 30, 2017, but upon information and belief, at least 30 additional cases were dismissed by the DA over the rest of calendar year 2017.

**(3)     Victims of Sexual Assault, Particularly Female Victims of Sexual Assault, Receive Disparate Treatment Relative to Other Violent Crimes**

68.     Women who are victims of sexual assault rely on the statements and commitments made to them by government actors in the criminal justice system, including Defendants.  They

routinely submit to invasive forensic exams, in which samples of tissue are removed from their most intimate areas of the body and pictures may be taken of any part of their naked bodies.  The exam can last hours, and to be helpful to the investigation, in most cases, must be done within 24 hours of the sexual assault and before the victim can shower or take any other steps she may wish or need to cope with the trauma she has experienced.

69.     Victims are then subjected to an interview, which may or may not involve an officer trained in trauma-informed practices, and may or may not involve someone from the department of victim services.  The interview involves difficult and invasive questions, all of which women submit to in order to aid in the investigation, apprehension and prosecution of their attackers.  Despite the trauma that this process itself can impose on already fragile victims, many report going through it in order to protect others who may be subjected to the same assailant.

70.     In the course of these interactions with government officials, female victims of sexual assault routinely confront obstacles that are not present for victims of other violent crime, including:  (1) victim blaming (routinely referred to by the APD, TCSO, the Former Police Chief, the Police Chief, the Sheriff, the Former DA, and the DA as "credibility issues"); and (2) purported consent.  Victim blaming includes, but is not limited to, a focus on the victim's past sexual history, alcohol or drug abuse, clothing worn on the date of the crime, location on the date of the crime, and/or general mental stability both before and after the crime.

71.     With other violent crimes, victim blaming does not occur, nor does the issue of consent arise.  With a homicide, for example, the victim is deceased, and no one routinely questions whether the victim of a burglary was "asking for it."  But female rape victims almost universally encounter those issues when they report the crimes against them.

72.     The story of Travis County serial rapist Saffa Bell, who was finally tried and convicted of sexual assault in November 2017 is just one more example of Defendants' unconstitutional and discriminatory Policies at work, and the disparate impact they have on female victims.

73.     The DA's prosecution of Bell in 2017 was the ***only*** sexual assault case that was taken to trial in Travis County that year.  Bell was tried and convicted for sexually assaulting a man.

74.     But Bell had been repeatedly accused of rape previously by women in Travis County.  At least two women reported being raped by Bell to the Police or the TCSO, prior to his 2015 assault on his male victim.

75.     According to reporting in the Austin American-Statesman based on affidavits in the cases, each of the women identified Bell as her attacker.  One victim met Bell through a dating website and went to his home for dinner in December 2013.  When she refused his sexual advances and went to her car to leave, he grabbed her, dragged her back inside, and raped her.  The woman later identified Bell from a photo array.

76.     In July 2014, Bell assaulted another victim in her sleep. She grew sleepy after drinking a glass of wine that Bell had given her.  When she woke, Bell was gone, her underwear was missing, and a condom wrapper was on the floor.  She had not consented to having sex with anyone.  The property manager of the residence thought it might be Bell after hearing her description of the man.  Bell evidently did maintenance work at the property.  The woman later identified Bell in a photo line-up.  This woman's underwear—which had been missing after the assault—was found in Bell's home, along with an edited recording of the assault of the prior female

victim.  Upon information and belief, a bag full of other underwear from other women—whether willing partners or other victims—was also found at Bell's home.

77.     Despite these earlier, reported assaults on Travis County women in 2013 and 2014, Bell was not tried until he assaulted a male victim in a similar fashion in September 2015.  Bell gave the man a drink that made him sleepy and then sexually assaulted him.  The male victim, an Army veteran with a wife and child, had been doing some work with Bell before going to Bell's home for dinner.

78.     Bell already had a conviction for a prior sexual assault from 1990.  As a result, following his conviction for the assault of his male victim, Bell was sentenced to life in prison, automatically triggered by the second offense.

79.     Upon information and belief, the Former DA and DA did not pursue charges for Bell's two assaults against his female victims in Travis County because they were women.  It was not until Bell assaulted *a man* in Travis County that prosecutors tried him for sexual assault, in 2017.

80.     Though Bell is now in prison, his female victims were not treated with the same respect, urgency, and importance as the Former DA and DA afforded his male victim.  Upon information and belief, concerns about consent were not considered by the Former DA, and are not considered by the DA, when the victim of a sexual assault is male, but those concerns are often used as a pretense to not prosecute cases involving female victims in Travis County.

C.      **The APD's and TCSO's Policies, Customs, and Practices Unconstitutionally Discriminate against Female Victims of Sexual Assault in Travis County**

81.     In the last ten years, APD, TCSO, the Police Chief, the Former Police Chief,[3] and the Sheriff have implemented numerous policies, practices, and customs regarding sexual assault cases that discriminate against women and deprive them of equal protection of the laws.  While these Policies may be visited differently upon different victims, the overall pattern of discrimination against female victims of sexual assault is pervasive and systemic, and results in women being put at risk for additional assault—both already existing victims and the women who will later suffer assaults at the hands of the same perpetrators.  The scope of these Policies is broad, as illustrated by several specific examples.

(1)     **APD, TCSO, the Police Chiefs, and the Sheriff Promote a Culture of Disbelieving, Demeaning, and Ignoring Female Rape Victims**

82.     Upon reporting rape to APD or TCSO, female sexual assault victims are routinely subjected to adversarial questioning about very personal and intimate details of their lives.  Many questions are wholly irrelevant to the crime at hand.  This is in stark contrast to victims of other violent crimes, such as robbery, non-sexual assaults, and attempted homicide.  Upon information and belief, female victims of sexual assault have routinely been asked by APD and TCSO about what they were wearing at the time of the assault, why they were in a particular place at all, whether they had been drinking, and/or whether they use drugs—implying that the victims bear some responsibility for the crimes committed against them.  Likewise, female victims are routinely questioned about their sexual history by APD and TCSO, even where a different suspect or perpetrator has been identified or a stranger is involved.

---

[3] The Police Chief and Former Police Chief are referred to collectively as the "**Police Chiefs**".

83.     Female victims who are raped by acquaintances are subjected to an even greater level of scrutiny by the APD and TCSO.  Officers frequently question the veracity of allegations when the victim knows or is friends with her attacker, and suggest or imply that these assaults— which make up the majority of sexual assaults generally[4]—are somehow less criminal or "real" than those involving strangers.  As described below, this culture has been publicly ratified by the DA.

84.     Despite research demonstrating that rape is a traumatic event and that trauma impacts a victim's ability to cooperate with an ongoing investigation and to remember details of the event with clarity, APD and TCSO officers ignore this information and accuse victims of dishonesty and/or an unwillingness to assist on a case.  Once a victim's credibility is questioned, her likelihood of seeing justice decreases substantially.  Likewise, APD and TCSO have simply stopped investigating cases when victims have not return calls from officers, even if only one or two messages have been left.

