# EXHIBIT B



## BOARD/COMMISSION RECOMMENDATION

### Human Rights Commission

Recommendation Number: 20180122-5(A) Women's Equity in Austin

Long-Term Recommendations in Response to Council Resolution No. 20170323-054, Including:

(a) Expanding of the Equity Office and its Assessment Tool and Equity Lens;

(b) Developing Ordinances to Adopt CEDAW Principles, Mandate Paid Family Leave, Protect Employees' Right to Express Breast Milk in the Workplace, Prohibit Salary History Requests in Connection With Hiring, Protect Family Caregivers from Employment Discrimination, Protect Victims of Domestic Violence, Sexual Abuse and Stalking From Discrimination in Housing or Employment; and

(c) Prioritizing the Elimination of Austin's Rape Kit Backlog.


WHEREAS, the Human Rights Commission of the City of Austin ("Commission") advocates on behalf of human rights for all people in the city of Austin ("City"); and

WHEREAS, the Commission's duties include, but are not limited to, advising and consulting with the Austin City Council ("Council") as well as all City departments, advisory boards and regulatory agencies on all matters involving discrimination, including providing legislative recommendations and proposing measures to improve the ability of various departments and agencies, as well as initiating and facilitating discussions and negotiations between individuals and groups to lessen tensions and improve understanding in the community and aiding in the formulation of local community groups in neighborhoods as needed to carry out specific programs; and

WHEREAS, on March 23, 2017, Council passed Resolution No. 20170323-054 ("Resolution")(copy at Ex. A[1]), calling upon the Commission, in collaboration with the City's Commission for Women ("Women's Commission"), to research the City's previous efforts to

---

[1]    For ease of refence, a copy of the Resolution is attached at Exhibit A.

address gender[2] disparities in the City as well as "research other potential practices that have not been documented or addressed by the City which have an unintended disparate impact on women but are commonly used by common governmental entities comparable to the City of Austin[,] examine whether those practices are being used within the City, and if so, [determine] their nature and scope[,] and develop recommendations for modifying City policies or practices to eliminate those disparate impacts"; and

WHEREAS, the Resolution further called upon for the Commission and the Women's Commission to separate their recommendations into long-term and short-term items; and

WHEREAS, the Commission has passed recommendations addressing those short-term items identified within the Resolution[3]; and

WHEREAS, the Women's Commission has provided its long-term recommendations in response to the Resolution by its November 8, 2017 Recommendation 20171108-004 Women's Equity in Austin (copy at Ex. B[4]); and

WHEREAS, long-term recommendations to address disparate impacts should begin with an understanding of that term, which was first developed in the context of antidiscrimination law to describe practices in housing or employment that may adversely affect members of a protected class of persons, even though the rules applied by the employers or landlords were facially neutral and conscious discriminatory intent was absent; and

WHEREAS, as society's notions of fairness and justice continue to evolve, there is increased awareness that, in addition to promoting principles of equal treatment and opposing discrimination against protected classes of persons, in this case women, lawmakers and leaders in the private sector have an affirmative obligation, when presented with evidence that an inequitable outcome has befallen a protected class of persons, to try to understand the underlying reasons for that inequitable outcome and to take affirmative steps to try to remedy it; and

WHEREAS, evidence shows Austin's women experience different outcomes than men in the areas of workforce participation, earnings, and likelihood of poverty - specifically, demographic data from the U.S. Census Bureau's 2016 American Community Survey 1-Year Estimates ("Survey")(relevant tables at Ex. C[5]) reveals the following:

---

[2]   Council's Resolution used the word "gender" in some places and "women" in others.  In its use of the term "women", Council presumably recognized that one's gender identity can be the same or different from the sex one is assigned at birth and intended that term to include all persons who identify as women, regardless of their sex assigned at birth and/or whether their gender expression conforms to cultural expectations based on the sex they were assigned at birth.  For the avoidance of doubt, the Commission wishes to adopt an expansive construction of the terms "women" and "gender."

[3]   *See* Recommendations 20171023-001a Women's Equity in Austin: Prohibiting Employment Inquiries Regarding Prior Salary and 20171023-001b Women's Equity in Austin: Equity in Naming of Public Symbols.

[4]   For ease of refence, a copy of that recommendation is attached at Exhibit B.

[5]   For ease of reference, the underlying tables are attached at Exhibit C.  According to the U.S. Census Bureau's website, it compiles the Survey based on random sampling of addresses in each state, the District of Columbia and Puerto Rico in order to provide up-to-date statistics between census years that can be relied upon by federal, state, tribal and local leaders.  *See* https://www.census.gov/programs-surveys/acs/about/survey-is-legitimate.html.  *See* also 13 U.S.C. §182 (authorizing administration to furnish annual and other current interim data on the subjects

- Workforce Participation – Of Austin's 439,246 women who are aged 16 and over, 67.8% participate in the labor force, as opposed to 80.9% of Austin's men aged 16 and over

- Earnings – Among Austinites who are labor force participants aged 16 and older, women's median earnings are 77.9% as high as men's median earnings

  o Survey data based on sex and occupation in Austin shows that women's median earnings were lower than men's in all but one (1) occupational category and one (1) sub-category out of the thirty-five (35) therein listed

  o Survey data based on sex and industry in Austin shows that women's median earnings were lower than men's in all but three (3) out of twenty-six (26) reported industries

  o Survey data analyzing the educational attainment levels of Austinites aged 25 and older shows the gap between women's and men's median earnings exists across all levels of educational attainment, although earnings gaps between men and women appear to be greatest at the extremes of the educational attainment spectrum, for instance, women with some college or an associate's degree have median earnings that are 79.1% as high as the median earnings of similarly-situated males, however, women without high school diplomas have median earnings that are 63.1% as high as those of men without high school diplomas and women with graduate or professional degrees have median earnings that are 64.3% as high as the median earnings of men with graduate or professional degrees

- Likelihood of Poverty – Survey data indicates that among the 124,703 Austinites who reported 2016 income at below the poverty level[6], 67,746 (54.3%) were women, as opposed to 56,957 (45.7%) who were men

WHEREAS, evidence shows Austin's women experience different outcomes than men in the areas of family violence and sexual assault, specifically, data from the Texas Department of Public Safety ("TXDPS") Texas Crime Report for 2016 ("Crime Report") (relevant portions at Exhs. D and E[7]) reveals the following:

---

covered by the censuses). Data from the Survey (and other Census Bureau data) can be accessed online using the "advanced search" function at https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t. For ease of reference, a copy of those tables that were used in drafting this recommendation is annexed at Exhibit C.

[6]    Upon information and belief, the Survey measured poverty status using the 2016 Poverty Rate table located at https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-poverty-thresholds.html, (copy included at last page of Exhibit C) which indicates, for instance, a threshold of 12,486 for a single person under 65 years of age and 24,339 for a four-person household with two children under 18 years of age.

[7]    For ease of reference, copies of Chapters 5 ("Family Violence") and 7 ("Sexual Assault") of that report are annexed at Exhibits D and E, respectively.

- Family Violence[8] – According to a portion of the Crime Report describing reporting of family violence, "[o]f the [214,815 statewide] victims whose sex was known, 28 percent were male and 72 percent were female[9]

  o That Crime Report reported that 7,811 of those 2016 family violence incidents occurred within Travis County

- Sexual Assault[10] – According to a portion of the Crime Report describing reporting of sexual assault against juvenile and adult victims, "[o]f the [19,045 statewide] victims whose sex was known, 12.9 percent were male and 87.1 percent were female[11]"

  o That Crime Report reported that 603 of those 2016 sexual assault incidents occurred within Travis County

WHEREAS, it may be presumed that Austin's women may experience different outcomes from those experienced by men in across additional indicators not recorded here; and

WHEREAS, it may be further presumed that outcomes experienced by Austin's women are not uniform and that an examination of other interrelated factors, such as their race, ethnicity, or class, may reveal additional intersectional[12] disparities that would merit special consideration by the City's advisory and policymaking bodies as they develop tools for implementing this and any other recommendation related to addressing disparate impacts; and

---

[8]    Chapter 5 of the DPS report explains that "Family Violence" includes violence by a member of one's household (as opposed to strictly looking to the family relationship). In 2015 the Texas Family Code was amended to include protections against dating violence. Exhibit D, at page 36. The offenses include; assault (97% of all reporting), homicide, kidnapping, robbery and sex offenses. Exhibit D, at page 37.