85.     Many organizations support and train law enforcement officials about engaging with victims in light of the trauma experienced by sexual assault victims.  A trauma-informed sexual assault investigation acknowledges that victims experience certain responses during and after the assault that make them especially susceptible to victim-blaming.  The trauma could result in the victim not being forthright, having a fragmented memory, experiencing a lack of emotion, and/or delayed reporting.  The trauma-informed approach to sexual assault investigation changes

---

[4] According to the National Crime Victimization Survey, which analyzed data from 2005 to 2011, 78% of sexual assaults were committed by a perpetrator known to the victim—which is to say a family member, friend, or acquaintance.  *See Austin/Travis County Sexual Assault Response and Resource Team Community Needs Assessment*, Sexual Assault Response & Resource Team ("**SARRT**") Coordinator Kristen Lenau (the "**CNA**") at 10, attached hereto as **Exhibit A**.

the way officers respond and investigate and most importantly the way victims are interviewed, and the use of such policies increases the likelihood that victims will report the crime. In fact, a 2006 study found that rape victims with victim-services advocates were 59% more likely to report their assaults to police.

86.     Despite the obvious need for, and benefits of, training regarding trauma-informed care, the APD, TCSO, the Police Chiefs, the Sheriff, the Former DA, and the DA have failed to engage in, and even rejected, trauma-informed approaches to victim interactions. In fact, as part of a recent study in Austin, 66% of law enforcement officers handling sexual assault cases who were interviewed reported that they had not received any training on how to read or interpret the results of a sexual assault forensic exam. One hundred percent of law enforcement officers and prosecutors interviewed for that study stated that there were no ongoing mandatory trainings related to their role in a sexual assault cases versus a different type of case.[5]

87.     Moreover, even when training is offered, there is no expectation or requirement that Defendants' employees participate. For example, upon information and belief, certain APD officers did travel to a training related to sexual assault and trauma held in San Antonio in March 2016. Upon information and belief, grant funds were used to send officers to the training. However, once there, the officers went sightseeing rather than attending the conference. When the issue was raised to the officers' supervisor at APD, he dismissed the complaint and indicated trips like that were one of the "perks of the job."

88.     APD, the Former Police Chief, and the Police Chief also know—from publicly available research—that false reports make up only a fraction of reported sexual assaults, and that the vast majority of victims have indeed endured those crimes. End Violence Against Women

---

[5] *Id.* at 32.

International reports that evidence-based estimates suggest that only 2-8% of allegations are determined to be false (and it is the police who typically decide whether those reports are false). Yet, APD had a wall in its sexual assault unit on which numerous pictures of victims were posted—each one representing a "false report" that officers had unilaterally determined had no merit. Officers posted pictures of these "debunked" female accusers on the wall as a matter of pride, as trophies of their "investigations." Meanwhile, the vast majority of the other 92-98% of reported cases in Travis County either languished or were never presented for prosecution.

89.     APD also routinely uses mutually exclusive excuses to avoid investigating sexual assault cases or presenting them for prosecution. In the event the perpetrator is a stranger, APD relies on the inability to identify the attacker with DNA as a justification for stalled investigations—while thousands of SAKs have sat untested for years. When a victim does know her attacker, APD will often suggest that it is too difficult to establish lack of consent to justify additional investigation or prosecution. Thus, only a thin slice of sexual assaults—those committed by strangers who can be identified by DNA (or in a few cases, witness testimony)—are likely to survive the investigation process. And even then, because SAKs for female victims have not been timely processed or have been mishandled and other Defendants maintain their own discriminatory Policies, prosecution does not occur.

90.     For a number of years, APD also routinely gave a "perjury statement" to female rape victims, warning them of their obligation to tell the truth. Upon information and belief, perjury statements were not routinely given to other crime victims.

91.     APD officers also frequently use terms like "bad victim," "unworthy," and "not credible" in their investigative roles, even with victims themselves. And although APD and TCSO employ victim services counselors, they are not consistently present for detective interviews with

sexual assault victims.  One detective explained the reasoning for not including them in a recent community study by noting that while policy suggests the counselors should be present, he does not include them because "the victims need to be able to handle the interview because the courts are worse."

> **(2)    APD, TCSO, the Police Chiefs, and the Sheriff Prioritize Other Crimes over Sexual Assaults against Women**

92.    Upon information and belief, APD and the Police Chiefs prioritize other types of crimes over sexual assault cases, both with regard to staffing and quality of investigation.  These other crimes do not disproportionately victimize women in the same way that sexual assault does. For example, roughly 91% of sexual assault victims are women.  APD has approximately 17 detectives assigned to sex crimes, and roughly 1,000 new cases per year (according to its own reporting), for which more than 900 are female victims.  In contrast, APD has 12 detectives assigned to its homicide unit to handle the roughly 30 murders that are committed annually.  Upon information and belief, the gender of murder victims is not disproportionately female.

93.    Upon information and belief, TCSO and the Sheriff have a similar allocation of resources.

94.    Additionally, upon information and belief, APD and the Police Chiefs have prioritized sexual assaults committed against men over assaults perpetrated on women.  While only 8% of sexual assault victims are male, fully half of the handful of cases investigated and thereafter taken to trial in the past year or so involved male victims.  The culture at APD supports the belief that a man would not willingly identify himself as a victim of sexual assault unless it were true, while simultaneously focusing on "false reports" and the possibility of implied consent where female victims are concerned—even when the perpetrator is a stranger.

95.     Additionally, upon information and belief, APD and TCSO have historically focused primarily on stranger rape cases and those likely to receive media attention, as opposed to allocating resources for the benefit of all sexual assault victims.

        **(3)     APD and TCSO Do Not Timely and Accurately Process SAKs**

96.     Prior to its closure in December 2016, the APD DNA Lab was plagued with known incompetence and contamination problems.  APD DNA LAB ignored or failed to appropriately investigate complaints of whistleblowers and outside advocates for years, all while amassing a backlog of more than 4,000 untested SAKs—DNA evidence in active sexual assault cases that simply was not being processed.  The legacy of that incompetence remains today.  Upon information and belief, as of the beginning of 2018, more than 1,500 SAKs, which had been waiting more than three to five years for testing, still remained untested.  And although APD has recently stated that all untested SAKs have been submitted for testing, it remains unclear what "submitted for testing" actually means.

97.     When it was in existence, the APD DNA Lab regularly cross-contaminated samples and failed to understand or adhere to current standards related to DNA testing and analysis. Ultimately, after a May 2016 site audit of the APD DNA Lab conducted by the Texas Forensic Science Commission and the American Society of Crime Laboratory Directors/Laboratory Accreditation Board revealed gross incompetence, the APD DNA Lab was temporarily shut down in June 2016, and completely shuttered in December 2016.  The audit established that the APD DNA Lab's personnel were improperly trained, contaminated numerous DNA samples, and failed to conduct any due diligence in hiring.

98.     After the APD DNA Lab was shut down, more than 800 SAKs were discovered to have mold on and inside of them, possibly rendering the DNA unusable.  Moreover, in or around

that same timeframe the door to the refrigeration system at the APD DNA Lab was left open, rendering multiple additional SAKs unusable.

99.     Following the closure of its own lab, APD was forced to locate another lab to which it would "send" its SAKs and other DNA kits (for other crimes) for testing in order to comply with Texas law.  The Department of Public Safety lab (the "DPS Lab") that was ultimately chosen to receive APD's evidence only agreed to test evidence for roughly 30 cases per month.