[9]    A federal study of the previous decade's nonfatal domestic violence reporting from the National Crime Victimization Survey found that 22% of reported victims were male and 78% were female. *See Police Response to Domestic Violence*, 2006-2015, U.S. Department of Justice Office of Justice Programs, May 2017, at appendix table 5, available online at https://www.bjs.gov/content/pub/pdf/prdv0615.pdf.

[10]    Chapter 7 of the DPS report explains that the "Sexual Assault" data that is collected for the purposes of the report includes the offenses of; sexual assault, aggravated sexual assault, continuous sexual abuse of a young child or children, indecency with a child by contact, indecency with a child by exposure, and sexual performance by a child. Exhibit E, at p. 53.

[11]    Similarly, the Rape, Abuse and Incest National Network ("RAINN") reports that 82% of all juvenile sexual assault victims are female and 90% of all adult rape victims are female. *See* https://www.rainn.org/statistics/victims-sexual-violence.

[12]    Scholars have criticized the tendency of traditional antidiscrimination theory to isolate gender and race analysis, to the detriment of women of color. For instance, Kimberlé Crenshaw, a pioneer in the development of critical race theory and intersectional feminism, often uses the case of DeGraffenreid v. General Motors, 413 F. Supp.142 (E.D. Mo. 1976) to illustrate the phenomenon. In that case, a group of African American women asserted that they received compound discrimination excluding them from employment opportunity. They contended that although women were eligible for office and secretarial jobs, in practice such positions only were offered to white women, barring African American women from seeking employment in the company. The court weighed the allegations of race and sex discrimination separately, finding that the employment of African American male factory workers disproved racial discrimination, and the employment of white female office workers disproved sex discrimination. The court declined to consider compound discrimination and dismissed the case. For more information about Kimberlé Crenshaw, *see* her Wikipedia page at https://en.wikipedia.org/wiki/Kimberl%C3%A9_Williams_Crenshaw.

WHEREAS, in order to assist the Commission and Women's Commission in preparing recommendations for long-term items, on August 24, 2017, the City's Human Resources Department provided the Commission with a memorandum ("Memorandum") (copy at Ex. F)[13] summarizing the City's previous and ongoing efforts to address gender disparities in the City; and

WHEREAS, that Memorandum identified several City policies aimed at promoting women's health, promoting City procurement opportunities for women-owned businesses, eliminating sex-based discrimination in City employment, promoting women's leadership opportunities for City employees, and publicly-available programming aimed at promoting women's participation in a wide variety of economic, scientific, civic and cultural endeavors; and

WHEREAS, review of that Memorandum makes clear that there is no City program or policy whose broader aim is to investigate and address City laws, policies, and practices that create an unintended disparate impact on women; and

WHEREAS, the Commission and Women's Commission determined that there is one City department, the Equity Office, that employs an Equity Assessment Tool (copy at Ex. G)[14] and Equity Lens to investigate and addresses City laws, policies and practices that create an unintended disparate impact on racial minorities; and

WHEREAS, the City's Equity Office and its Equity Assessment Tool and Equity Lens, have not heretofore been developed to examine issues of gender except inasmuch as those issues may intersect with racial inequity; and

WHEREAS, various equity assessment tools (sometimes called lenses) have been developed for use in the private sector and by other cities, states, and international bodies to investigate and addresses laws, as well as public and private policies and practices, that create an unintended disparate impact on women and guide decisionmakers towards more equitable prioritization in future planning, budgeting, and policy development; and

WHEREAS, the City of San Francisco, through its Department on the Status of Women, has developed Gender Analysis Guidelines[15] which have been used to perform a gender analysis of that city's departmental operations, commission activities, budget, and workforce data; and

WHEREAS, similarly, the City of New York has established a Commission on Gender Equity[16] as an advisory body whose sole purpose is to support City agencies in dismantling institutional barriers for women and girls in order to reduce gender-based inequity and promote

---

[13]   For ease of reference, a copy of that Memorandum is attached at Exhibit F.

[14]   The City's Equity Assessment Tool has not been finalized and remains in draft form. A copy of the most recent draft is annexed at Exhibit G.

[15]   A copy of those guidelines can be found online at http://sfgov.org/dosw/gender-analysis-reports.

[16]   See New York City Commission on Gender Equity webpage at http://www1.nyc.gov/site/genderequity/what-we-do/what-we-do.page.

opportunities for women and girls in all areas, including employment, housing, childcare, education, health and reproductive justice, criminal justice and public safety; and

WHEREAS, the work of San Francisco's Department on the Status of Women and New York's Commission on Gender Equity suggests large cities may be moving towards a model whereby municipalities establish permanent units whose sole purpose is to regularly and systemically examine that city's laws, policies and practices (typically with the assistance of a gender equity tool or lens) in order to identify and address those that create an unintended disparate impact on women; and

WHEREAS, in much smaller cities[17] that have committed to examining gender equity in their own laws, policies, and practices, some, such as Cincinnati[18], have looked towards appointed task forces, backed by technical assistance from local academics, to oversee citywide gender analysis work, while others, such as Pittsburgh[19], have budgeted and hired executive directors to assist newly-formed gender equity commissions in doing so; and

WHEREAS, other cities' efforts to address systemic gender equity issues are often explicitly linked to their public commitment to implement the principles of the Convention for the Elimination of Discrimination Against Women ("CEDAW")[20]; and

WHEREAS, CEDAW is an international human rights instrument that has been ratified by 187 out of 193 U.N. Member states, excluding the United States, Iran, Sudan, Somalia, Palau and Tonga; and

WHEREAS, CEDAW sets forth a definition of discrimination against women and calls upon each ratifying country to take steps to eliminate discrimination in the political, social, economic, and cultural fields; and

WHEREAS, after the United States Senate failed to ratify CEDAW, starting in the late 1990s, U.S. municipalities began promulgating ordinances to implement CEDAW locally and/or passing resolutions expressing support for certain CEDAW provisions the principles which underlie it; and

WHEREAS, the cities of San Francisco, Los Angeles, Miami-Dade County, Pittsburgh, Cincinnati, Berkeley, and Honolulu, have formally adopted ordinances implementing CEDAW (list of cities at Ex. H)[21];

---

[17]   According to the U.S. Census website's "quickfact comparison", the city of Austin has a population of 947,890 while Pittsburgh has a population of 303,635 and Cincinnati has a population of 296,946. *See* https://www.census.gov/ quickfacts/fact/table/pittsburghcitypennsylvania,austincitytexas,US/PST045216 and https://www.census.gov/quickfacts/fact/table/cincinnaticityohio,pittsburghcitypennsylvania,austincitytexas,US/PST0 45216.

[18]   Jonathan Goolsby, *UC Researchers to Lead Cincinnati Gender Equality Study*, University of Cincinnati News, Jun. 14, 2017, available online at http://www.uc.edu/news/NR.aspx?id=25203.

[19]   Adam Smeltz, *Pittsburgh City Council Approves Measure to Fight Gender Bias*, Pittsburgh Post-Gazette, Dec. 6, 2016, available online at http://www.post-gazette.com/local/city/2016/12/07/Pittsburgh-City-Council-approves-measure-to-fight-gender-bias/stories/201612070049.