100.    Upon information and belief, APD prioritized DNA kits related to other crimes over SAKs.   Additionally, upon information and belief, many of the SAKs were not actually sent to the DPS Lab at all, but were instead stored by APD while being "submitted" to DPS under the relevant paperwork—with actual transport and testing to occur at some unspecified time in the future (or in many cases, not at all).  For those SAKs that were actually, physically provided to the DPS Lab, the vast majority were simply stored and not tested with any urgency whatsoever based on DPS's capacity, a fact known to APD when it decided to send the evidence to DPS.

101.    Additionally, APD represented that the SAKs "submitted" to DPS were in the queue to be tested, even while it understood that under the Policies in place and agreed to, most of those kits would ***not*** be tested.  The SAKs were simply being warehoused.  But APD represented to victims, agencies working with sexual assault survivors, and the community that it was rectifying issues related to the backlog of thousands of untested kits in its own APD DNA Lab, while in reality no solution was in place at all—except on paper.

102.    APD knew there were significant problems with the APD DNA Lab by 2011, as a result of Named Plaintiff Smith's case and others like hers.  And a whistleblower was pushed out of the department altogether, although each of her allegations about the APD DNA Lab turned out to be true.  Moreover, the APD DNA Lab determined on its own which evidence to test or prioritize

for a period of time, and typically favored homicide cases over sexual assault cases, although sexual assault cases made up the bulk of its work.

103.     The incompetence at the APD DNA Lab was finally reported in detail in the Final Audit Report for Austin Police Department Forensic Services Division DNA Section. Nonetheless, some of the same employees of APD DNA Lab continue to be employed (although now under the supervision of DPS) at the "new" lab, and their performances continue to be plagued with issues.  Upon information and belief, several DPS employees have terminated their own employment at the DPS Lab—where the former APD DNA Lab employees now work—over frustrations at the lack of competence demonstrated by lab employees.

**D.     The Policies, Customs, and Practices of the Travis County District Attorney's Office Unconstitutionally Discriminate Against Female Victims of Sexual Assault**

104.     The current and immediately prior administrations within the Travis County District Attorney's Office have engaged in numerous discriminatory practices that failed to protect female victims and women in Travis County generally from sexual predators.  Further, the explicit and implicit policies of the Former DA and DA disadvantage female victims of sexual assault and put other women in Travis County at risk.

**(1)     The Travis County DA Presides Over, Promotes, and Perpetuates a Culture of Disbelieving, Demeaning, and Ignoring Female Rape Victims**

105.     DA Moore has stated during at least one community meeting that non-consensual sexual "incidents" involving acquaintances of female victims are really better characterized as "traumatic occurrences" that do not rise to the level of sexual assault.  Moore suggested that these assaults—which make up the majority of rapes and sexual assaults in Travis County—are not criminal, and that the victims just need counseling and medical services as opposed to the

assistance of law enforcement.  DA Moore did not address why women would need counseling and medical services if they had not actually been assaulted.

106.    In the same discussion, DA Moore indicated that rapes involving victims who had consumed alcohol or drugs are generally not prosecutable as criminal acts, either, confirming the discriminatory practice of the DA to blame a victim, rather than seek justice on her behalf.

107.    Similarly, DA Moore has responded to publicity about the backlog of SAKs awaiting testing by confirming her intention to not seek justice for the victims represented by those 4,000 kits.  DA Moore was quoted in the Austin American-Statesman as saying, "The most important thing is [the mold] didn't affect the disposition of these cases.  There's a backlog, but that backlog is caused because these aren't high enough priority to be fed into the capacity we currently have.  It's only for informational purposes; it's not for prosecution."  This statement bluntly establishes that, for 4,000 victims of rape in Travis County, the DA does not view them as a "high priority" and has already determined not to seek justice before the DA even knows what evidence might exist to do so.

108.    Such statements openly confirm the discriminatory Policies of Defendants and explain why female victims of sexual assault in Travis County can only expect to see a case tired to verdict in a tiny fraction of cases.  For 2017, that was 1 in about 1,000 reported sexual assaults— or only one-tenth of one percent of cases.  And that case involved a male victim.

109.    Prosecutors also frequently cite the "CSI effect" as a reason they cannot take a case to trial, referring to a perception that juries will not convict without DNA evidence.  However, this justification has been used even when DNA is present, and even when the perpetrator has been confirmed through other forms of evidence.  In the case of Named Plaintiff Conner detailed above,

prosecutors cited this "CSI effect" as a justification for dismissal even when the perpetrator **admitted** via text and to Police that he had engaged in sex with the victim.

110.    Prosecutors also routinely dismiss cases due to purported credibility issues, which apparently only arise with female victims.  Upon information and belief, the case taken to trial in November 2017 (involving a male victim) was at least the fifth time the rapist had attacked. Prosecutors were overheard discussing at trial that they could not take the other prior cases—all of which involved female victims—to trial because a jury would not believe that women who knew the attacker did not consent, and because the other victims did not have credibility because they were sex workers.  Prosecutors also regularly refer to female victims as "unworthy" or "bad victims" during the criminal justice process.

111.    Prosecutors also routinely inform female victims that they will not pursue cases against their attackers because they cannot prove that the victim did not consent, despite the fact that the victims themselves would so testify.

112.    As reflected by each of the Named Plaintiff's experiences, female victims of sexual assault have historically waited years before their cases were disposed of or tried by the Former DA or DA's office.  Because of the negative perception in the victims' services community with regard to the extraordinary amount of time sexual assault victims spend in limbo, DA Moore's administration sought to move cases faster—which was accomplished by simply dismissing more cases almost immediately.  Upon information and belief, several cases in the past year have been dismissed within 6-8 weeks of the victim's **report** being made.

(2)     **The DA's Office Prioritizes Investigation, Processing, and Prosecution of Other Crimes over Investigation, Processing, and Prosecution of Sexual Assaults against Women**

113.     DA Moore's dismissive and discriminatory remarks about female sexual assault victims in Travis County are not simply words.  They reflect the flawed and discriminatory system over which she presides, and over which her predecessor presided.  The systemic discrimination inflicted upon female victims of sexual assault is pervasive.

114.     For example, upon information and belief, one prosecutor at the DA is dedicated to sexual assault cases involving acquaintances of the victims (as opposed to stranger rape).  This prosecutor maintains a caseload of roughly 25 cases at any given time.  Upon information and belief, the DA has not tried any cases from this dedicated caseload since the position was created, despite the fact that more than 70% of the sexual assaults reported annually involve acquaintance attacks, or roughly 700 per year in Austin.  Upon information and belief, although there is only one such prosecutor, the DA refers to this prosecutor as "the unit."

115.     Similarly, law enforcement officials in Travis County are generally authorized to file charges against perpetrators.  However, law enforcement officials must present a sexual assault case to the DA for consideration once an investigation is far enough along to support the charges, and do not independently decide whether to file charges.  Once presented, the DA either accepts and staffs the case with a prosecutor, refuses the case, or informs law enforcement that it will not proceed unless additional evidence is secured.  Upon information and belief, this submission to the DA is somewhat unique to sexual assault claims—for most other types of crimes, APD files charges themselves rather than seeking approval from the DA.[6]  Of 56 case referrals received between July and December 2017, only 23 were accepted by the DA for prosecution.