[20]   A copy of the full CEDAW text can be found at http://www.un.org/womenwatch/daw/cedaw/cedaw.htm.

WHEREAS, twenty-two other cities have passed resolutions promoting CEDAW principles and over two dozen cities (as well as the District of Columbia) are exploring passage of CEDAW ordinances or resolutions, including Denver, Boston, New York City, Portland, and Philadelphia; and

WHEREAS, an Non-Governmental Organization, Cities for CEDAW, compiles information regarding how cities can develop and promulgate ordinances and resolutions supporting CEDAW and that organization includes, among its publicly-available materials, a template for a CEDAW ordinance ("Model CEDAW Ordinance") (copy at Ex. I[22]) that is similar to those signed into law by that above cities; and

WHEREAS, the Model CEDAW Ordinance (and those ordinances based on it) contains three key components; (a) a requirement that cities engage in systemic gender analysis of their operations, including policies, programs, divisions, service provision, etc., (b) a requirement that an oversight body be established to continually monitor the ordinance's implementation efforts, and (c) a requirement that cities commit to allocating funding to fully support implementation[23]; and

WHEREAS, Council has previously passed at least one resolution promoting CEDAW principles, Austin City Council Resolution 20140417-055, which declared freedom from domestic violence was a human right, established the Austin/Travis County Family Violence Task Force, and tasked it with producing three biannual reports to report on law enforcement and probation, mental and physical healthcare, and criminal prosecution, respectively; and

WHEREAS, if the City of Austin were to adopt a version of CEDAW as a local ordinance, it would commit itself to integrating gender equity principles into all of its operations, including policy, program and decision-making, which would, at a minimum, require that the Equity Office (or similar office) be empowered to employ an equity tool and equity lens to investigate and address City laws, policies and practices that create an unintended disparate impact on women and guide decisionmakers towards more equitable prioritization in future planning, budgeting, and policy development; and

WHEREAS, in places other than Austin, where women also experience different outcomes than men in the areas of workforce participation, earnings, and likelihood of poverty, other cities, states, and the District of Columbia, have enacted laws aimed at improving women's economic outcomes by removing equity barriers in the workplace;

WHEREAS, in light of research indicating that the common employer practice of inquiring about job applicants' prior salary histories (a practice that is gender-neutral on its face) harms women by reinforcing and amplifying earnings imbalances that exist from the time of

---

[21]   A full list of cities that have adopted CEDAW Ordinances or Resolutions is attached at Exhibit H.
[22]   A copy of the Model CEDAW ordinance is attached at Exhibit I.
[23]   *See* Exhibit I.

women's initial workforce entry[24], Philadelphia[25], New York[26] and Massachusetts[27], have enacted laws to prohibit private employers from inquiring about job applicants' prior salary histories; and

WHEREAS, in light of research indicating that employer family and medical leave that is unpaid (another gender-neutral policy) harms working families and especially women, who disproportionately take time off in connection with the birth or adoption of a child, San Francisco[28], the District of Columbia[29], New York[30], Rhode Island[31], New Jersey[32], California[33], and Washington[34] have enacted laws to require private employers provide paid family leave to their employees (typically though a state-funded disability insurance fund or city-specific enhancement thereto); and

WHEREAS, in light of research showing that employers routinely discriminate against employees and job applicants with family caregiving responsibilities[35] (a gender-neutral practice)

---

[24] For more detailed discussion of this cumulative phenomenon, *See* Recommendation 20171023-001a Women's Equity in Austin: Prohibiting Employment Inquiries Regarding Prior Salary. *See* also Christianne Corbett and Catherine Hill, *Graduating to a Pay Gap; the Earnings of Women and Men One Year After College Graduation*, American Association of University Women Study (2013), available online at https://www.aauw.org/files/2013/02/graduating-to-a-pay-gap-the-earnings-of-women-and-men-one-year-after-college-graduation.pdf. *See* also Todd Thorsteinson, *Initiating Salary Discussions With an Extreme Request: Anchoring Effects on Initial Salary Offers*, 1 J. of Applied Psychology, 41(7)(2011). *See* also Association for Phycological Science article discussing anchoring theory and salary negotiations and Massachusetts law banning the practice of asking for prior salary history, available online at https://www.psychologicalscience.org/news/minds-business/how-cracking-the-right-joke-benefits-salary-negotiations.html.

[25] Bill No. 160840, amending Title 9 of the Philadelphia Code, Philadelphia's Fair Practices Ordinance, text available online at https://phila.legistar.com/LegislationDetail.aspx?ID=2849975&GUID=239C1DF9-8FDF-4D32-BACC-296B6EBF726C.

[26] Local Law 2153 to amend the administrative code of the City of New York, text available online at http://legistar.council.nyc.gov/LegislationDetail.aspx?ID=2813507&GUID=938399E5-6608-42F5-9C83-9D26 65D9496F.

[27] Massachusetts Pay Equality Act, Senate Bill 2119 (2016), text available online at https://malegislature.gov/Bills/189/Senate/S2119.

[28] San Francisco Paid Parental Leave Ordinance, text available online at http://library.amlegal.com/nxt/gateway.dll/California/police/article33hpaidparentalleave?f=templates$fn=default.htm$3.0$vid=amlegal:sanfrancisco_ca$anc=JD_Article33H

[29] D.C. Universal Paid Leave Amendment Act of 2016 (UPLAA), text available online at http://www.lexisnexis.com/hottopics/dccode/

[30] New York Paid Family Leave Benefits Law, text available online at http://assembly.state.ny.us/leg/?default_fld=&bn=A03870&term=2015&Summary=Y&Memo=Y&Text=Y

[31] Rhode Island Temporary Caregiver Insurance Fund Law, text available online at http://webserver.rilin.state.ri.us/Statutes/TITLE28/28-41/28-41-35.HTM.

[32] New Jersey Family Temporary Disability Leave Law, text available online at http://lwd.dol.state.nj.us/labor/forms_pdfs/tdi/fli_adopted_regs.pdf.

[33] California Family Temporary Disability Insurance (FTDI) Law, text available online at https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200120020SB1661

[34] Washington State Family Leave Act, text available online at http://apps.leg.wa.gov/RCW/default.aspx?cite=49.78

[35] Caregiver discrimination has also been referred to as "Family responsibility discrimination" or "sex-plus discrimination." *See* generally Family Responsibilities Discrimination webpage and factsheet at U.C. Hastings College of Law's Center for Worklife Law, available online at http://worklifelaw.org/get-help/what-is-frd/ and http://worklifelaw.org/publications/FRD_Fact_Sheet.pdf. Common patterns of caregiving discrimination include:

firing pregnant employees because they are pregnant or will take maternity leave;

and that caregiver discrimination especially harms women (who tend to shoulder a disproportionate share of family caretaking responsibilities or are stereotypically perceived to do so), San Francisco[36], New York City[37], the District of Columbia[38] and Minnesota[39] have enacted laws prohibiting private employers from discriminating against employees based on their caregiving status and/or requiring reasonable accommodation to employees to accomplish caregiving tasks; and

WHEREAS, both federal and Texas state law reflect a public policy recognizing that supporting lactation in the workplace provides public health benefits and promotes women's continued labor force participation after childbirth[40]; and

WHEREAS, gaps exist in both federal and Texas laws relating to private employers' requirement to provide nursing employees with adequate time and private space within which to express breast milk in the workplace - specifically, federal law[41] only protects mothers of employees in workplaces of 50 or more (or those in smaller workplaces where the accommodation does not impose unreasonable employer hardship) and it only protects those mothers who are otherwise entitled to overtime pay while Texas law[42] only protects public employees, although it does encourage private Texas employers to seek out a state-certified business designation as "mother-friendly"; and

WHEREAS, through the Austin Public Health Mother Friendly Worksite Initiative, the City has assisted private employers in attaining state "mother-friendly" certification (see Ex. F), although the City has not followed in the footsteps of other cities such as San Francisco[43], Philadelphia[44], the District of Columbia[45] and, upon information and belief[46], states such as

---

failing to consider promotions for qualified women because they have children;
harassing employees upon return to work from caretaking leave;
fabricating work infractions to justify dismissal of employees because of family responsibilities;
harassing employees who *Seek* out flexible schedules or giving parents work schedules that interfere with childcare while giving nonparents flexible schedules; and
refusing to hire divorced fathers because they have custody of their children.