---

[6] Upon information and belief, this process also existed under the Former DA.

116.     Moreover, upon information and belief, when cases are referred to the DA, taken to the grand jury and "true billed," or approved for indictment, no one serves the warrants that are issued or takes steps to locate and arrest the perpetrators.  Essentially, for sexual assault cases, after warrants are issued as a result of the grand jury's findings, they do not go to APD or constables to be served, and instead linger until the perpetrator is arrested for another crime.[7]

117.     Likewise, upon information and belief, when a prosecutor raises "credibility issues" with a victim (essentially blaming her) and the victim became an advocate for her own case, the DA's office will take the case to the grand jury with little to no effort, knowing that without the backing of the DA's office, the grand jury will not indict and will "no bill" the case, providing the DA's office with cover for not moving forward with the prosecution.[8]

118.     Once assigned by the chief prosecutor of a particular court to an ADA to handle the case, a sexual assault file may sit dormant for months or years without receiving any attention or action by that prosecutor.  There is no mechanism in place at the DA's Office to ensure sexual assault cases are not ignored for extended periods of time, or that they are actively prosecuted at all.

119.     Upon information and belief, the general practice at the DA's Office is to ignore sexual assault cases in favor of others.  Prosecutors prefer not to take them to trial because they are perceived as harder to win than other types of cases.  In fact, prosecutors interviewed for a recent community needs assessment for Austin/Travis County (the "**CNA**") repeatedly raised the need for training on prosecution strategies for sexual assault cases, particularly overcoming the "consent defense."[9]  The Former DA did not, and the DA does not, provide this training.  Adding

---

[7] Upon information and belief, this process also existed under the Former DA.

[8] Upon information and belief, this process also existed under the Former DA.

[9] *See* CNA at 33.

insult to injury, the DA does offer and conduct a seminar *to others* about how to prosecute a sexual assault case—it just does not actually prosecute very many of those cases itself.

120.    Moreover, upon information and belief, the prosecutors who handle sexual assault cases avoid talking with the victims at all unless absolutely necessary, despite receiving calls and questions regularly from those victims, who are predominantly women.

121.    Additionally, upon information and belief, the Former DA and the DA have prioritized sexual assaults committed against men over assaults perpetrated on women.  While less than 8% of sexual assault victims are male, fully half of the handful of cases investigated and thereafter taken to trial in the past year or so involved male victims.  The culture at the DA supports the belief that a man would not willingly identify himself as a victim of sexual assault unless it was true, while simultaneously focusing on "false reports" and the possibility of implied consent where female victims are concerned—even when the perpetrator is a stranger.

122.    The DA's Office frequently explains away the disproportionate number of dismissals and its decision not to indict most sexual assault cases as the result of independent and individualized decisions with regard to each particular case.  However, upon information and belief, the DA has no systematic approach to ensuring sexual assault cases are actually processed or prosecuted, no decision-making framework to ensure cases are treated appropriately and that female sexual assault victims do not see their cases dismissed in greater numbers as compared to other crimes (or compared to sexual assault cases involving male victims), and no guidelines or requirements as to the timelines associated with sexual assault cases, or the appropriate use of discretion for dismissal.[10]

---

[10] Upon information and belief, no such processes existed under the Former DA.

123.    Upon information and belief, prior to DA Moore assuming her position in 2017, she reached out to community leaders who work with sexual assault survivors to determine which prosecutors in her office were the most knowledgeable and skilled at handling sexual assault cases. After receiving similar lists from several people, Moore actively decided to "not retain" the majority of the prosecutors who had been identified as the best by the sexual assault services leaders in the community.  Eighteen prosecutors were "not retained."

**E.    Defendants Knew, or Should Have Known, Their Conduct and Policies are Unconstitutional, Discriminatory, and Unfair to the Women of Travis County.**

124.    Historical data and information provided by Defendants themselves confirm the existence of a number of the Policies that discriminate against women who are victims of sexual assault in Travis County, and the harm caused by those Policies.

125.    For example, the City of Austin's own Human Rights Commission confirms many of the facts alleged in this Complaint in its Board/Commission Recommendation Number 20180122-5(A) "Women's Equity in Austin," which was approved by a 9-0 vote on January 22, 2018.  The Board/Commission Recommendation specifically notes that the failure to timely process SAKs, "harms sexual assault victims and society at large in a variety of ways,"[11] including:

- Sexual assault victims may fear for their own and/or for other persons' safety if their attacker remains unidentified or at large;

- Society is harmed because the failure to identify and prosecute those rapists who are serial offenders logically results in the commission of more crime

---

[11] *Board/Commission Recommendation Number:  20180122-5(A) Women's Equity in Austin*, Human Rights Commission, City of Austin (approved Jan. 22, 2018), at 13, attached hereto as **Exhibit B**.

than would have otherwise been the case had the authorities completed rape kit analysis shortly following the time of the sexual assault;

- Sexual assault victims who must wait for months and years on end to learn the outcome of their rape kit processing may experience frustration, anger, distrust, disillusionment, and a variety of negative personal feelings towards law enforcement and government officials; and

- Members of society at large may experience similar feelings which could potentially result in greater reluctance to come forward in cases of sexual assault and/or to submit to rape kit evidence collection.[12]

126.    The Policies implemented both explicitly and implicitly by the Defendants result in the same consequences and more.  The Policies have injured, and continue to injure, the Named Plaintiffs and the Class by depriving them of their constitutional rights to equal protection of the law, and to be free from gender discrimination by the state.

127.    Similarly, during a 2017 presentation, the APD and the DA provided data that confirms the remarkably low apprehension and prosecution rate in cases of sexual assault against women.  During the presentation, the APD and the DA gave a breakdown of 113 sexual assaults that were reported from January to March 2015.[13]  Only 10 of the sexual assault cases—or less than 9%—led to arrests, the data showed.  Of the 103 remaining cases, in 49 of them, the DA's Office said it did not have enough evidence to make a case, in 40 cases the APD suspended the case allegedly because the victims did not want the Police to pursue the case, and 12 cases were

---

[12] *Id.* at 14.

[13] APD and the DA chose this three-month period to look at a sample of cases that had spent some time in the criminal justice process.

awaiting DNA evidence results.  Of the 10 cases that led to arrest:  (1) four of the cases led to charges other than sexual assault, aggravated sexual assault, criminal trespass, and harassment, (2) one case was dismissed, (3) one case was still pending awaiting DNA evidence, (4) one case was pending in court, (5) one perpetrator was sentenced to three years in prison, and (6) one perpetrator took a plea deal and served 120 days in jail.

128.    Moreover, upon information and belief, Defendants have manipulated reported data regarding the number of investigations and case dispositions for public view following criticism of their failings.