[36]   San Francisco Family Friendly Workplace Ordinance, text available online at http://library.amlegal.com/nxt /gateway.dll/California/administrative/chapter12zsanfranciscofamilyfriendlywork?f=templates$fn=default.htm$3.0$ vid=amlegal:sanfrancisco_ca$anc=JD_Chapter12Z.

[37]   New York City Caregiver Law, text available online at http://legistar.council.nyc.gov/LegislationDetail. aspx?ID=1672736&GUID=D78A68CB-0CA2-4777-9784-1B1CC79C4C9A.

[38]   District of Columbia Human Rights Law, text available online at https://beta.code.dccouncil.us/dc/council/code/titles/2/chapters/14/

[39]   Minnesota Human Rights Law "Familial Status" protections, text available online at https://www.revisor. mn.gov/statutes/?id=363a.08

[40]   *See generally* Patient Protection and Affordable Case Act (P.L. 111-148)(amending section 7 of the Fair Labor Standards Act at 29 U.S.C. §207 and Tex. Health and Safety Code. §165.001 *et seq.*

[41]   *See* Note 40, *supra*.

[42]   *See* Note 40, *supra*.

[43]   San Francisco Lactation in the Workplace Ordinance, text available online at http://sfbos.org/sites/default/files/ o0131-17.pdf

[44]   Breast Feeding Accommodation Bill, No. 130922, Amending Philadelphia Fair Practices Ordinance, text available online at https://www.duanemorris.com/site/static/Philadelphia_Bill_No_13092201_As_Amended.pdf

[45]   District of Columbia Code at §2-1402.82, text available online at https://beta.code.dccouncil.us/dc/ council/code/sections/2-1402.82.html

Arkansas, California, Colorado, Connecticut, Georgia, Hawaii, Indiana, Maine, Michigan, Minnesota, Mississippi, Missouri, Montana, New Mexico, New York, Oklahoma, Oregon, Rhode Island, Tennessee, and Vermont, that have passed laws requiring, as opposed to merely encouraging, private employers to provide lactating employees with reasonable time and private space within which to express breastmilk in the workplace; and

WHEREAS, in places other than Austin, where women also experience different outcomes than men in the areas of family violence and sexual assault, other cities, states, and the District of Columbia, have enacted laws aimed at improving women's outcomes by removing equity barriers in employment and housing;

WHEREAS, in light of research showing that employers routinely discriminate against employees based on their real or perceived status as victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking and that discrimination against those categories of persons, while facially gender-neutral, especially harms women (who tend to be disproportionality fall into those categories), Miami-Dade County, New York City, Westchester County (NY), Philadelphia, the District of Columbia, California, Colorado, Connecticut, Florida, Hawaii, Illinois, Kansas, Maine, New Mexico, New York, North Carolina, Oregon, Rhode Island, and Washington, have enacted laws to prohibiting private employers from engaging in discrimination against victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking and/or have enacted laws that create affirmative obligations for employers to support affected employees who seek relief to address their respective situations[47] (e.g. by requiring employers permit leave time to file protective orders, appear in court, search for new housing, etc.); and

WHEREAS, in light of research showing that landlords routinely discriminate against tenants based on their real or perceived status as victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking and that discrimination against those categories of persons, while facially gender-neutral, especially harms women (who tend to be disproportionality fall into those categories), federal law provides housing protections for persons who reside within subsidized housing who are victims of "domestic violence, dating violence, sexual assault, and stalking"[48]; and

WHEREAS, the Fair Housing Act does not explicitly include real or perceived victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking in the list of categories of persons to be protected from housing discrimination, although the U.S. Department of Housing and Urban Development has issued guidance indicating that it (and several U.S. District Courts) now consider housing discrimination against victims of "domestic violence" to

---

[46]   The author has not reviewed all 20 state laws for accuracy and relies on the summary of laws provided by the National Conference of State Legislatures on its website at http://www.ncsl.org/research/health/breastfeeding-state-laws.aspx#State. Notably, several cities and states also have laws requiring provision of lactation rooms in public accommodations such as airports and government buildings.

[47]   A summary of city and state laws affecting employment rights for victims of various related (but not identical) offenses is available online at Legal Momentum (Formerly National Organization for Women's Legal Defense and Education Fund), at https://www.legalmomentum.org/sites/default/files/reports/employment-rights.pdf.

[48]   Violence Against Women Act Reauthorization Act of 2013, text available online at https://www.gpo.gov/fdsys/pkg/PLAW-113publ4/pdf/PLAW-113publ4.pdf

constitute discrimination "because of sex" under the Federal Fair Housing Act[49] and, according to a brochure from the Texas Council on Family Violence, recent case law interpreting Texas' Fair Housing Act has found that "negative actions taken against a woman because she is a victim of domestic violence, dating violence or stalking is considered discrimination *in certain instances*" (emphasis supplied)[50]; and

WHEREAS, Texas law sets forth certain additional housing-related protections for victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking, including prohibiting landlords from penalizing tenants from summoning police or other emergency assistance in response to family violence[51], offering victims of family violence, human trafficking or sexual assault who are assaulted in their homes a one-time-only opportunity to claim financial assistance for relocation expenses and rent[52], permitting family violence victims who receive protective orders and/or temporary injunctions under the Texas Family Code to cancel and vacate their leases ahead of term[53], and offering an address confidentiality program for certain qualifying victims of family violence, sexual assault, aggravated sexual assault, incest or stalking[54]; and

WHEREAS, Philadelphia[55], San Francisco, and New York City, as well Monroe, Suffolk and Westchester Counties (in New York), the District of Columbia, and 49 states[56] have enacted their own housing laws, some of which offer more robust victim protections than can be found under federal or Texas law, including laws:

- granting status as a protected class, in the entity's housing antidiscrimination codes, to all persons who are actual or perceived victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking as well as to any household members otherwise legally residing with those actual or perceived victims

- prohibiting tenant screening services from disclosing an applicant's actual or perceived status as a victim of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking to any potential landlords

- permitting lease bifurcations whereby, at the victim tenant's request, landlords may permissibly terminate the tenancy of the abuser or assaulter and permit the victim to assume the lease in their name

---

[49]   2011 HUD Memorandum at http://nhlp.org/files/FHEO%20domestic%20violence%20memo.pdf
[50]   Texas Council on Family Violence, *Housing: Protections and Options for Survivors, Information for Advocates,* available online at http://tcfv.org/pdf/TCFV-Housing-Brochure-for-Advocates.pdf.  The brochure did not elaborate on what those certain instances would be.
[51]   Tex. Prop. Code. Ann. §92.015.
[52]   Tex. Code. Crim. Proc. Ann, Art. 56.42
[53]   Tex. Prop. Code. Ann. §92.016
[54]   Tex. Code Crim. Proc. Ann., Art 56.82 and 56.83
[55]   *See* Fact Sheet for Philadelphia Unfair Rental Practices Ordinance, available online at https://clsphila.org/sites/default/files/get-help/DV%20Housing%20Flyer.pdf
[56] *See* National Housing Law Project, *Housing Rights of Domestic Violence Survivors – A State and Local Law Compendium*, October 2016, available online at http://nhlp.org/files/CombinedD-HousingStateLawCompendium.pdf.