129.    Since 1992, a collaborative group of agencies called the Sexual Assault Response & Resource Team ("SARRT") has convened in Austin and Travis County.  The stated mission of the SARRT, is "to enhance the local response to post-pubescent adolescent and adult sexual abuse and assault by ongoing collaboration, training and coordination among the agencies charged with responding to these crimes."  Defendants have been members of this organization since its founding.  In 2017, DA Moore refused to continue participating in the SARRT, after her office was publicly criticized by SARRT leaders.[14]

130.    The public criticism of APD and the DA occurred after SARRT members raised a series of issues that seemed to have occurred on a continuing basis—some detailed in this Complaint—that resulted in a miscarriage of justice for rape victims and a shockingly low prosecution rate of those victims' cases.  Many of those criticisms were published in a 2018 document entitled "Austin/Travis County Sexual Assault Response and Resource Team Community Needs Assessment" (the "**CNA**").  The CNA was published by SARRT, pursuant to

---

[14] After leaving SARRT, DA Moore then formed her own similar group, excluding the agencies and individuals who had criticized the Defendants.

a grant received from the Office on Violence against Women at the U.S. Department of Justice. Over 15 agencies and entities participated and contributed data for the CNA, including the Defendants.

131. Key findings of the CNA include that systemic issues, like the length of the criminal justice process, were cited by professionals as the most common reasons for victim attrition. The second most common reason cited was "trauma and revictimization"—by law enforcement and criminal justice practices and professionals.

132. The CNA recommendations include many items that have been ignored by the Defendants for decades: implementation of mandatory, agency-funded training on sexual assault dynamics, trauma-informed responses, forensic exams, lab reports, and investigation/prosecution strategies for all personnel investigating and prosecuting sexual assault. Other recommendations include that law enforcement agencies should individually undertake annual or biannual sexual assault case reviews to identify challenges, trends, and opportunities for process improvement and that criminal case outcomes must be clearly documented and communicated to stakeholders, including closure decisions. These recommendations apply directly to the ongoing problems created and perpetuated by Defendants' Policies.

133. A civil attorney participating in an interview for CNA remarked that "it seems like the entire investigative process is a trial against the victim from day one. That's why people don't want to come forward." The Named Plaintiffs in this case concur; not one of them would have come forward had she known the discriminatory and unfair treatment that awaited her.

134. On April 27, 2018, the Austin American-Statesman posted an article in its online content titled "Travis County sex assault cases yield few convictions, lack resources." The article dealt with the release of the CNA, and discussed the low rate of prosecution for sexual assaults in

Travis County, as well as the fact that almost 1,000 sexual assaults were reported in a one year period. The data contained in the CNA was derived from reporting required of APD and the DA for their grant funding from the Office of Violence against Women. The article was removed from the Statesman's website within several hours of publication.

135.    Roughly two weeks later, a similar article appeared in the Austin American-Statesman's print edition, on May 7, 2018. However, the new article contained different numbers and explanations offered by Defendants for the reporting, which portrayed APD and the DA more favorably. This article suggested that the number of reported sexual assaults in a one year period was actually only 447. In the new article, a representative from the DA stated that victims deciding not to pursue charges was the primary reason for the low prosecution and conviction rates.

**F.    Named Plaintiffs and the Class have been Injured by Defendants**

136.    At all times relevant hereto, Named Plaintiffs and the members of the Class have been and are being continuously harmed by Defendants' ongoing unconstitutional Policies described above. Such customs and practices constitute continuing uninterrupted tortious conduct by Defendants.

137.    At all times relevant hereto on and on each day that passes, Named Plaintiffs and the members of the Class sustain a new injury as a result of Defendants' unconstitutional Policies and conduct described above.

138.    Named Plaintiffs and the members of the Class have suffered emotional distress and psychological damage as a result of Defendants' ongoing conduct.

**G.      Limitations are Tolled in this Case**

139.     The facts related to Defendants' Policies and conduct that impacted and discriminated against Named Plaintiffs and the Class were fraudulently concealed from and/or inherently undiscoverable to Named Plaintiffs the Class.

140.     Thus, the discovery rule, fraudulent concealment, and equitable tolling principles apply to any applicable limitations period.

## V.      CLASS ALLEGATIONS

141.     Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), Named Plaintiffs bring this class action on behalf of themselves and the Class, including the Subclasses.

142.     The exact number of the Class and each Subclass is not presently known, but upon information and belief, the Class includes approximately six thousand (6,000) women.  Therefore, under Federal Rule of Civil Procedure 23(a)(1), the Class and each Subclass are so numerous that joinder of individual members in this action is impracticable.  All members of the Class and each of the Subclasses are known to Defendants.

143.     There are common questions of law and fact in the action that relate to and affect the rights of each member of the Class and each of the Subclasses that will generate common answers that will drive resolution of this action.  Further, the relief sought is common to the entire Class, as all members of the Class are victims of Defendants' unconstitutional conduct.  Accordingly, pursuant to Federal Rule of Civil Procedure 23(a)(2), there are questions of law and fact common to the Class.

144.     Named Plaintiffs' claims are typical of the Class they represent pursuant to Federal Rule of Civil Procedure 23(a)(3) because Named Plaintiffs claim that Defendants violated the

rights held by the Class under the Fourteenth Amendment to the United States Constitution, Texas Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 1985, and state law.  There is no conflict between Plaintiffs and any other Putative Class Members with respect to this action.

145.    Named Plaintiffs are adequate representatives of the Class and each Subclass pursuant to Federal Rule of Civil Procedure 23(a)(4).  The interests of the Named Plaintiffs do not conflict with the interests of the Class and Subclasses that they seek to represent, and Named Plaintiffs will fairly and adequately represent the Class and Subclasses.  Moreover, Plaintiffs intend to prosecute this action vigorously.  Therefore, Named Plaintiffs should be appointed representatives of the Class and the Subclasses.

146.    This action is properly maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(a)(A) or 23(b)(1)(B) because the prosecution of separate actions by individual members of the Class or Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class or Subclasses that, as a practical matter, would be dispositive of the interests of other Class or Subclass members not party to the adjudication, or would substantially impair or impede the ability of other Class or Subclass members to protect their interests, or would establish incompatible standards of conduct and results for Defendants.

147.    This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, thereby making appropriate final injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

148.    This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class and Subclasses

predominate over individual questions for the members of the Class and Subclasses, and a class action is superior to other available methods for the fair and efficient adjudication of this case.

149.   The questions of law or fact common to the Class include:

a.   Whether the Policies were implemented by each of the Defendants;

b.   Whether Defendants' actions, patterns of behavior, history of decision-making, and departures from normal procedures in the treatment of female victims of sexual assault evidence ongoing, intentional discrimination against the Class on the basis of gender;

c.   Whether the Defendants' Policies constitute policies or customs that violated constitutionally protected rights of the Class under 42 U.S.C. § 1983; and

d.   Whether the Defendants implemented the Policies with deliberate indifference to the civil and constitutional rights of the Class.

150.   This action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The class action presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

151.   Named Plaintiffs have retained counsel for themselves and the Class and Subclasses that are experienced and capable in the field of constitutional law and class action litigation and have been recognized as knowledgeable, capable counsel who have carried out their duties.

# VI.   CLAIMS FOR RELIEF

**COUNT 1:  Violations of Equal Protection – 42 U.S.C. § 1983**

152.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

153.   At all relevant times herein, Defendants acted under color of law.

154.   At all relevant times herein, Defendants followed written and/or unwritten and Policies, and thus afforded less protection to female victims of sexual assault than to victims of other crimes, including the Named Plaintiffs and members of the Class and each of the Subclasses.