- adopting more flexible standards of establishing qualifying victim bona fides through police incident reports, medical records, or records from a victim service organization (as opposed to requiring victims to produce court orders, injunctions, or orders of protection)

- requirements that landlords make reasonable accommodations in order to restore and improve residential security measures, such as changing locks or fixing broken security systems

- enhanced protections for sexual assault victims separate and apart from the domestic violence context, such as, for example, laws permitting tenants that are sexually assaulted by intruders to their residence to take advantage of the lease cancellation rule in the event the police fail to apprehend the perpetrator

- exceptions to "one-strike" criminal activity lease provisions when the substance of the criminal activity involves family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking and when upholding the lease provision would serve to evict or otherwise penalize the victims of the alleged criminal activity; and

- prohibiting evictions based on nuisance ordinance violations[57], noise complaints or similar disturbances or repeated presence of police where those acts were in fact caused by domestic violence or sexual assault

- requiring landlords, in lease addenda, to advise tenants of their housing rights in the event they experience family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking; and

WHEREAS, women in Austin and nationwide are substantially more likely to suffer sexual assault than men; and

WHEREAS, the Austin Police Department ("APD") reports that 1 in 5 women are sexually assaulted[58] (as compared to 1 in 71 men) and that sexual assault is the most underreported violent crime in the U.S., with as low as 9% of all sexual assault cases being reported in Texas[59]; and

---

[57]   *See* also HUD's Office of General Counsel, *Guidance on Application of Fair Housing Act Standards to the Enforcement of Local Nuisance and Crime-Free Housing Ordinances Against Victims of Domestic Violence, Other Crime Victims, and Others Who Require Police or Emergency Services*, September 2016, available online at https://www.hud.gov/sites/documents/FINALNUISANCEORDGDNCE.PDF  HUD takes the position that ordinances that penalize residents for a small number of 911 calls to police, even when a person is in need of protection from domestic violence or another crime violate fair housing law. Nuisance ordinances often require or allow landlords to evict residents in such circumstances, thereby discouraging victims from reporting domestic abuse or other crimes and obtaining needed emergency assistance.

[58]   The APD Webpage uses the word "rape", but the Texas Penal Code does not use that term.  Presumably the APD meant to refer to "sexual assault" as defined at Texas Penal Code Ch. 22.011 and various related statutes.

[59]   *See* APD Sex Crimes Unit webpage, available online at https://www.austintexas.gov/department/sex-crimes.

WHEREAS, when persons report sexual assaults to law enforcement authorities, assuming their assault was recent (typically within a 72-hour window), they will likely be asked to complete a sexual assault evidence kit, more commonly referred to as a "rape kit"; and

WHEREAS, collection of rape kits provides law enforcement with a uniform protocol for information and evidence collection after sexual assaults[60]; and

WHEREAS, the process of rape kit collection is time-consuming (lasting 2.5-5 hours), highly invasive, and may be experienced as traumatic by the victim[61]; and

WHEREAS, the benefits of timely collection and processing of rape kit evidence cannot be understated – DNA helps to identify unknown perpetrators, strengthens the prosecution's case for trial, and reduces criminal activity overall (by bringing serial criminals, including serial rapists, to justice earlier and thereby preventing future offenses)[62]; and

WHEREAS, the failure to timely process DNA evidence after its collection harms sexual assault victims and society at large in a variety of ways:

- sexual assault victims may fear for their own and/or for other persons' personal safety if their attacker remains unidentified and/or at large

- sexual assault victims who know their attacker's identify and wish to proceed with prosecution may experience additional trauma knowing that failure to process their rape kit is either delaying adjudication of their case, or alternately (assuming the district attorney is willing to move their case forward absent DNA evidence), they

---

[60] For basic information about the development of rape kits beginning in the late 1970's, *See* Wikipedia "Rape kit" entry at https://en.wikipedia.org/wiki/Rape_kit.

[61] According to accounts of survivors, medical professionals, and third parties writing about the process, rape kit collection typically proceeds as follows. The victim, assisted by doctors, is made to stand on a piece of butcher paper and disrobe, so that any trace evidence falling from their body or clothing is preserved, then, after each article of clothing is removed and sealed away in separate bags arranged with tissue paper between folds of fabric to prevent cross-contamination, the victim's genitals, rectum, mouth and body surfaces are probed and swabbed in order to collect biological samples of semen, blood, saliva and other bodily fluids, after which fingernails are scraped, hair is combed and plucked from various areas, and a specialized medical camera called a colposcope is used to take photos of genital injury, while the victim's medical history, emotional state, and personal account of the assault are recorded by medical professionals, victims' advocates, and/or law enforcement. *See* Charlotte Alter, *Here's What Happens When You Get A Rape Kit Exam*, Time Magazine, July 17, 2014, available online at http://time.com/3001467/heres-what-happens-when-you-get-a-rape-kit-exam/. *See* also Sequoya LaJoy, *What They Don't Tell You About Sexual Assault*, Odyssey Journals, April 18, 2016.  Christopher Connelley, *Donations From Drivers Might Help End Rape Kit Backlog In Texas*, Fresh Air, National Public Radio, April 12, 2017, available online at https://www.npr.org/2017/04/12/523588098/donations-from-drivers-might-help-end-rape-kit-backlog-in-texas. *See* also Wikipedia entry "Rape kit", note 60 *supra*.

[62] Rape, Abuse and Incest National Network ("RAINN"), *The Importance of DNA in Sexual Assault Cases*, available online at https://www.rainn.org/articles/importance-dna-sexual-assault-cases. *See* also RAINN, *Perpetrators of Sexual Violence Statistics*, available online at https://www.rainn.org/statistics/perpetrators-sexual-violence and Roger Przybylski, *Adult Sex Offender Recidivism*, U.S. Dept. of Justice Sex Offender Management and Planning Initiative, available online at https://smart.gov/SOMAPI/sec1/ch5_recidivism.html (noting that one of the largest meta-analyses of studies of sex-offender treatment, tracking outcomes for over 22,000 persons who had been *convicted* of sex offenses, found that 32.5% of untreated sex offenders committed some type of additional crime within 5 years of release and that 17.5% of them committed other sex offenses).

may perceive that proceeding to adjudication without DNA evidence heightens the risk of an adverse criminal justice outcome and/or works to the advantage of the defendant during the plea bargaining process[63]

- society is harmed because the failure to identify and prosecute those rapists who are serial offenders logically results in the commission of more crime than would have otherwise been the case had the authorities completed rape kit analysis shortly following the time of the initial sexual assault[64]

- sexual assault victims who must wait for months and years on end to learn the outcome of their rape kit processing may experience frustration, anger, distrust, disillusionment, and a variety of negative personal feelings towards law enforcement and government officials

- members of society at large may experience similar feelings which could potentially result in greater reluctance to come forward in cases of sexual assault and/or to submit to rape kit evidence collection

WHEREAS, a rape kit processing backlog has posed a statewide crisis affecting law enforcement in Texas since at least 2011 when, in response to reporting requirements related to a new state law (S.B. 1636) which required kits be sent for testing within 30 days of collection, state authorities revealed the existence of nearly 20,000 untested rape kits statewide, some dating back to the mid-1990s[65]; and

WHEREAS, on April 21, 2016, APD Reported to City Council that it was in possession of a backlog of 2,700 untested rape kits collected between the years of 1996-2011 that "were never submitted to a laboratory based on the discretion of the investigator and dependent on the circumstances surrounding the case" and that an outside contractor, Sorenson Forensics, LLC ("Sorenson") would begin to process those rape kits, (see Ex. J[66]) and

WHEREAS, on September 13, 2016, the Austin Chronicle reported that an additional backlog of 482 untested rape kits existed for the 2011-2016 period (with the exception of 2012)

---

[63]   Madeline Brand, *Prosecuting Rape Without Conclusive DNA Evidence*, National Public Radio interview with Law Professor Laurie Levenson, April 12, 2006, available online at https://www.npr.org/templates/story/story.php?storyId=5338512

[64]   *See* statistics at note 58, *supra* and Gabrielle Banks, *Assault Survivor to Sue City, Officials Over Rape Kit Backlog*, Houston Chronicle September 25, 2017, http://www.houstonchronicle.com/news/houston-texas/houston/article/Assault-survivor-to-sue-city-officials-over-rape-12227930.php (discussing the pending civil rights case brought by a Houston woman who claims she would not have been raped had authorities promptly processed the rape kits of her attacker's previous two victims)

[65]   For a timeline of events with links to relevant statewide legislation, *See* End the Backlog Initiative, *Texas Backlog Snapshot*, Joyful Heart Foundation, available online at http://www.endthebacklog.org/texas.