155.   As described more fully above, Defendants have policies, practices, and/or customs that:

a.   Fail to properly train and supervise employees handling sexual assault cases or evidence;

b.   Allocate more resources to other violent crimes than to sexual assault against female victims;

c.   Fail to submit and/or test most of the SAKs sent to law enforcement offices;

d.   Prioritize the submission or testing of DNA evidence from other violent crimes over SAKs;

e.   Purposely and/or knowingly use or contract with labs that do not have the capacity to timely and properly test and/or analyze the SAKs;

f.   Purposely and knowingly and/or knowing use labs with known contamination and incompetence issues to test and/or analyze DNA from SAKs;

g.   Ignore or refuse to use SAKs results to prevent additional rapes and sexual assaults;

h.   Knowingly omit from communications with victims of sexual assault that it is unlikely their SAKs will be timely tested and that the investigation would not be completed in the absence of those results;

i.   Fail to arrest and charge known perpetrators of sexual assault against female victims;

j.   Disproportionately dismiss cases or refuse to prosecute sexual assault cases when the victim is female;

k.   Re-victimizing women by refusing to treat their testimony as adequate evidence regarding lack of consent;

l.   Over-emphasize or focus on unfounded professed concerns about lack of DNA or credibility, when such concerns: (a) are not applied to other crimes, like robbery, non-sexual assault, and homicide; or (b) to sexual assaults committed against male victims;

m.   Intentionally subjecting women to invasive collection of DNA with actual or constructive knowledge that such DNA would never be used to apprehend or convict their attackers;

n.   Subject victims and other women to future assaults by failing to act on, investigate, or prosecute prior sexual assaults;

o.   Disproportionately refuse prosecution in cases involving sexual assault against female victims without DNA evidence;

p.   Treat sexual assault cases involving female victims without the same urgency and importance afforded to other types of crimes;

q.      Inadequately staff investigations and prosecutions of sexual assault cases; and

r.      Treat female victims of sexual assault without the same respect and attention to their cases as male victims, as applied to both sexual assaults and other crimes.

156.    The injuries to the Named Plaintiffs, the Class, and each of the Subclasses are the result of the unconstitutional Policies.

157.    Defendants acted with a discriminatory motive in pursuing the Policies.

158.    In addition, Named Plaintiffs, the Class, and each of the Subclasses assert a claim of class-based discrimination based on sex.

159.    Defendants have established Policies that provide less protection to female rape victims than to other victims of assault.

160.    Defendants' Policies are sex and gender-based and their adverse effects reflect invidious sex and gender-based discrimination.

161.    Defendants' Policies, which discriminate against victims of sexual assault, adversely affect women.

162.    Defendants' Policies have both an adverse impact and a discriminatory purpose.

163.    Defendants, with deliberate indifference, failed to train their officers, prosecutors, and sheriffs as to the rights of female victims of rape and/or sexual assault, including but not limited to, Named Plaintiffs, the Class, and the Subclasses.

164.    Defendants' deliberate indifference, and willful and wanton conduct created a danger of an increased risk of harm of sexual abuse of females, and/or fostered an environment in which female victims are sexually abused and/or in fear of sexual assault.

165.    Defendants' deliberate indifference and willful and wanton conduct created a danger of an increased risk of harm to female victims of sexual abuse, by failing to investigate rape and/or sexual assault crimes.

166.    Defendants' deliberate indifference, and willful and wanton conduct created a danger of an increased risk of harm to female victims of sexual abuse, by fostering an environment whereby the perpetrators of sexual assault were allowed to continue to prey on victims without fear of investigation by the police.

167.    At all relevant times hereto, Defendants treated the Named Plaintiffs and the members of the Class and each of the Subclasses disparately as compared to similarly situated adult males.

168.    Defendants' conduct was motivated by the sex of the Named Plaintiffs and the sex of the members of the Class and each of the Subclasses.

169.    Defendants' Policies targeted females.

170.    Defendants' Policies have no rational basis and do not bear a substantial relationship to an important governmental objective.

171.    Defendants' conduct was intentional and due to the female sex of the Named Plaintiffs and the female sex of the members of the Class and each of the Subclasses.

172.    Defendants have a history of discriminating against females.

173.    At all relevant times hereto, the victims from whom the Defendants obtained the evidence contained in the SAKs are overwhelmingly of the female sex.

174.    At all relevant times hereto, the victims of crimes of non-sexual assault, robbery, and homicide subject to the jurisdiction of the Defendants include many more men.

175.    Defendants use their monetary resources to investigate and process and test evidence in crimes involving non-sexual assault, robbery, and homicide, but did not and do not properly use their resources to investigate, process, test, and prosecute evidence in crimes involving sexual assault.  Defendants had, and have, a policy of selective enforcement deliberately based upon the unjustifiable standard of gender.

176.    Defendants, instead of using their monetary resources to test the SAKs submitted by women, chose over the years to use their monetary resources to purchase storage space/bins for the SAKs and to simply warehouse them without notice to the victims tested.

177.    At all relevant times hereto, Defendants did not submit the SAKs for testing because of the victims' sex.

178.    At all relevant times hereto, Defendants provided government services to male victims of crimes but provided barely adequate or inadequate government services to female victims of sexual assault, affording a lower standard of service to women.

179.    Defendants violated the civil rights of the Named Plaintiffs and the members of the Class and each of the Subclasses by: (1) having express Policies that, when enforced, caused a constitutional deprivation to Named Plaintiffs and the members of the Class and each of the Subclasses; or (2) having a widespread practice and/or custom that, although not authorized by written law or express municipal policy, was so permanent and well-settled as to constitute usage with the force of law.

180.    The constitutional injury inflicted by Defendants was caused by persons with final policymaking authority for Defendants.

181.    Defendants knew about the described conduct and facilitated it, approved it, condoned it and/or turned a blind eye to it.

182.    The above described conduct of Defendants constitutes a violation of 42 U.S.C. § 1983.

183.    Named Plaintiffs and the members of the Class and each of the Subclasses are entitled to compensatory damages and other non-pecuniary losses.

184.    As a direct and proximate result of Defendants' actions, Named Plaintiffs and the members of the Class and each of the Subclasses suffered deprivation of their constitutional rights.

**COUNT 2:  Violations of the Fourth Amendment – 42 U.S.C. § 1983**

185.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

186.    At all relevant times herein, Defendants acted under color of law.

187.    At all relevant times herein, medical personnel who performed the SAKs testing on the Named Plaintiffs and the members of the Invasive Testing Subclass were either government actors or acting at the direction of Defendants and thus were effectively acting as agents of the government for Fourth Amendment purposes.

188.    The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the state.

189.    The SAKs performed, including but not limited to any taking of blood, urine, or DNA samples, on the Named Plaintiffs and members of the Invasive Testing Subclass constituted a warrantless search as it was an intrusion below the bodily surface and constituted a search of the Named Plaintiffs' and the Invasive Testing Subclass members' person within the meaning of the Fourth Amendment.

190.    Named Plaintiffs and the members of the Invasive Testing Subclass have both property rights and the right of privacy in their biological materials.