[66]   Exhibit J is relevant portions of Questions and Answers submitted to City Council before the April 16, 2016 meeting ("April 16, 2016 Q&A"), discussing on Agenda Item 23, which is also available online at http://www.austintexas.gov/department/city-council/2016/20160421-reg.htm).

and that grants from the Manhattan District Attorney's office would be used to fund the processing of that cases which had not been processed within the preceding year[67]; and

WHEREAS, in addition to its contract with Sorenson (from April 2016), the City subsequently secured additional contracts for DNA evidence processing with Signature Science, LLC (in February 2017[68]), and Bode Cellmark Forensics, Inc. (in March 2017[69]), and set up the Department of Public Safety Capital Area Regional Lab ("Capital Lab") (under TXDPS management) (in April 2017[70]); and

WHEREAS, on March 23, 2017, APD Reported to City Council that it possessed a backlog of 1,686 untested rape kits collected, which was categorized as either "DANY" or "NON-DANY" kits, presumably meaning those cases that had been collected more than a year ago vs. more recent cases (see Exhibit K)[71]; and

WHEREAS, at an April 3, 2017 meeting of the Public Safety Commission of the City of Austin, an APD representative repeated the 1,686 rape kit backlog figure, made up of "DANY" vs. "NON-DANY" cases[72]; and

WHEREAS, according to an October 24, 2017 interview of APD Interim Chief Brian Manley by Fox7 News, he reported 1,000 of the backlogged rape kits remained untested as of that date, but new rape kits were being turned around by outside labs within 60 days of being submitted for processing, and the City was on track to fully eliminate the rape kit backlog by the Summer of 2018[73];

WHEREAS, at a December 4, 2017 meeting of the Public Safety Commission of the City of Austin, an APD representative produced a document which summarized the total cases that had sent to each lab (presumably since it had come online) and provided numbers purporting to

---

[67]   *The Cost of Clearing the Rape Kit Backlog*, Austin Chronicle, September 13, 2016, available online at https://www.austinchronicle.com/news/2016-09-16/the-cost-of-clearing-the-rape-kit-backlog/

[68]   *See* February 16, 2017 City Council Agenda Item 27, available online at http://www.austintexas.gov/department/city-council/2017/20170216-reg.htm#027.

[69]   March 23, 2017 City Council Meeting Agenda Items 15, 16, 17, and 45, available online at https://www.austintexas.gov/department/city-council/2017/20170323-reg.htm#016. *See* also Tony Plohetski, *Austin Police Hand Over Keys of Troubled DNA Lab to State*, Austin-American Statesmen and KVUE video, March 15, 2017, available online at http://www.mystatesman.com/news/austin-police-hand-over-keys-troubled-dna-lab-state/ep5ZPmFIdNHF6zb51CVT7K/ and Catherine Markin, *Department of Public Safety to Take Over Austin DNA Lab*, Daily Texan, March 24, 2017, available online at http://www.dailytexanonline.com/2017/03/24/department-of-public-safety-to-take-over-austin-dna-lab.

[70]   *See* anticipated dates of operation in chart provided at Exhibit K.

[71]   Exhibit K is relevant portions of Questions and Answers submitted to council on March 23, 2017 ("March 23, 2017 Q&A"), discussing agenda items 15, 16 17, and 45, which is also available online at http://www.austintexas.gov/edims/document.cfm?id=273931. According to Exhibit K, the backlog remained at 1,686 on that date, suggesting that APD had sent out an average of three backlogged rape kit cases daily to Sorenson curing the preceding 11 months.

[72]   *See* April 3, 2017 Public Safety Commission Meeting at Agenda Item 5, available online at http://austintx.swagit.com/play/04032017-770.

[73]   Jennifer Kendall, *Turnaround For DNA Evidence in APD Cases Speeding Up*, Fox 7 News, October 27, 2017, video and text available online at http://www.fox7austin.com/news/local-news/turnaround-for-dna-evidence-in-apd-cases-speeding-up.

show a "Total SAK backlog" of 856, "Total in labs" of 1809, "Total completed" 1475 and "Total DNA backlog" of 1440 specimens (See Exhibit L[74]); and

WHEREAS, sexual assault survivors in Austin, the substantial majority of whom are women, require more substantial information concerning the disposition of Austin's remaining backlogged rape kits, which would include, for DNA evidence collected in cases of sexual assault, the approximate date(s) the evidence was first collected, actual and anticipated turnaround times, and identification of the lab(s) that the rape kits were sent to; and

WHEREAS, sexual assault survivors in Austin, the substantial majority of whom are women, have additional concerns that relate to the June 2016 Texas Forensic Science Commission's ("TFSC")[75] audit of the APD-operated forensic DNA Laboratory ("APD DNA Lab") and its permanent closure thereafter, specifically – given the recent backlog in forensic analysis, how long were/are Austin women waiting for their sexual assault cases to be prosecuted and, given doubts surrounding the legal materiality of the DNA evidence in the cases previously analyzed by the APD DNA Lab, how are prior sexual assault convictions being affected; and

WHEREAS, victims as well as defendants all types of cases that rely on DNA evidence for their investigation and prosecution may have similar concerns about the actual and anticipated effects that the APD DNA Lab's closure may have on their cases' outcomes; and

WHEREAS, members of the public at large may have concerns about whether and how the APD DNA Lab closure has affected the administration of criminal justice within Travis County; and

WHEREAS, those concerns may have been heightened by news coverage over the past 19 months, which has asserted, in various stories, that longstanding and systemic problems had existed at the APD DNA Lab[76], that prior to the lab's closure, forensic evidence was taking approximately 245 days to be processed[77], that over a thousand DNA cases were improperly

---

[74]   Exhibit L it the handout discussed at agenda item 5 of the Public Safety Commission's December 4, 2017 meeting, also available online at http://www.austintexas.gov/edims/document.cfm?id=289539.

[75]   That audit found determined the APD DNA Lab was using a DNA testing standard that was neither scientifically valid nor supported by the forensic DNA community, had deviated from protocol in a way that did not appear to be supported by documentation, and had repeatedly contaminated evidence, in addition to other shortcomings. *See* also June 10, 2016 letter from Lynn Garcia, General Counsel and Vincent J.M. Di Mail, MD, Presiding Officer of the TFSC to Austin Police Chief Art Acevedo and Travis County District Attorney Rosemary Lehmberg, available online at http://www.fsc.texas.gov/sites/default/files/APD%20DNA%20Letter%20061316.pdf and July 8, 2016 TFSC final audit Report and minutes from the Texas Forensic Science Commission Meeting, available online at https://www.dropbox.com/sh/y629croc63hz8im/AACy1KXZdUQIh4oqeoUk2Q5Ka?dl=0 &preview=APD+Audit+Final+report+071116.pdf and http://www.fsc.texas.gov/meeting/july-8-2016-texas-forensic-science-commission-quarterly-meeting-800-am. *See also* Chase Hoffberger, *APD's DNA Lab Shutters*, Austin Chronicle, June 17, 2016, available online at https://www.austinchronicle.com/news/2016-06-17/apds-dna-lab-shutters/.