191.     The SAKs performed on Named Plaintiffs and the members of the Invasive Testing Subclass implicates the Fourth Amendment at two independent stages:  (1) performance of the SAK; and (2) retention of the genetic material obtained during the SAKs.

192.     Defendants subjected Named Plaintiffs and the members of the Invasive Testing Subclass to objectively unreasonable searches and seizures that violated the Named Plaintiffs' and Invasive Testing Subclass members' constitutional rights under the Fourth Amendment.

193.     Named Plaintiffs and the members of the Invasive Testing Subclass did not voluntarily consent to the warrantless SAKs.  Specifically, any alleged consent obtained by Defendants at the time of the searches was not voluntary.

194.     Any alleged consent by Named Plaintiffs and the members of the Invasive Testing Subclass was not voluntary because they were deceived into providing such consent.  Named Plaintiffs and the members of the Invasive Testing Subclass were under the reasonable beliefs that: (1) the search was being performed in order to obtain DNA and other evidence for the purposes of identifying, apprehending and prosecuting assailants; and (2) the physical evidence would be tested as part of an investigation by Defendants.  An objectively reasonable person in Named Plaintiffs' and the Invasive Testing Subclass members' situation would have likely understood that the consent to search was for the purpose of obtaining physical evidence that would actually be tested in order to be used in an investigation and prosecution.  Named Plaintiffs and the members of the Invasive Testing Subclass did not give consent to the genetic testing as they had no knowledge and were not informed that Defendants deliberately and recklessly intended to ignore the genetic evidence obtained, had no intention of ever submitting the genetic materials obtained for genetic testing, had no intention to use the SAKs results in any investigation, and instead merely intended and knew that they would most likely indefinitely retain Named Plaintiffs' and the

Invasive Testing Subclass members' genetic information.  Named Plaintiffs and the members of the Invasive Testing Subclass were unable to give informed consent for the SAKs testing because they lacked knowledge that no investigative purpose was being served by the testing and did not understand that the test was not being conducted for the law enforcement purpose of obtaining evidence to be used in the investigation of a crime and prosecution of the perpetrator.  Because of Defendants' intentional failure to submit Named Plaintiffs' and the Invasive Testing Subclass members' SAKs for proper DNA testing, any alleged consent by Named Plaintiffs and the members of the Invasive Testing Subclass was not objectively reasonable and Defendants violated Named Plaintiffs' the Invasive Testing Subclass members' Fourth Amendment rights against unreasonable search and seizure.

195.    Any alleged consent by Named Plaintiffs and the members of the Invasive Testing Subclass was not voluntary and/or was invalid due to Named Plaintiffs' and the Invasive Testing Subclass members' vulnerability or mental condition given the trauma experienced during their sexual assaults.

196.    Any alleged consent by Named Plaintiffs and the members of the Invasive Testing Subclass was invalid because the SAKs as implemented by Defendants exceeded the scope of the consent provided by Named Plaintiffs and the members of the Invasive Testing Subclass.  Named Plaintiffs and the members of the Invasive Testing Subclass consented to SAKs that would be tested and used to investigate and prosecute their offenders.  Because of Defendants' intentional failure to submit Named Plaintiffs' and the Invasive Testing Subclass members' SAKs for proper DNA testing, the SAKs as implemented by Defendants exceeded any alleged consent obtained by Defendants, and Defendants violated the Fourth Amendment rights against unreasonable search and seizure of Named Plaintiffs and the members of the Invasive Testing Subclass.

197.    Defendants' indefinite retention of the genetic material obtained from Named Plaintiffs and the members of the Invasive Testing Subclass constitutes an unreasonable continued seizure under the Fourth Amendment.

198.    As a result of Defendants' misconduct, Named Plaintiffs and the members of the Invasive Testing Subclass suffered physical and emotional injuries and other damages.

199.    Defendants' misconduct described herein was objectively unreasonable and undertaken with malice, willfulness, and reckless indifference to the rights of others.

**COUNT 3:  Violations of the Fifth Amendment – 42 U.S.C. § 1983**

200.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

201.    The SAKs performed, including but not limited to any taking of blood, urine, or DNA samples, on the Named Plaintiffs and the members of the Invasive Testing Subclass constituted a taking as it was an intrusion below the bodily surface and took biological material of Named Plaintiffs' and the Invasive Testing Subclass members' person within the meaning of the Fifth Amendment.

202.    Named Plaintiffs' and the Invasive Testing Subclass members' genetic or biological material in the SAKs constitutes their property.

203.    Because Defendants have and are retaining the SAKs, Named Plaintiffs' and the Invasive Testing Subclass members' genetic material contained in the SAKs constitute *per se* takings.

204.    If Defendants had timely and appropriately submitted the SAKs for proper DNA testing and/or analysis, the taking of the biological material of Named Plaintiffs and the members of the Invasive Testing Subclass would provide appreciable benefits to the community, including but not limited to, the public purpose of promoting safety among members of society.  Defendants

failed to effectuate the taking for any public use because they failed to timely and accurately test and/or analyze the genetic evidence and other collected materials, much less use them to facilitate the investigation and prosecution of the individuals that committed the sexual assaults against the Named Plaintiffs and the members of the Invasive Testing Subclass.

205.     By retaining and not timely and accurately testing and/or analyzing SAKs collected from Named Plaintiffs and the members of the Invasive Testing Subclass, Defendants are unlawfully taking property owned by Named Plaintiffs and the members of the Invasive Testing Subclass in violation of the Fifth Amendment.

206.     Taking Named Plaintiffs' and the Invasive Testing Subclass members' genetic evidence and leaving it untested is not rationally related to the governmental or statutory purpose of collecting such evidence, because if untested, the SAKs do not provide evidence of a sexual offense, do not aid in the investigation of a crime, and do not facilitate the prosecution of the individuals that committed the sexual assaults.

207.     As a result of Defendants' misconduct, Named Plaintiffs and the members of the Invasive Subclass suffered physical and emotional injuries and other damages.

**COUNT 4:  Conspiracy to Violate Civil Rights – 42 U.S.C. § 1985**

208.     Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

209.     As to each of the above causes of action, by the facts set out herein, Defendants, in whole or part, conspired to interfere with the civil rights of the Named Plaintiffs and the members of the Class and each of the Subclasses in violation of 42 U.S.C. § 1985 by, among other things: (a) concealing the lack of SAKs testing and the delays in SAKs testing; and (b) keeping officers and prosecutors of the City of Austin and Travis County and others from: (1) performing their duties related to the sexual assaults committed against the Named Plaintiffs and the members of

the Class and each of the Subclasses; (2) timely and accurately testing and/or analyzing SAKs; and (3) testifying, or otherwise hindering such testimony, regarding SAKs.

210.   Defendants conspired for the purposes of: (a) depriving Named Plaintiffs and the members of the Class and each of the Subclasses of equal protection of law; or (b) hindering others from giving or securing equal protection of law to all persons, damaging Named Plaintiffs and the members of the Class and each of the Subclasses as alleged herein.

**COUNT 5:  Negligence**

211.   Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

212.   When Defendants, through their agents, voluntarily assume a protective duty toward a certain member of the public and undertake action on behalf of that member, thereby inducing reliance, they are held to the same standard of care as a private person or organization.