[76]   Andrea Ball and Tony Plohestki, *Lawyers Raised Doubts About Austin DNA Lab Work as Early as 2009*, Austin-American Statesman, Jan. 15, 2017, available online at http://www.mystatesman.com/news/crime--law/austin-crime-lab-bucked-dna-standard-for-years-yet-got-passing-grades/MZBboOfzXWWgqlcm6867TO/

[77]   *See* Jazmine Ulloa, *DNA Backlog at Austin Police Crime Lab Could Slow Massive Case Review*, Austin-American Statesman, May 2, 2016, available online at http://www.mystatesman.com/news/crime--law/dna-backlog-austin-police-crime-lab-could-slow-massive-case-review/7tydm4VdqsijYJUrS6XjrL/.

tested and would need to be re-tested[78], that the lab's freezer had been broken for eight days and the District Attorney and persons higher up in the City's chain of command had not been informed[79], that staffing choices for the APD DNA Lab had been ill-considered[80], that mold was found growing on the surface of 850 of the backlogged rape kits[81] stored in an APD facility (separate and apart from the APD DNA Lab), that APD had known about the mold for months but not addressed the problem or informed stakeholders[82], and that the mold growth may or may not have affected the outcomes of the affected rape kits[83]; and

WHEREAS, City officials, together with officials from Travis County, have taken steps to begin to address those concerns; and

WHEREAS, contemporaneous with recommendations that the City of Austin's Public Safety Commission made to Council in January of 2017 (Recommendation 20170103-0004, copy at Ex. L[84]), City of Austin and Travis County officials formed a joint working group ("Joint Working Group") which began to meet privately to address criminal justice issues relating to APD's DNA Lab (see memo at Ex. M[85]); and

WHEREAS, that Joint Working Group is comprised of representatives from the City of Austin (City Manager's Office, Law Department and Police Department), Travis County (County Judge, County Attorney, District Attorney, Sheriff's Office, and Courts), the Texas

---

[78]   Claire Ricke, *Nearly 1,400 DNA Cases May Have been Improperly Analyzed by APD Lab*, August 30, 2016, KXAN News, text and video available online at http://kxan.com/2016/08/30/travis-co-dna-lab-closed-needs-funds-to-re-test-samples/.

[79]   Andrea Ball, Tony Plohetski, *Lawyers Raised Doubts About Austin DNA Lab Work as Early as 2009*, Austin American Stateman, Jan. 15, 2017, available online at http://www.statesman.com/news/lawyers-raised-doubts-about-austin-dna-lab-work-early-2009/3XPHeUDcTLYMWt9DGu7LGN/

[80]   Jack Craver, *Safety Commissioners Voice Concerns About Forensic Officer's Firing*, April 4, 2017, Austin Monitor, available online at https://www.austinmonitor.com/stories/2017/04/safety-commissioners-voice-concerns-forensic-officers-firing/. *See* also Philip Jankowski, *Ex-DNA Lab Chief Said Police Knew of Bad Grades When He Was Hired*, Austin-American Statesman, Jun. 1, 2017, available online at http://www.mystatesman.com/news/local/dna-lab-chief-said-police-knew-bad-grades-when-was-hired/WcLfeNMVK0yEHSh27ESSAO/. *See* also Leslie Rangel and Andy Jechow, *APD DNA Lab Closed for ForeSeeable Future, Forensics Chief Removed*, KXAN News, December 16, 2016, available online at http://kxan.com/2016/12/16/apd-dna-lab-will-not-reopen-forensics-manger-removed-from-job/

[81]   Tony Plohetski, *City Memo: Mold Found in Containers of About 850 Austin Police Rape Kits*, Austin-American Statesman, Jun. 27, 2017, available online at http://www.statesman.com/news/local/city-memo-mold-found-containers-about-850-austin-police-rape-kits/qEZ7rV5h3gnrcJPdJtMhjM/.

[82]   Sarah Marloff, *APD Knew About Moldy Rape Kits Back in April*, Austin Chronicle, July 7, 2017, available online at https://www.austinchronicle.com/.../apd-knew-about-moldy-rape-kits-back-in-april/.

[83]   Sarah Marloff, *APD Updates County on Moldy Rape Kits*, Austin Chronicle, Jul. 6, 2017, available online at https://www.austinchronicle.com/daily/news/2017-07-06/apd-updates-county-on-moldy-rape-kits/

[84]   That Commission recommendation found the City's proposed 2 to 3-year timeline for the renewed testing of DNA evidence was "unacceptable" and determined that "the public is owed transparency about" both the causes of the APD DNA Lab's closure as well as the City's prospective solutions for DNA analysis going forward.  For ease of reference, a copy of that recommendation is attached at Exhibit M.

[85]   *See* January 25, 2017 Memo to City Council from Rey Arellano, Assistant City Manager, providing an update Regarding Activities to Aggress APD DNA Lab Audit Recommendations, copy annexed at Exhibit N. *See* also KLBJ News Radio Newsroom, *Travis County Eyes Crime Lab Stakeholder Group and Agreement With Austin*, January 10, 2017, available online at http://www.newsradioklbj.com/news/austin-local-news/travis-county-eyes-crime-lab-stakeholder-group-and-agreement-austin.

17

Forensic Science Commission, Capital Area Private Defender Services ("CAPDS"), and Austin Criminal Defense Attorneys Association[86]; and

WHEREAS, upon information and belief, the Joint Working Group is working to improve outcomes pursuant to a series of agenda items City Council passed at its March 23, 2017 meeting (collectively "March 23, 2017 Items"[87]), which included executing an Interlocal contract with TXDPS for development of the Capital Lab, a contract with Bode Cellmark, a contract with an outside consultant, Dr. Van Daal, to advise on options and best practices for Austin-Travis County going forward, and an Interlocal contract between the City and Travis County ("Travis County Interlocal Agreement") (copy at Ex. N[88]) to oversee the Van Daal contract as well as a contract with CAPDS to review the legal materiality of DNA evidence processed by the APD DNA Lab and, where necessary, provide post-conviction writ litigation services on behalf of defendants whose cases were impacted by the TFSC's audit report findings; and

WHEREAS, according to the relevant portions of Council's March 23, 2017 Meeting Question and Answer documents (at Ex. K), APD advised Council that it was willing to provide monthly written updates on the status of the DNA backlog and current DNA caseload to the City Council, Public Safety Commission, and other stakeholders as appropriate; and

WHEREAS, upon information and belief, the APD has not subsequently provided City Council or Public Safety Commission with monthly DNA caseload or rape kit backlog numbers, or if it has done so, that information has not been posted on the City of Austin's website in any readily searchable form, excepting the document produced at the December 4, 2017 meeting; and

WHEREAS, notwithstanding of a statement within Section 5 of the Travis County Interlocal agreement that the parties thereto shall "keep the public apprised of the progress of [the Van Daal Report]" and "when appropriate, City and County Co-Project Managers will jointly distribute updates and status reports to City and County Officials"[89], public reporting on the progress of those items is not readily apparent by searching the websites of Joint Working Group Members, except that one member, CAPDS, has published some of the documents it is

---

[86]   *Id.*

[87]   March 23, 2017 City Council Meeting Agenda Items 15, 16, 17, and 45, hyperlink at note 69 *supra*. *See* also Tony Plohetski, *Austin Police Hand Over Keys of Troubled DNA Lab to State*, Austin-American Statesmen and KVUE video, March 15, 2017, available online at http://www.mystatesman.com/news/austin-police-hand-over-keys-troubled-dna-lab-state/ep5ZPmFIdNHF6zb51CVT7K/ and Catherine Markin, *Department of Public Safety to Take Over Austin DNA Lab*, Daily Texan, March 24, 2017, available online at http://www.dailytexanonline.com/2017/03/24/department-of-public-safety-to-take-over-austin-dna-lab.