213.   Breach of duty may be an affirmative act that places the person in peril or increases the risk of harm, or may constitute an omissions or failure to act.

214.   Defendants are liable when investigating law enforcement officials fail to investigate properly or fail to investigate at all, and when law enforcement officials induce reliance on a promise, express or implied, that they will provide assistance, but do not do so.

215.   Defendants assumed the responsibility of properly investigating the sexual assaults perpetrated on Named Plaintiffs and the members of the Class and each of the Subclasses by inducing them into submitting to the investigative process and/or the physical examination required by SAKs.

216.   Defendants contributed to, increased, and changed the risk that would have otherwise existed to Named Plaintiffs and the members of the Class and each of the Subclasses by inducing them into submitting to the investigative process and/or the physical examination

required by SAKs testing, and then taking possession of any genetic evidence obtained and retaining all obtained evidence indefinitely without testing and/or analysis or otherwise using it in any investigation.

217.    Had Named Plaintiffs and the members of the Class and each of the Subclasses not relied upon Defendants to properly investigate sexual assaults and/or submit the evidence obtained from SAKs for testing and/or analysis, they could have had genetic testing performed themselves and could have pursued alternative or additional investigatory options.

218.    Named Plaintiff's and the Class and Subclass members' detrimental reliance on Defendants, Defendants' voluntary assumption of the duties described herein, and Defendants' conduct and statements induced a false sense of security and thereby worsened Named Plaintiffs' and the Class and Subclass members' positions and violated Defendants' duty owed to Named Plaintiffs and the Class and Subclass members.

219.    Defendants authorized, tolerated as an ongoing institutional practice, and ratified the misconduct of others, including other Defendants by (including, but not limited to):

a.    Refusing to implement and/or ignoring proper training and supervision of government employees handling sexual assault cases or evidence;

b.    Allocating more resources to other violent crimes than to sexual assault;

c.    Failing to submit and/or timely test SAKs;

d.    Prioritizing the submission or testing of DNA evidence from other violent crimes over SAKs;

e.    Purposely and/or knowingly using or contracting with labs that do not have the capacity to timely and accurately test and/or analyze SAKs;

f.      Purposely and/or knowingly using labs with known contamination and incompetence issues for the testing and/or analysis of the SAKs;

g.      Ignoring or refusing to use SAKs results to prevent additional sexual assaults;

h.      Knowingly omit from communications with victims of sexual assault that it is unlikely their SAKs will be tested and that the investigation will not be completed in the absence of those results;

i.      Failing to arrest and charge known perpetrators of sexual assault against female victims;

j.      Disproportionately dismissing cases or refusing to prosecute sexual assault cases when the victim is female;

k.      Re-victimizing women by refusing to treat their testimony as adequate evidence regarding lack of consent;

l.      Over-emphasizing or focusing on unfounded professed concerns about lack of DNA or credibility, when such concerns are not applied to: (a) other crimes, like robbery, assault, and homicide; or (b) to sexual assaults committed against male victims;

m.      Intentionally and/or knowingly subjecting women to invasive collection of DNA with actual or constructive knowledge that such DNA would never be used to apprehend or prosecute their attackers;

n.      Subjecting victims and other women to future assaults by failing to act on, investigate, or prosecute prior sexual assaults against women;

o.      Disproportionately refusing to prosecute cases involving sexual assault against female victims without DNA evidence;

p.      Treating sexual assault cases against female victims without the same urgency and importance afforded to other types of crimes;

q.      Inadequately staffing investigations and prosecutions of sexual assault cases; and

r.      Treating female victims of sexual assault without the same respect and attention to their cases as male victims, as applied to both sexual assaults and other crimes.

220.    Named Plaintiffs and the members of the Class and each of the Subclasses suffered ongoing injuries, including but not limited to: deprivation of their property, deprivation of their right to privacy, and emotional distress.

## VII.    INJUNCTIVE RELIEF SOUGHT

221.    Plaintiffs incorporate the preceding paragraphs as if set forth fully herein.

222.    Plaintiffs also pray that the Court issue a permanent injunction against Defendants ordering them to:

a.      Properly train and supervise government employees handling sexual assault cases or evidence;

b.      Require and enforce trauma-informed approaches to investigation and prosecution of sexual assault cases;

c.      Submit, test, and analyze all SAKs obtained by (or sent to) law enforcement offices;

d.   Inform victims of sexual assault of the likelihood and timing of their SAKs being tested;

e.   Prosecute cases even without DNA evidence;

f.   Treat sexual assault cases with the same urgency and importance afforded to other types of crimes;

g.   Provide adequate staffing for investigation and prosecution of sexual assault cases; and

h.   Treat female victims of sexual assault with the same respect and attention to their cases as male victims, both of sexual assaults and other crimes.

223.   Without the intervention of this Court, Named Plaintiffs and the members of the Class cannot prevent Defendants from continuing their violations of equal protection of the law.

224.   Named Plaintiffs and the members of the Class request that the court appoint a monitor or Special Master to ensure that required changes are reviewed, approved, and implemented.

## VIII.   JURY DEMAND

225.   Plaintiffs hereby demand a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

## IX.   PUNITIVE DAMAGES

226.   All of the acts committed by Defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, and/or recklessly, and said acts meet the standards required for the imposition of punitive damages.

## X.     ATTORNEYS' FEES

227.    Named Plaintiffs and the Class are entitled to recover their reasonable and necessary attorneys' fees and costs for their claims against Defendants.

228.    Specifically, Named Plaintiffs and the Class are entitled to recover their attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## XI.     CONCLUSION AND PRAYER FOR RELIEF

Named Plaintiffs and the Class respectfully request and pray for the following:

a.     Judgment finding Defendants jointly and severally liable for monetary damages;

b.     Judgment awarding Named Plaintiffs and the Class the costs of this action;

c.     Judgment awarding Named Plaintiffs and the Class their attorneys' fees pursuant to 42 U.S.C. § 1988 and any other applicable law;

d.     Judgment awarding Named Plaintiffs and the Class pre- and post-judgment interest as allowed by law; and

e.     All relief, in law or in equity, to which Named Plaintiffs and the Class show themselves entitled.

DATED:  June 18, 2018.

Respectfully submitted,

By:     */s/ Jennifer R. Ecklund*

Jennifer R. Ecklund
Texas Bar No. 24045626
Jennifer.Ecklund@tklaw.com

Mackenzie S. Wallace
Texas Bar No. 24079535
Mackenzie.Wallace@tklaw.com

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:  214/969-1700
Facsimile: 214/969-1751

Elizabeth Myers
Texas Bar No. 24047767
Elizabeth.Myers@tklaw.com

**THOMPSON & KNIGHT LLP**
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Telephone:  512/469-6100
Facsimile: 512/469-6180

**ATTORNEYS FOR PLAINTIFFS**


**<u>CERTIFICATE OF SERVICE</u>**

On June 18, 2018, I electronically submitted the foregoing document to the Clerk of the Court for the United States District Court for the Western District of Texas using the electronic case filing system of the Court.

*/s/ Jennifer R. Ecklund*
Jennifer R. Ecklund