[88]   For ease of reference, a copy of that agreement is attached at Exhibit N.  Note that the interlocal agreement provides that the City Manager and County Judge, together with co-project managers they select, will appoint an advisory panel of subject matter experts to advise them with expertise in DNA analysis, prosecution, legal defense, contracts, forensics lab operation, law enforcement, as well as "other areas as needed."  Reference to expertise in victim services is absent. *See* Exhibit O at page 3.

[89]   *See* Travis County Interlocal Agreement, Exhibit O, at Section 5, page 4.

examining in connection with its review of prior DNA convictions[90], including one undated document that is identified as being prepared by Dr. Van Daal[91]; and

WHEREAS, the meetings of the Joint Working Group are not open to the public and it initially excluded certain victim-centered groups and civil rights groups from participation, which raised controversy within the community[92]; and

WHEREAS, in August 2017, the Women's Commission passed Recommendation 20170809-003b (copy at Ex. P[93]) which recommended, in connection with addressing the issue of the rape kit backlog and the loss of public confidence associated therewith, that, *inter-alia*, that the City increase APD staffing in its Victims Services Division to counteract staffing cuts that have persisted in that division since 2006; and

WHEREAS, in its November 8, 2017 Recommendation 20171108-004 (Ex. B), the Women's Commission repeated that request;

WHEREAS, upon information and belief, the City has yet to take up that Women's Commission request; and

WHEREAS, to the extent the City intends to supplement APD staffing within its Victim Services Division that intention needs to be clearly communicated to members of the public, together with regularly updated numbers measuring progress in ending the rape kit backlog as well as information to address concerns that the APD DNA Lab closure may be affecting a host of cases (including sexual assault cases) that await prosecution as well as those cases that were successfully prosecuted but are now subject to post-conviction writs; and

## NOW, THEREFORE, BE IT RESOLVED,

- Austin City Council and City Manager should immediately act to integrate gender equity principles into all City operations, including policy, program and decision-making, which would, at a minimum, require that the Equity Office (or similar office) be empowered and supported to employ an equity tool and equity lens to investigate and addresses City laws, policies and practices that create an unintended disparate impact on women; and

---

[90]   *See* CAPDS website at https://www.forensicproject.org/learn-about-the-apd-dna-lab and related Google-Docs Folder at https://drive.google.com/drive/folders/0B27m8-w9-dQNS1pVNU1pRUNDNUk

[91]   There exists one 13-page document authored by Van Daal in the folder of Google Drive documents linked to the CAPDS website, but upon information and belief, that document is not the one that is contracted for in Item 16 of the March 23, 2017 Items. *See* https://drive.google.com/drive/folders/0BwiFz2JpwpJlMWtvVGljS1RZM0k.

[92]   Caleb Pritchard, *DNA Lab Concerns Test Travillion's Patience*, Austin Monitor, July 20, 2017, available online at https://www.austinmonitor.com/stories/2017/07/dna-lab-concerns-test-travillions-patience/. *See also* Taylor Goldenstein, *Travillion Decries Lack of Civil Rights Advocates in DNA Lab Review*, Austin-American Statesman, July 18, 2017, available online at http://www.mystatesman.com/news/local-govt--politics/travillion-decries-lack-civil-rights-advocates-dna-lab-review/Rpl42RjfwJKpfqA4vvhypM/. *See* also Tony Plohetski, *Evidence Backlog: Austin "Condones Rape" Committee Leaders Charge*, Austin-American Statesman, July 13, 2017, available online at http://www.mystatesman.com/news/evidence-backlog-austin-condones-rape-committee-leaders-charge/cXpPHPUZWFxU6GalOPV1HN/.

[93]   For ease of reference, a copy of that recommendation is attached at Exhibit O.

- Austin City Council and City Manager, assisted by persons from the Law Department, should investigate the CEDAW Cities movement in order to pursue adoption of an ordinance implementing CEDAW principles into the Code of the City of Austin; and

- Austin City Council and City Manager, assisted by persons from the Law Department, should investigate the many above-referenced laws of other cities, states, and the District of Columbia, and explore possible adoption of one or more ordinances that would
  o prohibit private employers within Austin from inquiring about job applicants' prior salary,
  o provide Austin employees with paid family and medical leave,
  o prohibit discrimination based on an employee's real or perceived status as a family caregiver,
  o mandate the right to express breastmilk in the workplace for all Austin employees who wish to exercise that right,
  o prohibit discrimination against employees because of their real or perceived status as victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking, and
  o require employers to support their employees who are victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking by giving them reasonable time off when necessary to attend to relocation, file police complaints, protective orders, and similar acts to ameliorate their situation

- Austin City Council and City Manager, assisted by persons from the Law Department, should investigate the many above-referenced laws of other cities, states, and the District of Columbia, and explore possible adoption of one or more ordinances that would
  o prohibit housing discrimination against tenants because of their real or perceived status as victims of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking, and
  o prohibit tenant screening services from disclosing an applicant's actual or perceived status as a victim of family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking to potential landlords
  o permit lease bifurcations whereby, at the victim tenant's request, landlords may permissibly terminate the tenancy of the abuser or assaulter and permit the victim to assume the lease in their name
  o adopt more flexible standards of establishing qualifying victim bona fides through police incident reports, medical records, or records from a victim service organization (as opposed to requiring victims to produce court orders, injunctions, or orders of protection)
  o require that landlords make reasonable accommodations in order to restore and improve residential security measures, such as changing locks or fixing broken security systems
  o enhance protections for sexual assault victims in the housing context, including, for example, passing a law to permitting tenants that are sexually assaulted by intruders to their residence to cancel their lease in the event the police fail to apprehend the perpetrator

- o  prohibit enforcement of "one-strike" criminal activity lease provisions when the substance of the criminal activity involves family, domestic, and/or dating violence, sexual assault and/or abuse and/or stalking and upholding such provision would serve to evict or otherwise penalize the victims of the alleged criminal activity
- o  prohibit evictions based on nuisance ordinance violations, noise complaints or similar disturbances or repeated presence of police in cases where those acts were in fact caused by domestic violence or sexual assault
- o  require landlords, in lease addenda, to advise tenants of their housing rights in the event they experience family, domestic and/or dating violence, sexual assault and/or abuse and/or stalking; and

- Austin City Council and the City Manager should, in accordance with City of Austin Commission for Women Recommendations 20170809-003b and 20171108-004, increase APD staffing in its Victims Services Division to counteract staffing cuts that have persisted in that division since 2006; and

- Austin City Council and the City Manager should take immediate steps to keep the public informed of the progress of Austin's DNA processing efforts and the clearance of Austin's rape kit backlog, preferably by prominently publishing from a conspicuous place on its website, a monthly accounting showing DNA processing numbers and explaining what those numbers mean, which would include, for all DNA evidence collected in cases of sexual assault, the approximate date the evidence was collected, actual and anticipated turnaround times, and identification of the lab(s) that the rape kits were sent to; and

- Austin City Council and the City Manager should, in conjunction with the work the City is performing as part of the Joint Working Group, arrange for public meetings to be held once every quarter until such time as the rape kit or any other DNA evidence processing backlog have been cleared, to report on the City's efforts to restore prompt and accurate DNA evidence processing capabilities, to speed the resolution of any and all individual cases affected by the APD DNA Lab closure, and to fully restore public confidence, and, in particular, women's confidence, in the City's law enforcement procedures.

Date of Approval: January 22, 2018
Record of the vote: 9-0; Commissioner Normand motion, Commissioner Miguez second; Commissioner Brown and Commissioner Royall absent.

Attest: _Jonathan Babiak_____
Jonathan Babiak, Staff Liaison