## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **AMY SMITH, JULIE ANN NITSCH, MARINA CONNER, EMILY BORCHARDT, SARAH JONES, ANGELA FIELDING, ANISHA ITUAH (By and Through her Legal Guardian, ANGELA McKAY), and HEATHER SIN, each individually and as representatives of all others similarly situated** | § § § § § § § § § | **CASE NO. 1:18-cv-505-LY** |
| **v.** | § § | |
| **CITY OF AUSTIN, TRAVIS COUNTY DISTRICT ATTORNEY MARGARET MOORE, FORMER TRAVIS COUNTY DISTRICT ATTORNEY ROSEMARY LEHMBERG, AUSTIN POLICE CHIEF BRIAN MANLEY, FORMER AUSTIN POLICE CHIEF ART ACEVEDO, and TRAVIS COUNTY, TEXAS** | § § § § § § § § | |

## OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS

Jennifer R. Ecklund
Texas Bar No. 24045626
Jennifer.ecklund@tklaw.com

Mackenzie S. Wallace
Texas State Bar 24079535
Mackenzie.Wallace@tklaw.com

**Thompson & Knight LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:  214/969-1700
Facsimile: 214/969-1751

Elizabeth G. Myers
Texas Bar No. 24047767
Elizabeth.Myers@tklaw.com

**Thompson & Knight LLP**
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Telephone:  512/469-6100
Facsimile: 512/469-6180

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................2

II.  RULE 12(b)(1) and 12(b)(6) STANDARDS ...........................................................4

III.  ARGUMENTS AND AUTHORITIES...................................................................5

    A.    The Named Plaintiffs have Standing. ...................................................5

        1.    Plaintiffs' claims are based on recognized legal rights.............................6

        2.    Plaintiffs have alleged injuries-in-fact, fairly traceable to Defendants. ...................................................................................6

        3.    Plaintiffs have alleged redressable harm.....................................................11

    B.    Defendants Are Not Entitled to Immunity.............................................11

        1.    Prosecutorial immunity does not apply to the DA Defendants' actions in this case. ..................................................................12

        2.    Eleventh Amendment immunity is not available.......................................16

        3.    Qualified immunity does not apply...............................................................17

    C.    Plaintiffs have Adequately Alleged Their Constitutional Claims.........................20

        1.    Plaintiffs' Equal Protection claim.................................................................20

        2.    Plaintiffs' Fourth Amendment claim. ...........................................................25

        3.    Plaintiffs' Fifth Amendment claim ...............................................................30

        4.    Plaintiffs' claim under the Texas Constitution. ..........................................34

    D.    Plaintiffs have Alleged All Elements under Section 1983....................................37

        1.    Plaintiffs have appropriately pled municipal liability under Section 1983 against the City and the County. .......................................37

        2.    Plaintiffs have adequately pled supervisory liability under Section 1983 against the DAs and the Police Chiefs.............................................41

        3.    Plaintiffs are entitled to seek punitive damages against the DAs and the Police Chiefs under Section 1983. ......................................................46

    E.    Plaintiffs Sin and Ituah have Adequately Pled Claims under the Americans with Disabilities Act against the City Defendants. ...............................................46

F.      Plaintiffs' Conspiracy Claim is Viable. ................................................................50

G.      Injunctive Relief is Appropriate and Available. ....................................................52

IV.  CONCLUSION................................................................................................................54

# **TABLE OF AUTHORITIES**

## **CASES**

*Akins v. Texas,*
    325 U.S. 398 (1945)...................................................................................... 22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)........................................................................................ 5

*Balistreri v. Pacifica Police Dept.,*
    901 F.2d 696 (9th Cir. 1990) ........................................................................ 21

*Barbera v. Smith,*
    836 F.2d 96 (2nd Cir. 1987) ........................................................................ 14

*Barr v. City of San Antonio,*
    No. SA-06-CA-0261-XR, 2006 WL 2322861 (W.D. Tex. July 25, 2006)........................ 19, 39

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................ 5

*Bell v. City of Milwaukee,*
    746 F.2d 1205 (7th Cir. 1984) ...................................................................... 52

*Bell v. Hood,*
    327 U.S. 678 (1946)............................................................................... 11, 53

*Benavides v. Cty. of Wilson,*
    955 F.2d 968 (5th Cir. 1992) ........................................................................ 43

*Bennett v. City of Slidell,*
    728 F.2d 762 (5th Cir. 1984) ........................................................................ 41

*Botello v. Gammick,*
    413 F.3d 971 (9th Cir. 2005) ........................................................................ 16

*Breaux v. City of Garland,*
    205 F.3d 150 (5th Cir. 2000) ........................................................................ 41

*Brown v. Bryan Cty., OK,*
    219 F.3d 450 (5th Cir. 2000) ................................................................. 37, 38

*Brown v. City of Houston,*
    No. H-17-1749, 2018 WL 1333883 (S.D. Tex. Mar. 15, 2018) ...................... 39

*Buckley v. Fitzsimmons,*
    509 U.S. 259 (1993)...................................................................................... 14

*Carter v. City of Philadelphia,*
    181 F.3d 339 (3d Cir. 1999) ......................................................................... 39

*City of Beaumont v. Bouillion,*
    896 S.W. 2d 143 (Tex. 1995)........................................................................ 34

*City of Fort Worth v. Jacobs,*
    382 S.W.3d 597 (Tex. App.—Fort Worth 2012, pet. dism'd) ...................... 35

*Clements v. Fashing,*
    457 U.S. 957 (1982)........................................................................................ 7

*Coolidge v. New Hampshire,*
    403 U.S. 443 (1971)...................................................................................... 28

*Crane v. State of Texas,*
    766 F.2d 193 (5th Cir. 1985) ............................................................. 16, 17, 39

*Davenport v. Rodriguez,*
 147 F. Supp. 2d. 630 (S.D. Tex. 2001) ................................................................ 10

*Davis v. Ector Cty,*
 40 F.3d 777 (5th Cir. 1994) ................................................................................. 39

*Davis v. Passman,*
 442 U.S. 228 (1979)...................................................................................... 11, 53

*DeShaney v, Winnebago County,*
 489 U.S. 189 (1989)............................................................................................ 20

*Eagleston v. Guido,*
 41 F.3d 865 (2d Cir. 1994) ................................................................................. 21

*Echols v. Parker,*
 909 F.2d 795 (5th Cir. 1990) ................................................................... 15, 16, 17

*Edelman v. Jordan,*
 415 U.S. 651 (1974)............................................................................................ 17

*Esteves v. Brock,*
 106 F.3d 674 (5th Cir. 1997) .......................................................................... 15, 39

*Ex parte Young,*
 209 U.S. 123 (1908)............................................................................................ 12

*Gallaher v. City of Maypearl, Texas,*
 No. 3:17-CV-1400-M, 2018 WL 700252 (N.D. Tex. Feb. 2, 2018) ...................... 41

*Geter v. Fortenberry,*
 849 F.2d 1550 (5th Cir. 1988) ............................................................................ 12

*Goodman v. Harris Cty.,*
 571 F.3d 388 (5th Cir. 2009) ............................................................................. 44

*Greenwood v. City of Yoakum,*
 No. V-07-78, 2008 WL 4615779 (S.D. Tex. Oct. 17, 2008) ................................. 19

*Harper v. Thiokol Chem. Corp.,*
 619 F.2d 489 (5th Cir. 1980) ......................................................................... 49, 51

*Hawaii Housing Auth. v. Midkiff,*
 467 U.S. 229 (1984)............................................................................................ 33

*Hecht v. Superior Court,*
 16 Cal. App. 4th 836 (Cal. Ct. App. 1993) ..................................................... 31, 32

*Hernandez v. Baylor Univ.,*
 274 F. Supp. 3d 602 (W.D. Tex. 2017) ................................................................. 5

*Hill v. City of Houston,*
 991 F. Supp. 847 (S.D. Tex. 1998)...................................................................... 51

*Hill v. City of New York,*
 45 F.3d 653 (2nd Cir. 1995) ............................................................................... 14

*Hoog-Watson v. Guadalupe Cnty., Tex.,*
 591 F.3d 431 (5th Cir. 2009) ............................................................................. 12

*Hynson v. City of Chester,*
 864 F.2d 1026 (3rd Cir. 1988) ............................................................................ 21

*Imbler v. Pachtman,*
 424 U.S. 409 (1976)............................................................................................ 14

*In re Katrina Canal Breaches Litig.,*
 495 F.3d 191 (5th Cir. 2007) ................................................................................ 5

*In the Marriage of Rooks*,
  No. 15CA0990, 2016 WL 6123561 (Colo. Ct. App. Oct. 20, 2016) ........................................ 30
*Jamal v. Kane*,
  105 F. Supp. 3d 448 (M.D. Pa. 2015) .................................................................................... 36
*Jefferies v. Harris County Cmty. Action Ass'n*,
  615 F.2d 1025 (5th Cir. 1980) ............................................................................................... 49
*Jingrong v. Chinese Anti-Cult World Alliance*,
  287 F. Supp. 3d 290 (E.D.N.Y. 2018) ................................................................................... 52
*Johnson v. Sw. Research Inst.*,
  210 F. Supp. 3d 863 (W.D. Tex. 2016) ................................................................................... 4
*Kelo v. City of New London, Conn.*,
  545 U.S. 469 (2005) ................................................................................................................ 33
*Krueger v. Reimer*,
  66 F.3d 75 (5th Cir. 1995) ...................................................................................................... 15
*Lacey v. Maricopa Cnty.*,
  693 F.3d 896 (9th Cir. 2012) .................................................................................................. 15
*Mack v. Newton*,
  737 F.2d 1343 (5th Cir. 1984) ................................................................................................ 52
*Marrero v. City of Hialeah*,
  625 F.2d 499 (5th Cir. 1980) .................................................................................................. 14
*McKee v. City of Rockwall, Tex.*,
  877 F.2d 409 (5th Cir. 1989) ............................................................................................ 20, 22
*McQueen v. Gadberry*,
  507 S.W.3d 127 (Mo. Ct. App. 2016) ..................................................................................... 30
*Med. Components, Inc. v. Osiris Med., Inc.*,
  226 F. Supp. 3d 753 (W.D. Tex. 2016) ................................................................................ 4, 5
*Mink v. Suthers*,
  482 F.3d 1244 (10th Cir. 2007) .............................................................................................. 16
*Monell v. Dept. of Soc. Servs. of City of New* York,
  436 U.S. 658 (1978) ................................................................................................................ 20
*Moore v. Regents of the University of California*,
  51 Cal. 3d 120 (Cal. 1990) ............................................................................................... 31, 32
*Morton v. Bradley*,
  No. A-08-CV-597-SS, 2009 WL 10700167 (W.D. Tex. June 19, 2009) ................................ 35
*Navarro v. Block*,
  72 F.3d 712 (9th Cir. 1995) ...................................................................................................... 7
*Northeastern Fla. Ch. Assoc. Gen. Contractors v, City of Jacksonville*,
  508 U.S. 656 (1993) .................................................................................................................. 7
*Ohio v. Robinette*,
  519 U.S. 33 (1996) ................................................................................................................... 26
*Oliver v. Scott*,
  276 F.3d 736 (5th Cir. 2002) ................................................................................................... 11
*Oporto v. City of El Paso*,
  No. EP-10-CV-110, 2010 WL 3503457 (W.D. Tex. Sept. 2, 2010), ......................... 39, 41, 44
*Peterson v. City of Fort Worth, Tex.*,
  588 F.3d 838 (5th Cir. 2009) ................................................................................................... 37

*Porter v. Epps*,
　659 F.3d 440 (5th Cir. 2011) ........................................................................ 42

*Quinn v. Roach*,
　326 F. App'x. 280 (5th Cir. 2009) ............................................................... 18

*Ramming v. U.S.*,
　281 F.3d 158 (5th Cir. 2001) ......................................................................... 5

*Regents of the Univ. of California v. Bakke*,
　438 U.S. 265 (1978) .............................................................................. 7, 9, 10

*Ricketts v. City of Columbia*,
　36 F.3d 775 (8th Cir. 1994) ........................................................................ 21

*Sanchez v. Gomez*,
　283 F. Supp. 3d 524 (W.D. Tex. 2017) ............................................. 38, 39, 40

*Saucier v. Katz*,
　533 U.S. 194 (2001) ..................................................................................... 18

*Schneckloth v. Bustamonte*,
　412 U.S. 218 (1973) ..................................................................................... 26

*Shipp v. McMahon*,
　234 F.3d 907 (5th Cir. 2000) ........................................................... 18, 21, 23

*Sierra Club v. Energy Future Holdings Corp.*,
　921 F. Supp. 2d 674 (W.D. Tex. 2013) ......................................................... 5

*Sioux City Bridge Co. v. Dakota County*,
　260 U.S. 441 (1923) ..................................................................................... 20

*In re Sistrunk*,
　142 S.W.3d 497 (Tex. App—Houston [14th Dist.] 2004, orig. proceeding) ........... 35

*Skinner v. Ry. Labor Executives Ass'n*,
　489 U.S. 602 (1989) ..................................................................................... 28

*Smith v. Wade*,
　61 U.S. 30 (1983) ......................................................................................... 46

*Soto v. Flores*,
　103 F.3d 1056 (1st Cir. 1997) ..................................................................... 21

*Spokeo, Inc. v. Robins*,
　136 S. Ct. 1540 (2016) ................................................................................... 6

*State v. McDonald*,
　839 S.W.2d 854 (Tex. App—San Antonio 1992, orig. proceeding ................... 35

*Tasby v. Estes*,
　412 F. Supp. 1185 (N.D. Texas 1975) .......................................................... 53

*Turner v. Fouche*,
　396 U.S. 346 (1970) .................................................................................. 7, 24

*U.S. v Gen. Motors Corp.*,
　323 U.S. 373 (1945) ..................................................................................... 30

*U.S. v. Garber*,
　607 F.2d 92 (5th Cir. 1979) ................................................................... 30, 31

*U.S. v. Paige*,
　136 F.3d 1012 (5th Cir. 1998) ..................................................................... 29

*U.S. v. Richard*,
　994 F.2d 244 (5th Cir. 1993) ....................................................................... 26

*United States v. Tweel,*
   550 F.2d 297 (5th Cir. 1977) ................................................................ 25
*Van de Kamp v. Goldstein,*
   555 U.S. 335 (2009)........................................................................... 14
*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977)...................................................................... 21, 23
*Walker v. City of New York,*
   974 F.2d 293 (2d Cir. 1992) ................................................................ 39
*Washington University v. Catalona,*
   490 F.3d 667 (8th Cir. 2007) ............................................................... 31
*Washington v. Davis,*
   426 U.S. 229 (1976)........................................................................... 22
*Watson v. City of Kansas City, Kansas,*
   857 F.2d 690 (10th Cir. 1988) ........................................................ 20, 21
*Way v. County of Ventura,*
   445 F.3d 1157 (9th Cir. 2006) ........................................................ 26, 28
*Way v. Mueller Brass Co.,*
   840 F.2d 303 (5th Cir. 1988) ............................................................... 52
*Willowbrook v. Olech,*
   528 U.S. 562 (2000)........................................................................... 20
*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886)...................................................................... 7, 22
*York v. Jones,*
   717 F. Supp. 421 (E.D. Va. 1989) ........................................................ 31

## STATUTES

42 U.S.C. § 12102.................................................................................... 47
TEX. CONST., ART, I, § 30 .............................................................. 34, 35, 36
TEX. EST. CODE ANN. § 1101.101(a)(1) (West 2018) ................................. 47
TEX. C. PRIM. PROC. § 56.021 (West 2018)......................................... 34, 35
ALASKA STAT. ANN. § 18.13.010 (West 2018)............................................ 31
COLO. REV. STAT. ANN. § 10-3-1104.7 (West 2018) .................................. 31
FLA. STAT. ANN. § 760.40 (West 2018) .................................................... 31
GA. CODE ANN. § 33-54-1 (West 2018) .................................................... 31
N.J. STAT. ANN. § 10:5-45 (West 2018) .................................................... 31
N.Y. CIV. RIGHTS LAW § 79 (West 2018) .................................................. 31
OR. REV. STAT. ANN. § 192.543(2) (West 2018)......................................... 31

## RULES

Fed. R. Civ. P. 8....................................................................................... 11
Fed. R. Civ. P. 12 .................................................................................. 4, 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| AMY SMITH, JULIE ANN NITSCH, MARINA CONNER, EMILY BORCHARDT, SARAH JONES, ANGELA FIELDING, ANISHA ITUAH (By and Through her Legal Guardian, ANGELA McKAY), and HEATHER SIN, each individually and as representatives of all others similarly situated | § § § § § § § § § § | CASE NO. 1:18-cv-505-LY |
| v. | § § | |
| CITY OF AUSTIN, TRAVIS COUNTY DISTRICT ATTORNEY MARGARET MOORE, FORMER TRAVIS COUNTY DISTRICT ATTORNEY ROSEMARY LEHMBERG, AUSTIN POLICE CHIEF BRIAN MANLEY, FORMER AUSTIN POLICE CHIEF ART ACEVEDO, and TRAVIS COUNTY, TEXAS | § § § § § § § § § | |

**OMNIBUS RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

TO THE HONORABLE LEE YEAKEL, UNITED STATES DISTRICT JUDGE:

Plaintiffs file this Omnibus Response to the Motions to Dismiss filed by Defendants[1] and respectfully show this Court the following:

---

[1] Defendants have collectively filed approximately 57 pages of argument in their Motions, but many of their arguments and authorities overlap. Plaintiffs are therefore filing a single Omnibus Response in order to address the Defendants' arguments as efficiently as possible for the Court and to avoid duplicative filings. The Motion filed by Defendants Travis County, District Attorney Margaret Moore, and Former District Attorney Rosemary Lehmberg [Docket Do. 38-2] is referred to as the "County Motion," those defendants collectively are referred to as the "County Defendants," and DA Moore and DA Lehmberg are referred to as "DA Defendants" or "DAs." The Motion filed by Defendants City of Austin, Police Chief Brian Manley, and Former Police Chief Art Acevedo [Docket No. 40] is referred to as the "City Motion," those defendants collectively are referred to as the "City Defendants," and Chief Manley and Chief Acevedo are referred to as "Chief Defendants" or the "Chiefs."

## I.  INTRODUCTION

The Motion to Dismiss filed by the County Defendants states:

> It is the moral and legal duty of the elected District Attorney not to convict, but to seek justice.  Thus, in deciding which charges to file and what punishment to seek, the District Attorney must exercise prosecutorial discretion to balance the needs of a victim, the rights of an accused, and the safety of the community. . . .
>
> Working together, the Travis County law enforcement, advocacy groups, and prosecutorial communities prioritize seeking justice against those that threaten the safety of our community.[2]

The County Defendants make these claims in the face of data that indicates less than 0.2% of the roughly 1,000 sexual assaults reported annually in Travis County proceed to finality on those charges through the criminal justice system.[3]  Of those 1,000 sexual assault reports made annually in Travis County, more than 900 are made by women,[4] and on average more than 600 of those women have historically been subjected to an invasive collection of evidence in the form of a rape kit.[5]  All of the women who report their sexual assaults in Travis County interact with the law enforcement and/or prosecutorial communities, where they encounter systemic discriminatory and prejudicial behavior from the government actors sworn to protect them.[6]

Like the Named Plaintiffs in this case, the women of Travis County who report their sexual assaults go through this process because they are told they should report the crimes committed against them and because they want to protect other women from criminals.  Yet, when they do

---

[2] County Mot. at 2.
[3] First Am. Compl. at ¶ 243.
[4] *Id.* at ¶ 275.
[5] *See* Elizabeth Findell, *Victims, advocates plead with city leaders to resolve rape kit backlog*, Austin American-Statesman, available at https://www.statesman.com/news/2016 0915/victims-advocates-plead-with-city-leaders-to-resolve-rape-kit-backlog (Sept. 15, 2016, updated Sept. 25, 2018) ("Forensic examiners at SAFE Alliance in Austin perform 50 to 60 sexual assault exams per month.").
[6] *See generally* First Am. Compl. at ¶¶ 19-344.

report, they are repeatedly re-traumatized by law enforcement and the prosecutorial communities. From being disbelieved or discounted upon the very first report,[7] to being coerced into an invasive, hours-long search of their body for evidence that will not actually be used,[8] to being interrogated multiple times by law enforcement and members of the DAs office,[9] to being called "bad victims,"[10] to being told that their physical injuries are not sufficient,[11] to learning months or years after the fact that the evidence taken by the government from inside their bodies is only for "informational purposes,"[12] to being told that the crimes committed against them are "traumatic incidents" and not really crimes from the DAs' perspective,[13] to learning that someone they know cannot really ever be a criminal, at least according to the DAs' Office,[14] to being told by government actors that they actually consented to the criminal attack,[15] and to finally being told that no matter what evidence exists, and no matter how willing they may be to proceed, the case will not go forward because Travis County juries do not like "he said, she said" cases.

That the prosecutorial and law enforcement communities of Travis County claim they are prioritizing justice against those that threaten the safety of our community in these circumstances is breathtaking.  Defendants' contentions that they have satisfied their moral and legal duties to the women of Travis County—or are simply immune from doing so—are wrong.  Every Defendant in this lawsuit is legally required to provide equal protection to the women of Travis County and

---

[7] *See id*. at ¶¶ 19-229, 251-53, 259-63, 265-98, 301-41.
[8] *See id.* at ¶¶ 44, 57, 100, 210, 217-18, 221-22, 225-26, 229, 257-58, 265-83, 293-98, 338, 361, 379-83.
[9] *See id*. at ¶¶ 25, 32, 34, 39, 86, 165, 199, 210, 250-52, 284-98, 323-36.
[10] *See id.* at ¶¶ 138, 251, 285-86, 289, 327, 334.
[11] *See id*. at ¶¶ 61, 114, 293, 301, 305, 333.
[12] *See id.* at ¶ 314.
[13] *See id.* at ¶¶ 320-22.
[14] *See id.*
[15] *See id*. at ¶¶ 63-118, 146-75, 251-52, 281, 293-94, 303, 329, 331, 334-35, 361.

to abide by the Unites States and Texas Constitutions.  They have not done so, and for that, they can indeed be held to account in this Court.

Defendants filed two separate Motions to Dismiss, one on behalf of Travis County and the District Attorney Defendants (the "County Motion") and one on behalf of the City of Austin and the Police Chief Defendants (the "City Motion"), but they generally assert the same types of arguments.  They claim Plaintiffs do not have standing to bring the suit, that Defendants are immune from suit, that Plaintiffs' 111-page First Amended Complaint (the "Complaint") lacks sufficient factual allegations, that no constitutional right has been identified or violated, that the disabled plaintiffs have not adequately pled a cause of action for discrimination based on their disabilities, and that the relief sought is inappropriate.  Each of these arguments is wrong on the law, and the Complaint states plausible claims against all of the Defendants.  The Motions to Dismiss should be denied in their entirety.[16]

## II.  RULE 12(B)(1) AND 12(B)(6) STANDARDS

Defendants filed their Motions under Federal Rules of Civil Procedure 12(b)(1), asserting lack of subject matter jurisdiction, and 12(b)(6), asserting failure to state a claim upon which relief can be granted.  In ruling on a Rule 12(b)(1) motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff.  *Johnson v. Sw. Research Inst.*, 210 F. Supp. 3d 863, 867 (W.D. Tex. 2016).  A court may weigh the evidence and resolve factual disputes in order to satisfy itself that jurisdiction is proper.  *Med. Components, Inc. v. Osiris Med., Inc.*, 226 F. Supp. 3d 753, 760 (W.D. Tex. 2016).  In determining jurisdiction, the Court is free to consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts; or (3) the complaint supplemented by undisputed facts, plus the Court's resolution of

---

[16] If the Court determines that any portion of the Motions should be granted, Plaintiffs respectfully request leave to replead.

disputed facts.  *Id*.  "Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."  *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001) (internal citation omitted).

A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted." *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 609 (W.D. Tex. 2017).  When considering a motion to dismiss under Rule 12(b)(6), a court must accept all well-pled facts as true and view them in the light most favorable to the plaintiff.  *Sierra Club v. Energy Future Holdings Corp.*, 921 F. Supp. 2d 674, 681 (W.D. Tex. 2013).  To survive a motion to dismiss under 12(b)(6), a plaintiff must plead "enough facts to state a claim for relief that is plausible on its face."  *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 L. Ed. 2d 929 (2007)).  The plausibility standard is not akin to a "probability requirement," and simply asks for more than a sheer possibility that a defendant has acted unlawfully.  *Sierra Club*, 921 F. Supp. 2d at 681 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 L. Ed. 2d 868 (2009)).  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citing *Twombly*, 550 U.S. at 127).  In determining whether a complaint states a plausible claim for relief, a court must draw upon "its judicial experience and common sense."  *Sierra Club*, 921 F. Supp. 2d at 682 (citing *Iqbal*, 556 U.S. at 679).

## III.  ARGUMENTS AND AUTHORITIES

### A.    The Named Plaintiffs have Standing.

The County Defendants assert that Plaintiffs lack Article III standing to bring this case because, according to them, Plaintiffs' claims are based upon a non-existent federal right—the

prosecution of a third-party for crimes committed against them.[17]   They also claim that the Plaintiffs have not suffered an injury-in-fact, and that Plaintiffs' alleged injuries are not redressable.[18]   These arguments ignore Plaintiffs' allegations and misunderstand the law.

> **1.      Plaintiffs' claims are based on recognized legal rights.**

The County Defendants devote considerable time to the non-controversial idea that "a private citizen lacks a judicially cognizable interest in the prosecution or non-prosecution of another."[19]   But Plaintiffs are not asserting a right to have a third-party prosecuted for a crime; instead, they assert their rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution to be free from gender discrimination by state actors, their rights to be free from unreasonable searches and seizures under the Fourth Amendment to the U.S. Constitution, their rights to be free from government actors improperly taking their property under the Fifth Amendment to the U.S. Constitution, and their rights to be treated with dignity and respect under the Texas Constitution.  All of these are recognized "constitutional rights," as discussed in greater detail in the sections below.

> **2.      Plaintiffs have alleged injuries-in-fact, fairly traceable to Defendants.**

The County Defendants also argue that Plaintiffs' injuries are not specific or traceable enough to their conduct to satisfy the standing requirements of *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540 (2016).  *Spokeo* held that "a bare procedural violation" of a statute, "divorced from any concrete harm," does not constitute an injury in fact.  *See id.* at 1549.  The alleged violations in this case are not "bare procedural violations"; they are violations of some of the most fundamental and basic constitutional protections.

---

[17] County Mot. at 5.
[18] *See id.* at 10.
[19] *See id.* at 6.

For example, although there is no federally recognized right to prosecution of specific offenders, there is a well-established constitutional prohibition on state actors like Travis County, the DAs, the City of Austin, and the Police Chiefs perpetrating policies and practices that provide less protection to certain victims on the basis of their gender. *Yick Wo v. Hopkins,* 118 U.S. 356 (1886); *Navarro v. Block*, 72 F.3d 712, 716 (9th Cir. 1995). In short, the "'injury in fact' in an equal protection case . . . is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Fla. Ch. Assoc. Gen. Contractors v, City of Jacksonville,* 508 U.S. 656, 666 (1993); *see also Turner v. Fouche,* 396 U.S. 346 (1970); *Clements v. Fashing,* 457 U.S. 957 (1982); *Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 281 n.14 (1978). The failure to provide equal protection under the law is not a bare procedural violation but instead an injury—the deprivation of a right to which Plaintiffs are entitled under the constitution. Likewise, the injury occasioned by violations of the Fourth and Fifth Amendments rests in the state actors' deprivation of a plaintiff's constitutionally guaranteed rights.

The County Defendants' assertion that only Ms. Smith has "complained of specific actions taken by Defendant Lehmberg and/or Defendant Moore specific to their respective claims,"[20] is simply wrong. It also seems to be based on the County Defendants' continued refusal to acknowledge that the operative facts are alleged throughout the Complaint, not just in the three paragraphs they have chosen to cite. Specifically, paragraphs 299 through 336 articulate facts giving rise to plausible inferences of the following actions taken by the DAs in their personal and/or official capacities:

- The implementation and/or maintenance of the unconstitutional policies and customs that deny equal protection to female victims of sexual assault.

---

[20] *See id.* at 6.

- The misuse and continued demand for rape kit searches for "informational purposes," knowing that such kits will never actually be used for prosecution.

- Policies of de-criminalizing sexual assaults in which the female victim knows her offender, drugs or alcohol are involved, a videotape of the assault does not exist, or severe physical injury separate and apart from injuries inflicted during a sexual assault are not present.

- Failing to provide appropriate training to their staff.

Additional paragraphs throughout the Amended Complaint contain similar factual allegations from which plausible inferences of harm to each of the Named Plaintiffs can be drawn, including, but not limited to, stark statistical patterns that evidence the results of Defendants' discriminatory conduct and a direct comparison between how a similarly situated male victim was treated by Defendants.[21]

The County Defendants also wrongly argue that "Plaintiffs do not allege facts establishing involvement of the DA Defendants or Travis County" related to the "collection, custody, and use of SAKs and DNA evidence obtained from Plaintiffs" or that the rape kits were conducted pursuant to a policy, custom or practice of the County or the DA's Office.[22]  These assertions are belied by their own words and the current DA's own policies regarding rape kits, not to mention specific allegations in the Complaint.

In their Motion, the County Defendants admit that they "work[] together" with law enforcement, ostensibly to "prioritize seeking justice against those that threaten the safety of our community."[23]  And in their attempt to articulate why the taking of personal property from Plaintiffs is—from their perspective—not for "public use," the County Defendants assert that the

---

[21] *See also* First Am. Compl. ¶¶ 28-34, 43-44, 58-62, 107-10, 114-17, 129-32, 135-36, 138-44, 172-74, 189-91, 244-48, 251.
[22] County Mot. at 7-8.
[23] *Id.* at 2.

Plaintiffs' "biological samples were taken for the investigation and prosecutions of their respective individual cases."[24]

Similarly, DA Moore publicly touts her September 2017 formation of an Interagency Sexual Assault Team ("ISAT"), which is "headed by an Executive Committee that includes the District Attorney's Office, the Travis County Sheriff's Office, the Austin Police Department, the Pflugerville Police Department, the University of Texas Police Department, the Lakeway Police Department, the Capital Area Law Enforcement Association, and Safe Alliance."[25]  As described in the 2017 Annual Report from her office, that team, "comprises entities/agencies that are responsible for responding to, investigating, and prosecuting adult sexual assaults reported to law enforcement in Travis County," and the group is "unified in its mission to identify ways that sexual assault cases can best be investigated and prosecuted."[26]  Setting aside their incorrect legal conclusions about private/public use, the County Defendants cannot maintain that they have nothing to do with law enforcement's collection of rape kits and simultaneously assert that they are intimately involved with law enforcement and that the very same rape kit searches are conducted to help facilitate potential investigations and prosecutions.

Moreover, as alleged by Plaintiffs, but repeatedly ignored by the County Defendants, DA Moore has publicly stated that the vast majority of rape kits performed on women in Travis County have been performed, and continue to be performed, with no intention of actually using the "evidence" obtained.  For example, following a July 7, 2017 briefing from APD to the Travis County Commissioners Court about the status of rape kits in Travis County, DA Moore and her

---

[24] *Id.* at 25.
[25] Margaret Moore, District Attorney, Travis County District Attorney 2017 Annual Report, available at   https://www.traviscountytx.gov/images/district_attorney/docs/2017-da-annual-report.pdf   at   19 (cited in First Am. Compl. ¶ 308, n.82) (hereinafter the "2017 DA Report").
[26] *Id.*

9

second in command stated that the roughly 800 kits that had been allowed to grow mold in APD custody were not for "prosecutable cases."[27]   At or near the same time, DA Moore said: "The most important thing is [the mold] didn't affect the disposition of these cases.  There's a backlog, but that backlog is caused because these aren't high enough priority to be fed into the capacity we currently have.  It's only for informational purposes; it's not for prosecution."[28]

In May of 2018, DA Moore said that non-consensual sexual "incidents" involving acquaintances of female victims are really better characterized as "traumatic occurrences" that do not rise to the level of sexual assault,[29] confirming that the thousands of female victims of acquaintance rape in Travis County who have previously reported their rapes and submitted to rape kits at the request of the law enforcement and prosecutorial communities, will never see the property taken from them used for prosecution.  That DA Moore has only recently begun to publicly acknowledge these policies and customs make them no less real and does nothing to mitigate the impact of them on the Named Plaintiffs and the Invasive Testing Subclasses.

Whether the actions alleged by Plaintiffs were taken by the DAs in their personal capacities or their official capacities, or some combination of the two, is irrelevant to whether Plaintiffs have standing.  Plaintiffs have alleged facts demonstrating injuries in fact, fairly traceable to the alleged conduct of the DAs (in any capacity), that can be redressed through a favorable judicial decision. Article III standing requires nothing more, particularly at the pleading stage.  *See, e.g.*, *Davenport v. Rodriguez*, 147 F. Supp. 2d. 630, 634-35 (S.D. Tex. 2001) ("The Court notes that recent judicial attempts to impose a 'heightened pleading standard' for [Section] 1983 claims have been expressly rejected by the Supreme Court.  Thus, [Section] 1983 claims against municipalities are governed

---

[27] First Am. Compl. ¶¶ 313-14.
[28] *Id.*
[29] *Id.* at ¶¶ 320-22.

by the standard of Fed. R. Civ. P. 8(a)(2), and Plaintiff need only submit a 'short and plain statement of the claim showing the pleader is entitled to relief.'"); *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) ("The generic pleading requirements of [FRCP] 8 govern suits against individual defendants in their official capacity. [Plaintiff] need only provide a short and plain statement of the claim that will give the defendants fair notice of what the plaintiff's claim is and the grounds upon which it rests.").

### 3.    Plaintiffs have alleged redressable harm.

Plaintiffs' alleged deprivations of constitutional rights and unconstitutional conduct by Defendants are redressable both by money damages and injunctive and equitable relief. The Supreme Court has recognized the availability of both forms of relief in various contexts for decades. *Davis v. Passman*, 442 U.S. 228 (1979); *Bell v. Hood*, 327 U.S. 678 (1946). Yet the County Motion asserts that the harm caused by the County and the DAs is not redressable because (1) certain Defendants are entitled to qualified immunity, and (2) injunctive relief would be too intrusive for the County's ongoing operations. Those arguments are meritless, as discussed in detail in Sections B and G below.

## B.    Defendants Are Not Entitled to Immunity.

All of the individual Defendants assert immunity against the claims brought by Plaintiffs. Using Defendants' application of immunity, no claim would exist against law enforcement or prosecutors who fail to follow the law and the constitution. Whether it appears as prosecutorial immunity, Eleventh Amendment immunity, qualified immunity, or some combination thereof, the individual Defendants' attempts to avoid liability for the harms caused to Plaintiffs and the Putative Class fail.

1.     **Prosecutorial immunity does not apply to the DA Defendants' actions in this case.**

The DA Defendants argue that they are entitled to prosecutorial immunity and should therefore be dismissed from this case.  They are wrong for at least four reasons.

First, even if prosecutorial immunity applied to the DAs' alleged actions in this case (and it does not), that immunity only extends to suits for money damages, not to suits for injunctive relief.  *Ex parte Young,* 209 U.S. 123, 183-84 (1908).  Here, Plaintiffs seek injunctive relief to force the Defendants, including the Current DA, to stop discriminating against female survivors of sexual assault and to prevent other ongoing constitutional violations.

Second, although prosecutors do have absolute immunity (from money damages) for prosecutorial acts intimately tied to advocacy in the judicial process, they do not have prosecutorial immunity for any other actions, including investigative acts or administrative acts.  *Hoog-Watson v. Guadalupe Cnty., Tex.*, 591 F.3d 431, 438 (5th Cir. 2009) (prosecutorial immunity does not extend to "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings").  In other words, DAs do not have absolute immunity for every action they take as DAs.  They are only absolutely immune from suits for money damages for a subset of tasks—advocacy in the judicial process.  *Geter v. Fortenberry*, 849 F.2d 1550, 1553 (5th Cir. 1988) ("[A] prosecutor is not entitled to absolute immunity when he engages in activities outside his quasi-judicial role.").

Plaintiffs' allegations about the DAs do not relate to discrete prosecutorial choices intimately tied to the prosecution of a case in criminal courts.  Indeed, for most of the Named Plaintiffs' assaults, the judicial process never even began because their criminal assailants have never been arrested or indicted.  Nor do Plaintiffs complain about the discretion exercised by individual line prosecutors in the course of preparing or presenting a specific criminal case in court.

12

Instead, the policies, practices, and customs complained of in the Complaint evidence a pervasive and invidious approach by the DAs in the management, investigation, and administration of sexual assault cases involving female victims before arrests or indictments are made, and in the treatment of female sexual assault victims across the entirety of the DA's Office.  The failure to prosecute any individual sexual assault case may be one of the *results* of those illegal policies and practices, but the conduct complained of by Plaintiffs is:

- The behavior of the DA's Office and its personnel toward female victims of sexual assault;[30]

- The perception of unimportance assigned to sexual assault cases against women by the DA's Office and its personnel;[31]

- The DAs refusal to implement proper training of DAs handling sexual assault cases;[32]

- The prioritization of sexual assault cases involving male victims;[33]

- Statements made by DA Moore regarding the "non-criminality" of sexual assault;[34]

- The refusal or unwillingness of personnel within the DA's Office to call female victims and apprise them of the status of an investigation or case;[35] and

- Attitudes of the DAs and employees under their supervision regarding the credibility of female victims and consent.[36]

These are not complaints regarding individual prosecutorial decisions or discretion exercised by individual prosecutors when preparing or presenting a case in court, nor are they directly or intimately connected with a particular trial or any prosecutor's basic trial advocacy

---

[30] *See* First Am. Compl. at ¶¶ 320-21, 327.

[31] *See id.* at ¶¶ 313-18.

[32] *See id.* at ¶¶ 329, 361.

[33] *See id.* at ¶¶ 314-15, 322, 331, 361.

[34] *See id.* at ¶¶ 320-31.

[35] *See id.* at ¶ 330.

[36] *See id.* at ¶¶ 327, 334-35.

duties.[37]  They are allegations of a wide-ranging pattern of discrimination affecting female victims

of sexual assault within the DA's Office long before any quasi-judicial activity begins.  In the

absence of quasi-judicial activity, there is no prosecutorial immunity.  *See, e.g.*, *Buckley v.*

*Fitzsimmons*, 509 U.S. 259, 274 (1993) ("A prosecutor neither is, nor should consider himself to

be, an advocate before he has probable cause to have anyone arrested."); *Marrero v. City of*

*Hialeah*, 625 F.2d 499, 507 (5th Cir. 1980) ("[S]tate prosecutors are not entitled to absolute

immunity when they perform functions other than their quasi-judicial functions of 'initiating

prosecutions and presenting the State's case.'").[38]

Though the DAs' policies and practices may also manifest themselves in discretionary acts

later in the judicial process, immunity does not extend to the DAs insofar as they affirm and

promulgate the non-advocacy practices complained of as a matter of County policy.  *See Buckley*,

509 U.S. at 275-76 ("That the prosecutors later called a grand jury to consider the evidence this

work produced does not retroactively transform that work from the administrative into the

prosecutorial.  A prosecutor may not shield his investigative work with the aegis of absolute

---

[37] The DA Defendants cite *Van de Kamp* and *Imbler* to argue that prosecutorial discretion "extends to administrative and supervisory acts that are within the consideration of how cases work," but both *Van de Kamp* and *Imbler* relate to training or administrative issues regarding *specific* trials and post-indictment advocacy actions, not overall policies, customs, and practices that impact a class based on gender before advocacy activities begin.  *See Van de Kamp v. Goldstein*, 129 S. Ct. 855, 857 (2009); *see also Imbler v. Pachtman*, 424 U.S. 409, 425 (1976).

[38] *See also Barbera v. Smith*, 836 F.2d 96, 100 (2nd Cir. 1987) ("[I]n each of the cases we have reviewed where absolute immunity was upheld, some type of formal proceeding had been commenced or was being commenced by the challenged acts.  Conversely, where no proceedings have begun, qualified immunity is the norm."); *Hill v. City of New York*, 45 F.3d 653, 661 (2nd Cir. 1995) ("Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings.  Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts.").

immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial.").

Third, the DA Defendants are not entitled to absolute immunity for acts that are "designed to *avoid* the 'judicial phase.'"  *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 914 (9th Cir. 2012) ("The prosecutor's immunity is rooted in 'the same considerations that underlie the common-law immunities of judges and grand jurors . . . which is to protect the judicial process' . . . [and] those checks failed here.").  Plaintiffs allege that when a Travis County prosecutor raises "credibility issues" with a victim and the victim becomes an advocate for her own case, the DA's office will take the case to the grand jury with little to no effort, knowing that without the backing of the DA's office, the grand jury will not indict and will "no bill" the case.[39]  Attempts to avoid or side-step the protections within the judicial process forfeit protections the law offers—absolute immunity— to those who work within that process.  *See Lacey*, 693 F.3d at 914.

Finally, the DAs cite no authority to support their attempts to extend prosecutorial immunity to an office-wide policy or discriminatory practice.  Rather, each case they cite relates specifically to individual choices made by individual line prosecutors, after a criminal defendant has been arrested or indicted.  *E.g.*, *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997); *Krueger v. Reimer*, 66 F.3d 75, 77 (5th Cir. 1995); *Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990).  Plaintiffs have alleged that the DA requires law enforcement to present all sexual assault cases for review before obtaining an indictment (as opposed to the normal process for other crimes),[40] that the Current DA has made public statements that an entire set of cases that overwhelmingly impact women is "non-prosecutable" before primary evidence has even been examined,[41] and that the

---

[39] First Am. Compl. at ¶¶ 143, 327.
[40] *Id*. at ¶ 325.
[41] *Id.* at ¶¶ 320-21.

Current DA has made public statements that the overwhelming majority of sexual assaults committed against female victims are not, in fact, criminal.[42]   None of those actions relate to the discretion exercised by an individual prosecutor as he prepares to present, or does present, an individual case in court.   They instead unilaterally set the policy of the DA's Office and convey those policies to law enforcement to guide their investigations.   Prosecutorial immunity simply does not extend to such conduct.   *See generally Crane v. State of Texas*, 766 F.2d 193 (5th Cir. 1985); *see also Mink v. Suthers*, 482 F.3d 1244, 1263 (10th Cir. 2007) ("[I]n this case the prosecutor's function was not that of an advocate; her function was to provide legal advice outside the courtroom to aid a nascent investigation.   The 'premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide the police, not to prepare his own case.' . . . Accordingly, in these circumstances, immunity does not attach."); *Botello v. Gammick*, 413 F.3d 971, 976-77 (9th Cir. 2005) ("The Supreme Court has also held that prosecutors are not entitled to absolute immunity for advising police officers during the investigative phase of a criminal case, performing acts which are generally considered functions of the police, acting prior to having probable cause to arrest, or making statements to the public concerning criminal proceedings."); *Botello*, 413 F.3d at  977 n.5 ("By attempting to dictate the manner in which future investigations should be staffed and conducted, the prosecutors were likely engaging in an investigative rather than a judicial function.").

        **2.**       **Eleventh Amendment immunity is not available.**

The DA Defendants also claim Eleventh Amendment immunity, arguing that Plaintiffs' suit against them is in essence "a suit against the state."   But this assertion of immunity fails, too. Like prosecutorial immunity, Eleventh Amendment immunity does not attach in suits for

---

[42] *Id.*

injunctive and declaratory relief. *Edelman v. Jordan,* 415 U.S. 651, 672-73 (1974).  More significantly, however, the Fifth Circuit has made clear that district attorneys are properly viewed as county officials—not state officials—in most circumstances, for myriad reasons. *See generally Crane v. State of Texas*, 766 F.2d 193 (5th Cir. 1985).  In *Crane v. State of Texas*, the Fifth Circuit held that the Dallas County District Attorney was responsible for the policy promulgated in his office for *Dallas County*, noting "even were he a State official in every sense, called so in State law and designated by the State to make policy for its other creature, the county, our answer would likely remain the same; county responsibility for violation of the Constitution cannot be evaded by such ingenious arrangements." *Id.* at 195.

This case is not about challenging the enforcement of an unconstitutional state statute as in *Echols v. Parker,* or the constitutionality of the DAs' treatment of a single defendant as in *Quinn v. Roach*, which is the authority put forth by the DAs.  Rather than an action against the DAs related to the DAs' actions in initiating prosecution and presenting the State's case in a criminal proceeding, this lawsuit challenges the constitutionality of discriminatory *county policy* perpetrated by the DA's Office.  The policies complained of presumably do not represent the official policy of the State of Texas, and even according to the DAs' own cited authority, a DA "acts as a county agent when he is enforcing county law or policy." *Echols*, 909 F.2d. at 801.  The facts alleged in support of Plaintiffs' claims relate specifically to practices and policies employed in Travis County by the Travis County DA, thus the DAs are not entitled to Eleventh Amendment immunity.

### 3.    Qualified immunity does not apply.

The DAs and the Police Chiefs assert that qualified immunity precludes Plaintiffs' claims against them individually.  They are wrong.

When analyzing qualified immunity, a court first determines whether the facts alleged are sufficient to state a violation of a constitutional right, and then whether that right was clearly established at the time of the defendant's alleged misconduct. *Quinn v. Roach*, 326 F. App'x. 280, 284 (5th Cir. 2009); *Saucier v. Katz*, 533 U.S. 194 (2001). As discussed in Section C, the right to be free from gender discrimination in the provision of law enforcement services has been a clearly established right in the Fifth Circuit since at least 2000. *Shipp v. McMahon,* 234 F.3d 907, 916 (5th Cir. 2000). Likewise, the text of the Fourth and Fifth Amendments and related precedent establish beyond confusion that unreasonable searches and seizures by state actors are not permitted and that taking of personal property by state actors without just compensation is prohibited.

Plaintiffs have alleged numerous facts to establish the violation of these clearly established constitutional rights.[43] As pleaded, Plaintiffs offer facts (generally) on how sexual assault claims are treated differently when women are victims as opposed to men, how female victims are blamed for their own assaults when men are not, how women's DNA evidence is often left untested for years at a time, how the statistics demonstrate that far fewer prosecutions are undertaken or completed for sexual assaults on female victims as compared to male sexual assault victims or victims of other crimes (whose demographic make-up is not disproportionately female), just to name a few. Qualified immunity is not available to Defendants because the facts alleged—even at this early stage—demonstrate that the Defendants' conduct violated Plaintiffs' clearly established constitutional rights. *Quinn*, 326 F. App'x. at 284-85 ("If the official's conduct violated a clearly established constitutional right, then qualified immunity is not applicable.").

---

[43] *See* First Am. Compl. at ¶¶ 19-344.

The Police Chiefs' characterization of their actions as "a mistake in judgment" requiring protection by qualified immunity[44] is improper in the face of Plaintiffs' allegations that APD officers were marginalizing and demeaning female rape victims on the *walls* of the police house,[45] and when the APD's DNA lab was proceeding so inadequately that it was eventually shut down. There is nothing objectively reasonable about treating women who are victims of sexual assault differently than male victims, relying on gender-based assumptions in providing law enforcement services, or in dismissing the claims of female victims of sexual assault based on gender-based beliefs about their credibility or perceived complicity in their own assaults, among other things. Plaintiffs have alleged facts sufficient to establish that qualified immunity is not available to the DAs or Chiefs for the claims against them.

Moreover, the qualified immunity analysis depends on fact-intensive inquiries and a determination at this stage is inappropriate. *See Greenwood v. City of Yoakum*, No. V-07-78, 2008 WL 4615779, at *4 (S.D. Tex. Oct. 17, 2008) ("At the least, Greenwood's assertions entitle him to discovery related to whether Chief Formolo's actions, when viewed in light of Greenwood's prior complaints of police misconduct, preclude him from the protection provided by qualified immunity."); *Barr v. City of San Antonio*, No. SA-06-CA-0261-XR, 2006 WL 2322861, at *3 (W.D. Tex. July 25, 2006) ("In judging the reasonableness of Alcala's actions regarding his handcuffing and placing Plaintiff in his patrol car, the Court is unwilling to grant qualified immunity at this [motion to dismiss] stage. The decision as to qualified immunity on this claim would better be decided after Plaintiff has been able to gather evidence as to the circumstances surrounding the March 23, 2004 stop of Plaintiff's vehicle."). In the event the Court disagrees that

---

[44] City Mot. at 9.
[45] First Am. Compl. at ¶ 259.

the facts pleaded are sufficient to demonstrate violation of clearly established constitutional rights, Plaintiffs seek leave to replead, and to take discovery related to the availability of the defense.

## C.      Plaintiffs have Adequately Alleged Their Constitutional Claims.

### 1.      Plaintiffs' Equal Protection claim.

Defendants assert that Plaintiffs do not base their claims on any recognized constitutional rights.[46]  But there is no doubt that Plaintiffs have a right to equal protection of the laws, and to be free from discrimination by state actors in the implementation of those laws.

"The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 445 (1923); *City of Willowbrook v. Olech,* 528 U.S. 562 (2000).   With regard to the criminal justice system specifically, "[t]he State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause."   *DeShaney v. Winnebago County,* 489 U.S. 189, 197 n.3 (1989); *see also McKee v. City of Rockwall, Tex.,* 877 F.2d 409, 418 (5th Cir. 1989).  And, "[a]lthough there is no general constitutional right to police protection, the state may not discriminate in providing such protection."  *Watson v. City of Kansas City, Kansas,* 857 F.2d 690, 694 (10th Cir. 1988).  Plaintiffs' Fourteenth Amendment claims are based on the right to equal protection in the provision of services by law enforcement authorities, including the DA's Office, and the failure of Defendants to provide those services equally to women based on their gender.  Section 1983 provides the mechanism by which Plaintiffs can enforce those rights.  *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978).

---

[46] *See* County Mot. at 3; City Mot. at 2-3.

As the Fifth Circuit established eighteen years ago, "to sustain a gender-based Equal Protection claim based on law enforcement policies, practices, and customs toward domestic assault and abuse victims, a plaintiff must show: (1) the existence of a policy, practice, or custom of law enforcement to provide less protection to victims of domestic assault than to victims of other assaults; (2) that discrimination against women was a motivating factor; and (3) that the plaintiff was injured by the policy, custom, or practice." *Shipp*, 234 F.3d at 914.  The court noted that victims of domestic violence are disproportionately female, and as the Complaint in this case details, the same is true for victims of sexual assault.[47]  The Fifth Circuit is not alone in recognizing a gender-based Equal Protection claim based on law enforcement policies and practices.  The elements of such a claim have been well-established across most of the country for two decades. *See, e.g.*, *Watson v. City of Kansas City,* 857 F.2d 690 (10th Cir. 1988); *Soto v. Flores,* 103 F.3d 1056, 1066 (1st Cir. 1997); *Ricketts v. City of Columbia,* 36 F.3d 775, 779 (8th Cir. 1994); *Eagleston v. Guido,* 41 F.3d 865, 878 (2d Cir. 1994); *Hynson v. City of Chester,* 864 F.2d 1026, 1031 (3d Cir. 1988); *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 701 (9th Cir. 1990).

Defendants also argue that Plaintiffs have not sufficiently alleged discriminatory intent. Notably, the cases cited by Defendants generally relate to determinations made at the summary judgment phase, after discovery has been conducted and Plaintiffs have had an opportunity to provide evidence of that intent to the Court.  This is not surprising because discriminatory intent is a fact-intensive inquiry that is usually not appropriate at the motion to dismiss stage.  *See generally Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977).[48] Regardless, Plaintiffs have sufficiently alleged discriminatory intent throughout the Complaint.

---

[47] *See* First Am. Compl. at ¶¶ 230-32.

[48] In addition to being wrong on the law and ignoring the allegations included in the Complaint, Defendants' arguments overlook the fact that evidence of Defendants' actions in the course of their

Gender or race-based discrimination is rarely apparent on the face of official policies, and a statute or policy must not be applied so invidiously to discriminate on those bases. *Washington v. Davis*, 426 U.S. 229, 241 (1976); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Unequal application of the law (or policies put in place by law enforcement) can show intentional discrimination. *Washington*, 426 U.S. at 241; *Akins v. Texas*, 325 U.S. 398, 404 (1945); *McKee v. City of Rockwall, Tex.*, 877 F.2d 409 (1989). The Complaint contains numerous facts sufficient to give rise to a plausible inference of discriminatory intent, including the history of a series of official actions with discriminatory purposes, departures from normal procedures when dealing with female sexual assault victims, and communications by the decision-makers concerning the intent and purposes of their actions, such as:

- Allocation of investigatory and management resources disproportionately favoring other violent crimes that do not disproportionately affect women as opposed to sexual assaults against female victims;[49]

- Prioritization of other DNA evidence over rape kits (which disproportionately and negatively affects female victims);[50]

- Ignoring or refusing to test rape kits at all, allowing viable evidence to sit for as long as three decades unprocessed, and allowing evidence to mold;[51]

- Misleading female victims of sexual assault about the use of DNA evidence for their cases;[52]

---

investigation and processing of sexual assault cases—which is directly relevant to the issue of discriminatory intent—will also exist in Defendants' own files. Counsel for Plaintiffs requested access to public records from each of the Defendants via open records requests in June, but to date, the DA's Office has provided no responsive information. The Texas Attorney General's Office issued a ruling on October 9, 2018, which requires the DA's Office to provide information responsive to several of the requests. Letter from Daniel Hung, Attorney General's Office, Open Records Division, OR2018-25096 (Oct. 9, 2018).

[49] First Am. Compl. ¶¶ 257, 275, 296, 308-09.
[50] *See id.* at ¶ 296.
[51] *See id.* at ¶¶ 255, 295-298, 313-15.
[52] *See id.* at ¶ 298.

- Treating women's testimony as inadequate evidence regarding lack of consent;[53]

- Treating women as less credible than male victims of sexual assault;[54]

- Traumatizing female sexual assault victims through victim-blaming, shaming, or disregarding their statements;[55]

- Relying on lack of consent for refusal to bring charges or prosecute cases when women are involved (but not men);[56]

- Traumatic and unequal interrogation of female victims, including adversarial questioning about what they were wearing, who their sexual partners are, whether they drink or use drugs, and why they went to a particular place;[57]

- Statements suggesting that sexual assaults against women are not criminal or actionable if the perpetrator is known to the victim;[58]

- Focusing on "false reports" made by women and "de-bunking" accusations rather than investigating based on testimony and evidence apparent in the case;[59]

- Ignoring DNA evidence in thousands of cases involving female victims and then claiming the evidence is not relevant after Defendants themselves close the cases for lack of evidence or investigative activity;[60] and

- Refusing to return phone calls to victims of sexual assault (who are more than 90% female).[61]

Moreover, although the existence and evidence of disparate impact is ordinarily not alone sufficient to prove discriminatory intent, it is a factor courts consider alongside other evidence. *Shipp,* 234 F.3d at 914.  And when evidence of disparate impact is particularly striking, that alone can suffice to establish discriminatory intent.  *See, e.g.*, *Arlington Heights*, 429 U.S. at 266

---

[53] *See id.* at ¶¶ 293, 334-35.
[54] *See id.* at ¶¶ 287, 294, 334.
[55] *See id.* at ¶¶ 25, 39, 285-86, 321.
[56] *See id.* at ¶¶ 293, 335, 329.
[57] *See id.* at ¶¶ 25, 39, 285.
[58] *See id.* at ¶¶ 288, 320.
[59] *See id.* at ¶ 259.
[60] *See id.* at ¶¶ 257, 293, 272, 314.
[61] *See id.* at ¶ 330.

(explaining that impact alone may evince a constitutional violation when such impact creates a stark pattern that is "unexplainable on grounds other than" discrimination); *see also Turner v. Fouche*, 396 U.S. 346 (1970).  The Complaint is replete with factual allegations supporting a striking disparate impact on the women of Travis County.[62]

The DAs also separately assert that there are no facts pleaded to demonstrate gender discrimination specifically on the part of the DA's Office.  To name just a few additional factual allegations that give rise to a plausible inference of discriminatory intent by the DAs specifically, Plaintiffs pled:

- The DA's Office, under both the Current and Former DA, ignores sexual assault cases (disproportionately affecting female victims) in favor of others;[63]

- The DA's Office treats male victims of sexual assault differently than female victims, even when they are similarly situated;[64]

- The Current DA's own statistics demonstrate a policy or custom under both the Current and Former DA to process only a tiny fraction of the hundreds of sexual assault cases involving female victims that are reported each year and presented to her office;[65]

- The Current DA has publicly said that incidents involving alcohol, acquaintances or known assailants "aren't really criminal;"[66] and

- The Current DA has no intention of prosecuting cases on behalf of victims whose rape kits have gone untested for years.[67]

The Complaint also includes specific and direct allegations of animus against women by Defendants, including APD's maintenance of a wall trumpeting all of the "debunked" female victims, the DAs' determinations to take a rapist to trial only after he raped a man, even while

---

[62] *See id.* at ¶¶ 230-42, 243-48, 275, 332.
[63] *See id.* at ¶ 329.
[64] *See id.* at ¶¶ 294, 322, 334.
[65] *See id.* at ¶ 340.
[66] *See id.* at ¶¶ 320-21.
[67] *See id.* at ¶ 314.

female victims of the same rapist saw their cases disappear,[68] and DA Moore's recent admissions that (1) the DA's office does not believe the vast majority of sexual assaults against women are criminal, and (2) the hundreds or thousands of women who have been subjected to invasive searches of their bodies for evidence will never actually see that evidence used for prosecution.[69] Additional discovery is likely to illuminate other evidence of animus as well.

Each of these allegations reflects stereotypes, false beliefs, and gender-based assumptions that contribute to the purposeful practices of the Defendants toward female sexual assault victims. Those beliefs as implemented create the type of systemic and invidious discrimination that the Equal Protection Clause prohibits. Defendants intentionally acted on the basis of those gender-based beliefs, and that conduct has impacted female victims differently than males, which is sufficient to allege discriminatory intent.

### 2. Plaintiffs' Fourth Amendment claim.

Plaintiffs allege that their bodily and genetic material was taken by Defendants as part of an unreasonable search, which is prohibited by the Fourth Amendment.[70] In response, Defendants make a number of bizarre and incredible claims with regard to the government searches represented by the rape kits. All of the Defendants' arguments are incorrect.

First, Defendants claim that Plaintiffs consented to the rape kit searches. But, as alleged in the Complaint, Defendants misled Plaintiffs about Defendants' purpose and intent for the physical intrusion or search, which coerced them to submit to an invasive forensic exam. "A consent search is unreasonable under the Fourth Amendment if the consent was induced by deceit, trickery, or misrepresentation." *United States v. Tweel*, 550 F.2d 297, 299 (5th Cir. 1977). "The

---

[68] *See id.* at ¶¶ 259, 334.
[69] *See id.* at ¶¶ 313-15, 320-21.
[70] *See id.* at ¶¶ 19-228, 390-408.

Fourth Amendment test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined by all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996).[71]  "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents." *Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973).

It is difficult to imagine a person in a more vulnerable state than a victim who has just been violated sexually and subjected to a violent, unwanted intrusion upon her body.  It is equally difficult to imagine a more invasive search process than the hours-long process required for a rape kit, which includes another set of unwanted intrusions upon and into the same parts of her body that were just violated.  Similar but far less invasive types of searches have been found to be deeply personal and upsetting.  *See, e.g.*, *Way v. County of Ventura*, 445 F.3d 1157, 1160 (9th Cir. 2006) ("The scope of the intrusion here [a strip search] is indisputably a 'frightening and humiliating' invasion, even when conducted 'with all due courtesy.'  Its intrusiveness 'cannot be overstated.'").  And it is virtually impossible to imagine anything more coercive in that moment than being told that if a rape kit is not conducted, evidence of the crime may be lost, yet that is what the consent forms provided to victims of sexual assault in Travis County say.[72]

Plaintiffs reasonably believed, based on information provided by Defendants and their agents, that the rape kits would be appropriately handled and stored, timely and properly tested, used to assist Defendants in the investigation and potential identification of suspects, and for potential prosecution of their assailants.  As alleged in the Complaint, however, this is untrue in

---

[71] The burden is on the government to prove by a preponderance of the evidence that any consent given was free and voluntary.  *See U.S. v. Richard*, 994 F.2d 244, 252 (5th Cir. 1993).
[72] *See* First Am. Compl. at ¶ 205.

the vast majority of cases.[73]  Most rape kits in Travis County sit for years (or even decades) without testing, and even when they are tested and a suspect is identified, the material taken from Plaintiffs is not used to pursue additional investigation or process cases through the criminal justice system (with rare exceptions).  Absent the purposeful misrepresentations by Defendants and their agents and the threat that if a rape kit is not conducted, a criminal investigation and prosecution will be compromised, no reasonable victim would subject themselves to the hours-long ordeal of a rape kit, prolonging the violation of their bodies and their privacy.

DA Moore has finally admitted in a public statement made this year that most rape kits will not, in fact, ever be used for prosecution.[74]  But the Defendants' explicit and implicit representations to victims, including Plaintiffs, that the collection of evidence from their bodies was necessary in order to bring their offenders to justice were deceptive because only a handful of cases are ever prosecuted.  Given the invasiveness of the search required to conduct a rape kit, Defendants unreasonably failed to inform victims of their *de facto* policies, practices and intent not to prosecute.  These misrepresentations alone make the searches unreasonable under the law, and there is no justification for Defendants—particularly where *victims*, as opposed to suspected perpetrators, are concerned—to induce Plaintiffs and other women to submit to a search that has virtually no hope of resulting in prosecution as a result of Defendants' discriminatory policies and conduct.[75]

Second, Defendants claim the rape kits cannot be a search under the Fourth Amendment because they are not performed under the agency of law enforcement.  This is a ridiculous position.

---

[73] *See id.* at ¶¶ 44, 57, 100, 210, 217-18, 221-22, 225-26, 229, 257-58, 265-83, 293-98, 313-22, 338, 361, 379-83.
[74] *See id.* at ¶¶ 313-22.
[75] *See id.* at ¶¶ 19-229, 244-48, 257-58, 265-83, 293-98, 313-22, 338, 361, 379-83.

The exams are called *forensic exams*, and the name itself denotes the obvious purpose and intended use of the collected evidence by Defendants.  The rape kit "consent" forms signed by victims in Travis County also state that the purpose of the exam is "to discover and preserve evidence of the assault"[76] and that "the report of the examination and any evidence obtained will be released to law enforcement authorities."[77]  While the exams may be directly performed by nurse examiners or other medical professionals, and not police officers or prosecutors, the only purpose of a rape kit is for use in law enforcement efforts.[78]  There is literally no other reason they are performed. Victims of sexual assault do not enjoy or wish to submit to the hours-long invasive process that prolongs a traumatic assault, and the collection of forensic evidence for a rape kit is not a medically necessary procedure.  Plaintiffs and members of the Invasive Testing Subclass endured the rape kit searches solely to assist law enforcement efforts.

Defendants know this, work with the nurse examiners, and coordinate the transfer of evidence after the rape kit search is performed.[79]  Moreover, as alleged in the Complaint, Defendants often improperly rely on the *lack* of evidence from rape kits to justify why a case cannot be further investigated or processed, so they are certainly aware that the rape kits—while performed by nurses or other medical personnel—are taken on behalf of, and for the use of the APD and the DA's Office.  As such, the nurse examiners and other medical personnel who conduct

---

[76] *Id.* at ¶ 205.

[77] *Id.*

[78] The Fourth Amendment applies to searches by a private individual acting "as an instrument or agent of the [g]overnment."  *Skinner v. Ry. Labor Executives Ass'n*, 489 U.S. 602, 614 (1989); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971).

[79] Indeed, there is an entire Subchapter of the Texas Government Code dedicated to the collection, transfer, and use of rape kit evidence.  *See* Tex. Gov't Code Chapter 420, Subchapter B: Collection, Preservation, and Tracking of Evidence of Sex Offense.  The Texas Attorney General's Office has also published a "Texas Evidence Collection Protocol to standardize the collection of evidence in sexual assault cases across the State," which is available at https://www.texasattorneygeneral.gov/files/cvs/evidence_collection.pdf.

rape kit searches on women in Travis County are instruments or agents of the government when conducting them, thereby implicating the Fourth Amendment. *See U.S. v. Paige*, 136 F.3d 1012, 1017-18 (5th Cir. 1998) (describing the two-part test used "to determine if a private party activates the Fourth Amendment by acting as an instrument or agent of the government in conducting the search" as "(1) whether the government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends.").

Third, Defendants claim there are no facts establishing that the rape kits of the Named Plaintiffs were collected pursuant to a policy, custom or practice of the APD or under the DA Defendants' direction. This is an incorrect assertion and also disingenuous. As discussed in Section A and in the Complaint, rape kits are the primary evidence obtained and relied upon by both the APD and the DA's Office in cases of sexual assault, the DAs and APD work very closely together on reports and cases involving sexual assault, and the DAs and APD have implemented and maintained customs and policies surrounding the collection and use of rape kits.

The Complaint also alleges that each of the Named Plaintiffs who submitted to a rape kit did so in connection with reporting their assaults to law enforcement. Ms. Smith, Ms. Nitsch, Ms. Borchardt, Ms. Jones, and Ms. Sin all alerted APD immediately following their sexual assaults and then had a rape kit performed at a hospital or by SAFE, which is an authorized forensic exam provider in Travis County, at the suggestion and/or direction of the police.[80] Ms. Conner had a rape kit conducted by SAFE at or near the time she called the APD, which was less than 24 hours after she was assaulted.[81] Moreover, to the extent the Defendants truly do not know where the Named Plaintiffs' rape kits were conducted, by whom, and to whom they were delivered, they

---

[80] *See* First Am. Compl. at ¶¶ 22, 38-41, 84-92, 124-26, 198-206.
[81] *See id.* at ¶¶ 49-52.

have the means to immediately obtain all of that information by simply looking at their own paperwork and the rape kits that are in APD's possession.

Plaintiffs adequately pleaded a violation of the Fourth Amendment based upon the facts alleged and the applicable law. Defendants' Motion should be denied.

### 3.     Plaintiffs' Fifth Amendment claim

Defendants' arguments regarding Plaintiffs' Fifth Amendment claims also fail. Defendants assert that the taking of genetic material, fluids, and tissues found in the bodies of women following a sexual assault is not a physical taking under the Fifth Amendment. In fact, the City's Motion goes so far as to state that the City Defendants are "unaware of cases where courts have found genetic material to be 'property' implicating Fifth Amendment protection."[82] This is a surprising assertion for many reasons, not the least of which is that Plaintiffs' Omnibus Response to Defendants' original Motions to Dismiss included two examples of such cases.[83] *See generally In the Marriage of Rooks*, No. 15CA0990, 2016 WL 6123561 (Colo. Ct. App. Oct. 20, 2016), *cert. granted*, No. 16SC906, 2017 WL 1377942 (Colo. Apr. 17, 2017); *McQueen v. Gadberry*, 507 S.W.3d 127 (Mo. Ct. App. 2016), *reh'g denied*. Moreover, the Fifth Circuit noted almost forty years ago that "blood plasma, like a chicken's eggs, a sheep's wool, or like any salable part of the human body, is tangible property." *U.S. v. Garber*, 607 F.2d 92, 97 (5th Cir. 1979).

A property right is defined by a citizen's "relation to the physical thing, as the right to possess, use and dispose of it." *U.S. v Gen Motors Corp.*, 323 U.S. 373, 377-78 (1945). It is difficult to imagine anything that could be more personal, or more clearly one's own to possess, use and dispose of, than bodily tissues, fluids and DNA. In fact, as also noted in Plaintiffs' prior Omnibus Response, several states expressly recognize DNA as personal property by statute.

---

[82] *See* City Mot. at 12.
[83] *See* Omnibus Response to Defendants' Motions to Dismiss [Docket No. 23] at 51.

ALASKA STAT. ANN. § 18.13.010 (West 2018); COLO. REV. STAT. ANN. § 10-3-1104.7 (West 2018); FLA. STAT. ANN. § 760.40 (West 2018); GA. CODE ANN. § 33-54-1 (West 2018). Three additional states define the taking and using of DNA as a crime.  OR. REV. STAT. ANN. § 192.543(2) (West 2018); N.J. STAT. ANN. § 10:5-45 (West 2018); N.Y. CIV. RIGHTS LAW § 79-1 (McKinney 2018).

Courts have also recognized that bodily tissue, sperm, and blood plasma are "property." *See, e.g.*, *Washington University v. Catalona*, 490 F.3d 667, 674 (8th Cir. 2007) (examining donations of biological materials as inter vivos gifts, which are defined under Missouri law as "a voluntary transfer of property by the owner to another, without consideration or compensation as an incentive or motive for the transaction"); *Hecht v. Superior Court*, 16 Cal. App. 4th 836, 850 (Cal. Ct. App. 1993) ("[D]ecedent had an interest in the nature of ownership, to the extent that he had decision making authority as to the use of his sperm for reproduction.  Such interest is sufficient to constitute 'property' with the meaning of [the] Probate Code."); *York v. Jones*, 717 F. Supp. 421, 425, 427 (E.D. Va. 1989) (denying defendants' motion to dismiss quasi-contract and detinue claims related to defendants' refusal to release or transfer pre-zygotes as requested by donor couple); *Garber*, 607 F.2d at 97.

Defendants cite just one case in support of their claim that bodily tissues, fluids and DNA are not property—*Moore v. Regents of the University of California*, 51 Cal. 3d 120, 135 (Cal. 1990).  But the *Moore* Court itself recognized the limitations of its decision, noting: "[W]e do not purport to hold that excised cells can never be property for any purpose whatsoever."  *Id*. at 142. Rather, it was the "novelty of Moore's claim" that demanded "express consideration of the policies to be served by extending liability" under a conversion theory and ultimately guided the Court's decision.  *Id.*

The plaintiff in *Moore* filed suit against his physician and other defendants for "using his cells in potentially lucrative medical research without his permission."  *Id.* at 124-25.  Moore alleged that while undergoing treatment for hairy cell leukemia, his physician recommended that various tissue and blood samples be taken, and that Moore's spleen be removed.  *Id.* at 126. Without informing Moore, his physician and the other defendants conducted research on the samples, which eventually resulted in the creation of a cell-line that was patented and benefited the defendants financially.  *Id.* at 126-27.  In connection with his claims, Moore asserted "ownership of the results of socially important medical research, including the genetic code for chemicals that regulate the functions of every human being's immune system."  *Id.* at 136.  The California Court of Appeals rejected Moore's conversion claim, but held that he had stated a cause of action for breach of physician disclosure obligations.  *Id.* at 125.

Unlike Moore, none of the Plaintiffs here assert a property interest in financial proceeds received by Defendants for doing their jobs—*i.e.*, actually testing the samples taken from Plaintiffs.  They instead assert an interest in the bodily tissue and DNA itself, which was taken from them by the government, purportedly to be used to benefit public safety.  Moreover, the policy concerns articulated by the *Moore* Court—imposing strict liability on innocent third parties and potentially "hindering the socially useful activities of innocent researchers"—are not present in the instant case.  *Id.* at 147.  Simply put, *Moore* is a limited decision that does not preclude the recognition that bodily tissues, fluids and DNA are personal property.[84]

The County Defendants also insist that a person's bodily and genetic material cannot be taken for "public use," and therefore the Takings Clause does not apply.  Instead, the County

---

[84] In fact, three years after *Moore* was decided, a California Appeals Court specifically recognized the limits of the decision and recognized a property interest in donated sperm.  *Hecht v. Superior Court*, 16 Cal. App. 4th 836 (Cal. Ct. App. 1993).

Defendants argue, each plaintiff's "biological samples were taken for the investigation and prosecution of their respective individual cases—a non-public use."[85]  This argument is factually and legally wrong.

DA Moore herself has confirmed the "public use" supposedly intended for the personal property at issue.  She explicitly stated that the materials in the backlogged rape kits are not for prosecution (which could also be relevant to a specific victim), but for "informational purposes."[86] "Informational purposes" presumably refers to the entry of the rape kits' results into a database that will enable law enforcement to use the findings in the interest of the public, when further crimes—likely, more sexual assaults—are committed by the same perpetrators.

As to the legal issue, "public use" under the Fifth Amendment encompasses a "broad[] and more natural interpretation of public use as 'public purpose.'"  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 480 (2005).  "Without exception, [the United States Supreme Court's] cases have defined that concept broadly."  *Id.* at 480.  And contrary to the County Defendants' assertion, "the government's pursuit of a public purpose will often benefit private parties."  *Id.*  at 486; *see also Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 244 ("It is not essential that the entire community, nor even any considerable portion directly enjoy or participate in any improvement in order for it to constitute a public use.").  What matters for the analysis is "the taking's purpose, and not its mechanics," and whether the taking of private property "is rationally related to a conceivable public purpose."  *Midkiff*, 467 U.S. at 244, 241.  It defies credulity to claim that the taking and testing of samples from rape victims, and the entry of DNA results into a national database so that

---

[85] County Mot. at 25.
[86] *See* First Am. Compl. at ¶ 314.

repeat perpetrators can be identified (and presumably, kept from perpetuating more crime) is not rationally related to a conceivable public purpose.

The bodily and genetic material taken from Plaintiffs and members of the Invasive Testing Subclass was not removed pursuant to valid and un-coerced consent; it was taken, at least in part, to purportedly promote public safety; and Plaintiffs received no compensation from the government for the taking of their property.  Plaintiffs have adequately alleged these facts, and thus stated a viable Fifth Amendment claim.

### 4.      Plaintiffs' claim under the Texas Constitution.

Defendants make three arguments in an effort to defeat Plaintiffs' claims under the Texas Constitution, but all of them fail.

First, the City and County Defendants assert that there is no private right of action for damages under Article I, Section 30.[87]  Plaintiffs do not dispute this legal truism, and they are not seeking damages for the Defendants' violations of the Texas Constitution.  They instead seek an injunction to prohibit Defendants from continuing to violate the Texas Constitution.

Second, the City Defendants point to Sections 56.02 and 56.021 of the Texas Code of Criminal Procedure to suggest that Section 30(a) of the Texas Constitution is not "self executing" and that Section 56.02 and 56.021 are the "rules" that "effectuate Article I, Section 30 while shielding peace officers and law enforcement agencies from liability for violations."[88]  Neither of those assertions is correct.

Section 30(a) of the Texas Constitution, like all provisions of the Bill of Rights in the Texas Constitution, is presumed to be self-enacting.  *See, e.g.*, *City of Beaumont v. Bouillion*, 896 S.W. 2d 143, 148-49 (Tex. 1995) ("[T]he State has no power to commit acts contrary to the guarantees

---

[87] City Mot. at 20-22; County Mot. at 31-32.
[88] City Mot. at 21.

found in the Bill of Rights. . . [A]ny provision of the Bill of Rights is self-executing to the extent that anything done in violation of it is void.  Such a declaration [of voidness] is different from seeking compensation for damages, or compensation in money for a loss or injury.  Thus, suits for equitable remedies for violation of constitutional rights are not prohibited."); *City of Fort Worth v. Jacobs*, 382 S.W.3d 597, 600 (Tex. App.—Fort Worth 2012, pet. dism'd) ("[T]he State has no power to commit acts contrary to the guarantees found in the Bill of Rights.  Thus, these constitutional provisions authorize suits against governmental entities—that is, constitute a waiver of immunity—when such suits seek equitable relief from allegedly void, unconstitutional action.").[89]

Moreover, Sections 56.02 and 56.021 of the Texas Code of Criminal Procedure implement the specific requirements to satisfy Section 30(b) of the Texas Constitution, not Section 30(a). Section 30(b) mandates that crime victims be informed about certain aspects of the criminal justice process when a case is filed.  Sections 56.02 and 56.021 provide the specific requirements

---

[89] The City Defendants' reliance on *Morton v. Bradley*, No. A-08-CV-597-SS, 2009 WL 10700167, *State v. McDonald*, 839 S.W.2d 854, 858—59 (Tex. App—San Antonio 1992, orig. proceeding), and *In re State. Sistrunk*, 142 S.W.3d 497, 501—503 (Tex. App——Houston [14th Dist.] 2004, orig. proceeding) is misplaced.  *Morton* and *McDonald* involved plaintiffs who were crime victims or family members of crime victims that sought access to evidence in prosecutors' files in currently pending cases.  *McDonald*, 839 S.W.2d at 855; *Morton*, 2009 WL 10700167, at *1.  *Sistrick* involved the family members of a manslaughter victim, who filed an amicus curiae notice of appeal attempting to challenge the criminal defendant's sentence.  *Sistrunk*, 142 S.W.3d at 499.  Plaintiffs here do not seek access to evidence in pending cases.  For six of the Named Plaintiffs, the cases against their criminal assailants have been closed and none of the relief requested by Plaintiffs requires prosecutors to provide their case files to Plaintiffs.  Nor do any of the Plaintiffs seek to participate in any part of the criminal prosecutions of their assailants, which Section 30(e) specifically prohibits.  Tex. Const., Article I, Section 30(e) ("A victim or guardian or legal representative of a victim has standing to enforce the rights enumerated in this section but does not have standing to participate as a party in a criminal proceeding or to contest the disposition of any charge.").  Instead, Plaintiffs simply seek an injunction that ensures Defendants will provide the respect and dignity required by the Texas Constitution, which Section 30(e) grants them standing to do.  *Id.*

associated with those mandates.  Plaintiffs do not claim that any Defendant violated the requirements of Section 30(b) or the related provisions in the Texas Code of Criminal Procedure. Plaintiffs' claims under the Texas Constitution are based on the requirement that victims be treated with dignity and respect under Section 30(a), for which there are no specific provisions under the Texas Code of Criminal Procedure.[90]

Finally, the City Defendants assert that Plaintiffs' claims under the Texas Constitution must fail because the injunctive relief sought by Plaintiffs could hypothetically implicate the constitutional rights of an accused.[91]  The City Defendants do not explain how treating female victims of sexual assault with dignity and respect could imperil the rights of an accused, other than saying that "requiring that victims be notified of the likelihood their SAKs will be tested" and "not just be notified at the time such testing is performed" is more than what is required under the Code of Criminal Procedure and citing to a 2015 decision from the middle district of Pennsylvania.

Telling victims of sexual assault the truth about whether their rape kits will be tested does not implicate any rights of the accused; it merely requires the Defendants to obtain informed consent from a victim before subjecting her to an invasive search, which as discussed in Section C(2) above, is also required by the United States Constitution.  And the *Kane* decision from Pennsylvania involved a First Amendment challenge brought by prisoners and various prisoners' rights organizations against a Pennsylvania statute that authorized crime victims to sue their attackers for engaging in various oral advocacy activities.  *Jamal v. Kane*, 105 F. Supp. 3d 448, 452 (M.D. Pa. 2015).  No Plaintiff in this case is suing her criminal assailant for any reason. Instead, this suit seeks to hold government actors accountable for the actions they have taken

---

[90] Under Section 30(e), crime victims, like Plaintiffs here, are specifically recognized as parties with standing to enforce the requirements of Section 30(a).
[91] City Mot. at 21-22.

against female victims of sexual assault and to ensure that those same government actors abide by both the United States and Texas Constitutions when carrying out their sworn duties.

**D.      Plaintiffs have Alleged All Elements under Section 1983.**

In addition to wrongly asserting that none of Plaintiffs' constitutional rights have been violated, the City and County Defendants claim that Plaintiffs have not sufficiently established customs or policies as required for liability under Section 1983, and the DAs and Police Chiefs similarly claim that Plaintiffs have not adequately plead supervisory liability against them.  The DAs and Police Chiefs also claim that there is no basis for punitive damages.  All of these arguments are meritless.

**1.      Plaintiffs have appropriately pled municipal liability under Section 1983 against the City and the County.**

"To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right."  *See Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009).   Each of these three elements is alleged in the Complaint.

With regard to the first element, "official policy establishes culpability, and can arise in various forms."  *See id.*  "It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is so common and well-settled as to constitute a custom that fairly represents municipal policy."  *See id.*  Moreover, "[i]t is clear that a municipality's policy of failing to train its . . . officers can give rise to § 1983 liability."  *See Brown v. Bryan Cty., OK*, 219 F.3d 450, 457 (5th Cir. 2000).

Here, the City and County have committed (and continue to commit) constitutional violations by implementing, promoting, or maintaining policies, practices, and/or customs that intentionally discriminate against female victims of sexual assault.  This widespread practice

includes disbelieving, dismissing, and denigrating female sexual assault victims, failing to have

DNA evidence tested for years at a time, refusing to investigate or prosecute cases of sexual assault

against female survivors because juries purportedly do not like "he said, she said" cases, and failing to

appropriately and adequately train and manage their respective employees.[92]  The Defendants' policies

and the treatment of the Plaintiffs described in the Complaint demonstrate in detail that the City and

County's culture and practices foster animus and discriminatory treatment of female victims.[93]

The Complaint also alleges that:

- There are only 17 detectives assigned to sex crimes (approximately 1,000 sexual assaults committed annually) as compared to 12 detectives assigned to homicide (approximately 30 murders committed annually).[94]

- Thousands of SAKs remain untested.[95]

- Between July 2016 and June 2017, APD received 1,268 calls for assistance on sexual assault cases.  Of those cases, 1,161 were investigated, and only 96 arrests were made.  During the same time period, the Travis County District Attorney's Office received 224 case referrals for prosecution.  The DA accepted 77 of those 224 cases.  Of the 77 cases, only *one* – a case involving the rape of a *male victim* – went to trial.[96]

This data and statistics, paired with Plaintiffs' allegations of animus and discriminatory

treatment, the evidence actually on the walls of the APD, and the statements made publicly by DA

Moore herself are sufficient to allege a widespread practice and, at the very least, provide notice

of this pattern of similar violations to the City and the County.[97]  *See, e.g.*, *Sanchez v. Gomez*, 283

F. Supp. 3d 524, 537 (W.D. Tex. 2017) (holding that "the statistics [regarding excessive force used

against nine individuals with mental illness] combined with the numerous past cases of excessive

---

[92] *See id.* at ¶¶ 19-344.

[93] *See id.*

[94] *See id.* at ¶ 275.

[95] *See id.* at ¶¶ 44, 57, 100, 210, 217-18, 221-22, 225-26, 229, 257-58, 265-83, 293-98, 313-22, 338, 361, 379-83.

[96] *See id.* at ¶¶ 244-48.

[97] *See id.* at ¶¶ 19-344.

force in similar circumstances to those involved in the present case—followed by the repeated denial of wrongdoing—lead to a reasonable and plausible inference that excessive force against the mentally ill in El Paso is a widespread practice"); *Oporto*, 2010 WL 3503457, at *5-6 (collecting cases where similar prior incidents were sufficient to allege a widespread practice).[98]

With regard to the second element, "[c]ourts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983." *See Oporto*, 2010 WL 3503457, at *4. Likewise, the Fifth Circuit has held that the DA is an official policymaker for the County. *See, e.g.*, *Crane,* 766 F.2d. at 195; *see also Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997) (observing that, for duties that are administrative or managerial in nature, the district attorney "functions as a final policymaker for the county"); *Davis v. Ector Cty*, 40 F.3d 777, 784 (5th Cir. 1994) (holding that district attorney was acting as county policymaker in making firing decisions); *Brown v. City of Houston*, Cause No. H-17-1749, 2018 WL 1333883, *3-4 (S.D. Tex. Mar. 15, 2018) (holding that DA's alleged creation and implementation of unconstitutional policies that led to plaintiff's conviction were within capacity as final county policymaker); *accord Carter v. City of Philadelphia*, 181 F.3d 339, 351-52 (3d Cir. 1999) (holding that district attorney's failure to establish policies and training of police officers to prevent procurement of perjurious witnesses constituted county-wide policy-making); *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992) (holding that district attorney's office

---

[98] Courts have also held that "it is not appropriate to dismiss a case for failure to state a claim when evidence might be adduced showing that the City has constructively adopted such a policy or custom." *See Barr v. City of San Antonio*, 2006 WL 2322861, at *4; *see also Sanchez*, 283 F. Supp. 3d at 538 ("While the probity of a given statistic can be debated ad nauseam, it is not the Court's responsibility to settle such a debate at this time. The Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor when deciding a motion to dismiss. . . . It is also reasonable to combine this and other statistics with Plaintiffs' other factual allegations to infer that a widespread practice of excessive force exists."); *Oporto*, 2010 WL 3503457, at *6.

management with regard to officer training constituted county function).  There is no doubt that the DAs and Police Chiefs are municipal policymakers.

Finally, the City's and County's practices and customs of discriminating against female sexual assault victims caused the violations of Plaintiffs' constitutional rights, as required by the third element of municipal liability.  "While causation is usually difficult to prove, Plaintiffs need only provide enough facts to allow the Court to make a plausible inference that the policy was a moving force behind the harm in this case."  *See Sanchez*, 283 F. Supp. 3d at 539.

Here, the Complaint contains facts sufficient to give rise to a plausible inference that the DAs' and Chiefs' practices of implementing, promoting, or maintaining policies, practices, and/or customs that intentionally discriminate against female victims of sexual assault is the moving force behind the constitutional violations in this case.[99]  Without the Defendants' systemic discrimination, Plaintiffs and the members of the Class would have been provided with equal access to services of the City, Travis County, the DA's Office, and the APD.  Unfortunately, however, because as Defendants themselves admit, the Travis County law enforcement and prosecutorial communities "work together," their systemic and repeated discrimination violated Plaintiffs' constitutional rights throughout the law enforcement and criminal justice processes.

Additionally, the DAs and the Police Chiefs had actual and constructive knowledge of the widespread practice of discriminating against female sexual assault victims.  "Actual knowledge may be shown by such means as discussions at council meetings or receipt of written information" and "[c]onstructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public

---

[99] *See* First Am. Compl. at ¶¶ 19-344.

discussion or of a high degree of publicity." *See Oporto*, 2010 WL 3503457, at *8 (citing *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984) (en banc)); *see also Gallaher v. City of Maypearl, Texas*, No. 3:17-CV-1400-M, 2018 WL 700252, at *7 (N.D. Tex. Feb. 2, 2018).

Here, the DAs and Police Chiefs had actual and constructive knowledge of the violations because the information was the subject of numerous reports, studies, and discussions throughout Austin and Travis County.[100]  Moreover, the many failures of the APD and DAs—including the miscarriage of justice for rape victims and a shockingly low prosecution rate of those victims' cases—were raised by the Sexual Assault Response & Resource Team in open letters during 2017 and included in a grant-funded public report in 2018.[101]

## 2. Plaintiffs have adequately pled supervisory liability under Section 1983 against the DAs and the Police Chiefs.

The DA and Police Chief Defendants argue that there is no supervisory liability under Section 1983 because there are no allegations establishing that they were deliberately indifferent to a violation of a constitutional right.  This is simply untrue.  The Complaint details the DAs' and the Police Chiefs' failure to train and supervise their respective employees in the handling of sexual assault cases, including how to communicate with, respond to, and protect female sexual assault victims.[102]

In assessing an individual supervisor's liability under Section 1983, the Fifth Circuit applies the *City of Canton* standard.  *See Breaux v. City of Garland*, 205 F.3d 150, 161 (5th Cir. 2000).  Under that standard, a supervisor is liable if "(1) his conduct directly causes a constitutional violation" or (2) he "was deliberately indifferent to a violation of a constitutional right." *See id.* A supervisor is deliberately indifferent when he "disregarded a known or obvious consequence of

---

[100] *See id.* at ¶¶ 229-48, 265-83, 291-92, 299-341.
[101] *See id.* at ¶¶ 268-82.
[102] *See id.* at ¶¶ 282, 290-92, 329.

41

his action." *Porter v. Epps*, 659 F.3d 440, 446-47 (5th Cir. 2011).  "A failure to adopt a policy can be deliberately indifferent when it is obvious that the likely consequences of not adopting a policy will be a deprivation of constitutional rights."  *See id.*  "A supervisor may also be liable for failure to supervise or train if: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."  *See id.*

Plaintiffs' allegations support plausible inferences that the DAs and the Police Chiefs were deliberately indifferent in the training and supervision of their respective employees with regards to the handling of sexual assault investigations and cases, which violated the constitutional rights of the Plaintiffs and all female sexual assault victims in Austin.  In addition to the factual allegations describing the DAs' and the Police Chiefs' discriminatory intent in Section C, the Complaint details the DAs' and the Police Chiefs' failure to train their subordinates on the following topics:

- That female sexual assault victims should not be disbelieved, dismissed, and discriminated against when reporting crimes committed against them or cooperating with law enforcement;[103]

- That the majority of female victims are raped by acquaintances and that such rapes are criminal;[104]

- Communication skills to avoid victim blaming, which includes, but is not limited to, focusing on the victim's past sexual history, alcohol or drug abuse, clothing worn on the date of the crime, location on the date of the crime, and/or general mental stability both before and after the crime, and purported consent;[105]

---

[103] *See id.* at ¶¶ 229, 285-89, 320-22.
[104] *See id.* at ¶¶ 288, 320, 324.
[105] *See id.* at ¶¶ 224-25, 290, 321.

- That rape is a traumatic event and that trauma impacts a victim's ability to cooperate with an ongoing investigation and to remember details of the event with clarity;[106]

- Interviewing skills that include a trauma-informed approach;[107]

- That female sexual assault victims should not be referred to in derogatory ways, including "bad victim," "unworthy," and "not credible";[108]

- That female sex workers can also be victims of sexual assault;[109]

- Investigation and prosecution strategies for sexual assault cases, particularly related to overcoming the "consent defense";[110] and

- The low rate of false rape reports.[111]

Likewise, the Complaint alleges the DAs and Police Chiefs failed to supervise the submission and timely processing of SAKs[112] and the processing, investigating, and prosecution of sexual assault cases.[113] "An adequate training program must enable officers to respond properly to the usual and recurring situations with which they must deal." *See Benavides v. Cty. of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). With more than 1,000 new cases of reported sexual assaults in Austin each year, a training program without specific tactics for properly handling sexual assault cases is inadequate.[114]

 The inadequacy of the training program is known to the DAs and the Police Chiefs because it was documented in reports, studies, and presentations. Indeed, one recent study in Austin found

---

[106] *See id.* at ¶¶ 249-50, 282, 289-90, 292.
[107] *See id.* at ¶¶ 249-50, 282, 290.
[108] *See id.* at ¶¶ 138, 251, 285-86, 289, 327, 334.
[109] *See id.* at ¶ 334.
[110] *See id.* at ¶¶ 251-52, 281, 293-94, 329, 331, 334-35.
[111] *See id.* at ¶¶ 259, 294, 331.
[112] *See id.* at ¶¶ 44, 57, 100, 210, 217-18, 221-22, 225-26, 229, 257-58, 265-83, 293-98, 338, 361, 379-83.
[113] *See id.* at ¶¶ 19-344.
[114] *See id.* at ¶¶ 275, 318.

that 66% of the law enforcement officers handling sexual assault cases that participated in the study reported they had not received any training on how to read or interpret the results of a sexual assault forensic exam and 100% of law enforcement officers and prosecutors interviewed for the study stated that there were no ongoing mandatory trainings related to their role in a sexual assault case versus a different type of case.[115]   Additionally, prosecutors repeatedly raised the need for training on prosecution strategies for sexual assault cases, particularly strategies for overcoming the "consent defense," yet no such training is provided.[116]   Moreover, even when training is nominally offered by third parties, there is no expectation or requirement that Defendants' employees participate.[117]

Despite having actual knowledge of the significant deficits in their training programs and in the supervision of their employees, the DAs and the Police Chiefs made deliberate choices not to train their employees in a trauma-informed approach for the handling of sexual assault cases or to address gender bias in their work, which directly relates to tasks that the employees must perform for approximately 1,000 cases per year.[118]   *See Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (explaining that supervisory liability for failure to train arises when the inadequacy of the training program relates to tasks the particular employees must perform). Defendants' failure to implement adequate training and supervision has caused the obvious consequence of rampant and systemic violations of the constitutional rights of female survivors, including the Named Plaintiffs.  *See Oporto v. City of El Paso*, No. EP-10-CV-110, 2010 WL 3503457, at *4 (W.D. Tex. Sept. 2, 2010) ("[I]f a policy is found to have a 'known or obvious' consequence of infringing on federally protected rights . . . , it is difficult to see how such a policy

---

[115] *See id.* at ¶ 291.
[116] *See id.* at ¶ 281, 329.
[117] *See id.* at ¶ 292.
[118] *See id.* at ¶¶ 229, 249-344, 275, 282, 290, 318, 338-39.

could fail to be a 'moving force' behind these known or obvious harms when they finally come to fruition. . . .").

Several other incidents also put the DAs and the Police Chiefs on notice of the unconstitutional discrimination and actions pervading their employees' work. Austin's own Sexual Assault Response & Resource Team—of which these Defendants were members at the time—sent an open letter detailing inadequacies and evidence of the discrimination in 2017;[119] two APD officers were caught on camera joking about the police not being able to "un-rape" victims in 2014, another APD officer was caught on camera in 2014 justifying a physical assault by a man against his fiancée, and saying, "You act like a whore, you get treated like one!;"[120] the APD's physical walls showed evidence of the department's general disbelief of, and intention to discredit, female victims;[121] and DA Moore has made multiple public statements about how women have not been subjected to a criminal assault when acquaintances or alcohol are involved in sexual assaults—literally dismissing those situations as non-criminal and dismissing the victims as non-credible.[122]

Based on these allegations, plausible inferences can be drawn that (1) the DAs and the Police Chiefs had actual notice that their training programs and supervision were deficient and chose to maintain these deficient training programs and supervision, despite the existence of several alternative programs and supervision options; (2) that their programs and supervision were so deficient, and so likely to lead to the constitutional deprivations alleged herein, that the need for new training programs and supervision was obvious; and (3) their failure to properly train and

---

[119] *See id.* at ¶¶ 268-82.
[120] *Id.* at ¶ 261.
[121] *See id.* at ¶¶ 259-63.
[122] *See id.* at ¶¶ 320-22.

45

supervise their respective employees caused the violation of Plaintiffs' constitutional rights under the law.

>   **3.      Plaintiffs are entitled to seek punitive damages against the DAs and the Police Chiefs under Section 1983.**

In *Smith v. Wade*, the Supreme Court held "that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. 61 U.S. 30, 56 (1983). As demonstrated above, the DAs and the Police Chiefs violated Section 1983 due to their deliberate indifference in the training and supervision of their respective employees with regard to the handling of sexual assault cases and their failure to address (and explicit involvement in perpetuating) unconstitutional discrimination and actions in their work. Because Plaintiffs have viable Section 1983 claims against the DAs and the Police Chiefs, Plaintiffs may seek to punitive damages.

**E.      Plaintiffs Sin and Ituah have Adequately Pled Claims under the Americans with Disabilities Act against the City Defendants.**

As the City Defendants acknowledge, Title II of the ADA broadly prohibits discrimination in virtually all government activities and operations, and it applies to law enforcement and police departments.[123] The City Defendants instead focus on two pleading issues in an attempt to defeat the ADA claims: whether Plaintiffs Ituah's and Sin's allegations are sufficient to infer that they are "disabled" under the ADA and whether their allegations are sufficient to infer that they were discriminated against or denied benefits because of those disabilities.[124]

---

[123] City Mot. at 16-17.
[124] The County Defendants also assert that Ms. Ituah and Ms. Sin do not have standing to maintain their ADA claims against the County Defendants. County Mot. at 8-9. Based on the facts known to Plaintiffs at this time, those arguments are well-taken and Ms. Ituah and Ms. Sin are voluntarily dismissing without prejudice their ADA claims (and only those claims) against the County Defendants.

The City Defendants' assertion that Ms. Ituah's allegations do not establish her disability are perplexing.  The ADA defines disability as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," a record of such impairment, or being regarded as having such an impairment.  42 U.S.C. § 12102.  Ms. Ituah specifically alleges that she is an adult who "has been found legally incapacitated by a duly authorized Texas Court" and suffers from "cognitive impairment due to a traumatic brain injury."[125]  Her mother, Angela McKay, was required to file the instant suit on her behalf because Ms. McKay "is the legal guardian of both Ms. Ituah's person and estate."[126]

Under Texas law, a probate court cannot appoint a guardian of the person for Ms. Ituah without clear and convincing evidence that, among other things, Ms. Ituah is "an incapacitated person."  Tex. Est. Code Ann. § 1101.101(a)(1).  In order to make such a finding, the probate court must also find that Ms. Ituah is an adult, who "because of a physical or mental condition, is substantially unable to: (A) provide food, clothing, or shelter for . . .  herself; (B) care for [her] own physical health; or (C) manage [her] own financial affairs."  *Id.* at § 1002.017(2).  Ms. Ituah's allegation that she has been found legally incapacitated by a Texas court certainly gives rise to plausible inferences that (1) she has a physical or mental impairment that substantially limits her major life activities and (2) that a record of such impairment—*i.e.*, the guardianship order itself—exists.[127]

---

[125] First Am. Compl. at ¶¶ 7, 176.

[126] *Id.* at ¶ 7.

[127] Although Ms. Ituah's well-pleaded allegations must be taken as true for purposes of the City's Motion, and she is under no obligation to provide proof of her allegations at this time, her guardianship proceedings occurred in Probate Court No. 1 of Travis County, before the Honorable Guy Herman.  The cause number is C-1-PB-16-000048.  Should this Court determine that Ms. Ituah must plead these additional details, Ms. Ituah respectfully requests leave to do so.

Ms. Sin's "disability stems from several mental health diagnoses."[128]   Although the specifics of her disability and the impact it has on her daily activities are known to the APD,[129] the City Defendants' arguments regarding the specificity of Ms. Sin's allegations are well-taken.   Ms. Sin therefore respectfully requests leave to replead to allege additional facts regarding her disability.[130]

The City Defendants' second argument—that Ms. Ituah and Ms. Sin do not allege denial of services, disparate treatment, or lack of accommodation—is both confusing and incorrect.   First, the City Defendants assert that Ms. Ituah and Ms. Sin "were not denied access to any services provided by the City."[131]   But Ms. Ituah alleges that she was, in fact, denied services by the City for a period of several months.   Her sister reported Ms. Ituah's assault to APD immediately after it occurred.[132]   Yet, despite the fact that Ms. Ituah was a victim in immediate crisis, the APD call taker told Ms. Ituah's sister that there was nothing that APD could do because the rape occurred at the Austin State Hospital.[133]   It was not until March 2016, more than two months after Ms. Ituah's rape was first reported to APD, that APD apparently did anything.[134]

Second, the City Defendants assert that because "the First Amended Complaint alleges that reported rapes of other non-disabled women were allegedly not adequately investigated," that Ms.

---

[128] First Am. Compl. at ¶ 228.
[129] *See id.*
[130] Ms. Sin can and will allege: (1) the Social Security Administration found she became disabled on September 1, 2011; (2) she became entitled to monthly disability benefits in February of 2012; (3) in support of the disability finding, a medical professional determined that her mental health diagnoses "significantly affect her social, interpersonal relationships, and occupational function;" (4) her disability is ongoing; (5) she has been unable to work since September 1, 2011 due to her disability; and (6) a record from the Social Security Administration dated July 16, 2018 confirms that she remains "entitled to monthly payments as a disabled individual."
[131] City Mot. at 19.
[132] First Am. Compl. at ¶ 177-78.
[133] *Id.*
[134] *Id.* at ¶¶ 181-82.

Ituah and Ms. Sin cannot also assert that they were discriminated against on the basis of their disabilities.[135]   The City Defendants seem to argue that because they do not "adequately investigate" *any* rapes in Travis County, their inadequate investigation of rapes against disabled women in Travis County cannot be discriminatory.  This argument is nonsensical.  A plaintiff can simultaneously be a member of different protected classes.  *See, e.g.*, *Jefferies v. Harris County Cmty. Action Ass'n*, 615 F.2d 1025, 1032 (5th Cir. 1980); *Harper v. Thiokol Chem. Corp.*, 619 F.2d 489, 492 (5th Cir. 1980).  And the Defendants' inadequate investigation of sexual assaults committed against women can be based on a number of different discriminatory intents, which can (and do) manifest in different behaviors toward disabled women in particular.

In fact, that is precisely what Ms. Ituah and Ms. Sin allege.  They experienced discrimination by the City Defendants because of their respective disabilities on top of, and different from, the discrimination they also experienced as a result of being female survivors of sexual assault in Travis County.  For example, Ms. Ituah alleges that APD refused to respond to an immediate report of her rape because it occurred at the state mental hospital located in Travis County.[136]  Although the City Defendants' behavior toward the other Named Plaintiffs is also discriminatory and improper and their related investigations have also been inadequate, Ms. Ituah experienced a particular type of inadequate investigation; namely, none at all for two months because she was raped in a mental institution in Travis County.[137]  Likewise, Ms. Sin alleges that APD knew about her mental health disorders and expressed "credibility concerns" because of

---

[135] City Mot. at 20.

[136] First Am. Compl. at ¶ 177.

[137] The Complaint also notes the unsurprising but tragic result of this systemic refusal to investigate rapes reported by mentally disabled residents at the Austin State Hospital.  "Since 2007, 731 sexual assault allegations were made at Austin State Hospital and only 9 of those cases—or 1.2%—were confirmed."  *Id.* at ¶ 192.  That APD's refusal to timely respond to rape reports at Austin State Hospital contributes to this outcome is a plausible inference.

them, which is an experience separate and apart from the general disbelief that female survivors of sexual assault in Travis County experience simply because of their gender.[138]

**F.      Plaintiffs' Conspiracy Claim is Viable.**

The County and City Defendants make virtually identical arguments in an attempt to defeat Plaintiffs' conspiracy claims: (1) that Plaintiffs' conspiracy claim depends on the Plaintiffs' underlying constitutional claims;[139] (2) that the intracorporate conspiracy doctrine precludes Plaintiffs' conspiracy claims;[140] and (3) that Plaintiffs have not sufficiently alleged who conspired with whom and what acts furthered the alleged conspiracy.[141]  None of these arguments has merit.

First, as discussed in Section C, Plaintiffs have sufficiently pled the elements of each of their constitutional claims, and have also specifically alleged facts giving rise to plausible inferences that the Defendants actions were motivated by discriminatory intent.

Second, because the County and City Defendants are not part of the same governmental entity, the intracorporate conspiracy doctrine does not apply to actions they take as co-conspirators. Plaintiffs specifically allege that the County and City Defendants have conspired with each other. For example, APD consulted with the DAs' respective offices during the investigations of Ms. Conner's,[142] Ms. Borchardt's,[143] Ms. Fielding's,[144] and Ms. Ituah's[145] assaults.  As discussed in Section A, the County Defendants publicly tout their work with the APD and other law enforcement agencies.  In fact, the DAs office maintains a Major Crimes program that is "on-call

---

[138] The City Defendants' argument that "Plaintiffs have failed to plead any facts that support an allegation that they were denied access to police protection because the City failed to reasonably accommodate their disability" is meritless for the same reasons.
[139] *See* County Mot. at 4, 30-31; City Mot. at 15-16.
[140] *See* County Mot. at 30-31; City Mot. at 15.
[141] *See* County Mot. at 30; City Mot. at 15-16.
[142] *See* First Am. Compl. at ¶¶ 59-61.
[143] *See id.* at ¶¶ 107-17.
[144] *See id.* at ¶ 172.
[145] *See id.* at ¶ 189-91.

24/7 staffed by attorneys at Chief level or higher," which "was instituted by DA Moore to provide high level assistance on crimes involving serious bodily injury or death."[146]  From the time that program "began on March 6th [of 2017] until December 31st [2017], there were 883 calls from law enforcement to a duty ADA."[147]  Moreover, because the City of Austin is a large, municipal entity with standalone departments, it can conspire with itself, as Plaintiffs have properly pled.  *See Hill v. City of Houston*, 991 F. Supp. 847, 851 (S.D. Tex. 1998).

Finally, Defendants' complaints that Plaintiffs have not sufficiently alleged the details of the alleged conspiracy is yet another example of the Defendants ignoring extensive and detailed factual allegations related to the Defendants' conduct and imposing specific evidentiary requirements that simply do not exist.  The County Defendants go so far as to say that "other than reciting the elements of conspiracy cause of action under §1985, Plaintiffs have failed to assert facts that a conspiracy existed at all."[148]  They seem to base this claim on paragraphs 417 through 419 in the Complaint, which do include the legal elements of a claim under §1985; but, they conveniently overlook the immediately preceding paragraph, which "incorporate[s] the preceding [415] paragraphs as if set forth fully herein."[149]  Within those 415 preceding paragraphs are factual allegations that give rise to plausible inferences of a conspiracy to deprive Plaintiffs of equal protection under law, which is precisely what § 1985(3) requires at the pleading stage.[150]

Defendants' real argument seems to be that Plaintiffs must provide direct evidence of a meeting between the various co-conspirators at which the specific intent to discriminate was

---

[146] 2017 DA Report at 7.
[147] *Id.*
[148] *See* County Mot. at 30.
[149] First Am. Compl. at ¶ 417.
[150] *See, e.g.*, *id.* at ¶¶ 59-61, 108, 136, 244-48, 250-51, 325.

revealed and agreed upon.  But the Fifth Circuit has specifically recognized that direct evidence of

a conspiracy is both rare and unnecessary, holding:

> "[A] conspiracy may be proved by circumstantial evidence.  Since conspiracies,
> whether among businessmen or others, are rarely evidenced by explicit agreements,
> the determination of whether a conspiracy existed almost inevitably rests on the
> inferences that may fairly be drawn from the behavior of the alleged conspirators.
> At a minimum, their actions, to support a finding of a conspiracy, must suggest a
> commitment to a common end.  The circumstances must be such as to warrant a
> jury in finding that the conspirators had a unity of purpose or a common design and
> understanding, or a meeting of the minds in an unlawful arrangement."

*Mack v. Newton*, 737 F.2d 1343, 1350-51 (5th Cir. 1984); *see also Way v. Mueller Brass Co.*, 840

F.2d 303, 308 (5th Cir. 1988) ("Plaintiffs who assert conspiracy claims under the civil rights statues

must plead the 'operative facts' showing a prior illegal agreement . . . [t]he plaintiff, however, may

and often must rely on circumstantial evidence and reasonable inferences therefrom, since

conspiracies 'are rarely evidenced by explicit agreements.'").[151]   Here, Plaintiffs have alleged

precisely such a "unity of purpose" and "common design and understanding" among the City and

County Defendants.  Indeed, it is the *systemic* and repeated deprival of Plaintiffs' rights under the

U.S. and Texas Constitutions by both the City and County Defendants that is the source of the

harms at issue.

## G.     Injunctive Relief is Appropriate and Available.

Defendants assert that Plaintiffs' claims cannot proceed because the type of injunctive

relief sought is "extraordinary."  Defendants' arguments are belied by the numerous injunctions

---

[151] Courts in other jurisdictions have reached similar conclusions.  *See, e.g.*, *Bell v. City of Milwaukee*, 746 F.2d 1205, 1254 (7th Cir. 1984) ("Rarely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire . . . Circumstantial evidence may provide adequate proof of conspiracy."); *Jingrong v. Chinese Anti-Cult World Alliance*, 287 F. Supp. 3d 290, 287 (E.D.N.Y. 2018) ("[A] plaintiff seeking to make out a conspiracy claim must have 'some factual basis supporting a meeting of the minds.'  The factual basis need not be direct evidence—a plaintiff may also meet this burden by alleging 'facts upon which it may be plausibly inferred that the defendants came to an agreement to violate his constitutional rights.').

and consent decrees that have been entered against government actors for violations of the U.S. Constitution.

For instance, the New Orleans Police Department entered into a consent injunction with the United States Department of Justice in 2012 regarding some of the same types of unconstitutional and discriminatory policies and practices in the Eastern District of Louisiana. *United States of America v. City of New Orleans,* Case No. 2:12-cv-01924-SM-JCW (E.D. La.), Doc. 159 (incorporating consent decree at Doc. 2-1).  In 2018, the Southern District of Texas imposed injunctive relief and a monitorship on the state of Texas related to the violations of constitutional rights of children in Texas' foster care system.  *M.D.; bnf Stukenberg, et al. v. Abbott,* Case 2:11-cv-00084 (S.D. Tex.), Doc. 559 entered January 19, 2018.  And the Northern District of Texas imposed significant injunctive and equitable remedies in *Tasby v. Estes*, desegregating the Dallas schools.  412 F. Supp. 1185 (N.D. Texas 1975), *aff'g*, 572 F.2d 1010 (5th Cir. 1978); 412 F. Supp. 1192 (N.D. Tex. 1976); *remand* 572 F.2d 1010 (5th Cir. 1978).

Constitutional violations by government actors are, and long have been, redressable, through both equitable relief and monetary damages.  *Davis v. Passman*, 442 U.S. 228 (1979). Without the opportunity for equitable relief, there would be no mechanism to ensure that state actors comply with the requirements of the Constitution, or to redress wrongs occasioned on entire classes of people.  Defendants are sworn to protect the Constitution, and they are separately required by law to abide by it.  As the Supreme Court wrote, both in *Davis v. Passman* and *Bell v. Hood*, "it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution and to restrain individual state officers from doing what the 14th Amendment forbids the state to do."  *Davis*, 442 U.S. at 242; *Bell v. Hood*, 327 U.S. 678, 684 (1946).

## IV.  CONCLUSION

Government actors in Texas are required to adhere to the Constitutions of the United States and the State of Texas.  When, as alleged here by Plaintiffs, they fail to do so, redress in a United States Federal Court is both available and appropriate.  Defendants' misplaced claims of immunity and discretion do nothing to alter those fundamental legal tenets.  Plaintiffs have alleged sufficient facts to establish all elements of the claims asserted.  Defendants' Motions to Dismiss should be denied in their entirety.

DATED:  October 15, 2018.

Respectfully submitted,

By:      */s/ Jennifer R. Ecklund*  

     Jennifer R. Ecklund
     Texas Bar No. 24045626
     Jennifer.Ecklund@tklaw.com

     Mackenzie S. Wallace
     Texas Bar No. 24079535
     Mackenzie.Wallace@tklaw.com

**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
Telephone:  214/969-1700
Facsimile: 214/969-1751

     Elizabeth Myers
     Texas Bar No. 24047767
     Elizabeth.Myers@tklaw.com

**THOMPSON & KNIGHT LLP**
98 San Jacinto Boulevard, Suite 1900
Austin, Texas 78701
Telephone:  512/469-6100
Facsimile: 512/469-6180

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned does hereby certify that on the 15th day of October, 2018, a true and correct copy of the foregoing document was electronically filed and served on all counsel of record via the CM/ECF electronic system.

<u>Meghan L. Riley</u>
State Bar No. 24049373
P.O. Box 1088
Austin, Texas 78745
Phone: 512-974-2346
Fax: 512-974-1311
E-mail: Meghan.riley@austintexas.gov

<u>Hannah M. Vahl</u>
State Bar No. 24082377
P.O. Box 1546
Austin, Texas 78167-1546
Phone: (512) 974-2458
Fax: (512)974-1311
E-mail: Hannah.vahl@austintexas.gov

<u>Sara R. Schaefer</u>
State Bar No. 24086598
301 W. 2nd Street
Austin, Texas 78767
Phone: (512) 974-1536
Fax: 512/974-1311
E-mail: sara.schaefer@austintexas.gov

*Counsel for Defendants City of Austin, Austin Police Chief Brian Manley, and Former Austin Police Chief Art Acevedo*

<u>Leslie W. Dippel</u>
State Bar No. 00796472
Travis County Attorney's Office
P.O. Box 1748
Austin, Texas 78767
Phone: (512) 854-9513
Fax: 512/854-4808
E-mail: leslie.dippel@traviscountytx.gov

<u>Anthony J. Nelson</u>
State Bar No. 14885800
314 West 11th Street
Room 590
Austin, Texas 78701
Phone: (512) 854-4801
Fax: 512/854-4808
E-mail: tony.nelson@traviscountytx.gov

<u>Patrick T. Pope</u>
State Bar No. 24079151
P.O. Box 1748
Austin, Texas 78767
Phone: (512) 854-9523
Fax: 512/854-4808
E-mail: patrick.pope@traviscountytx.gov

*Counsel for Defendants, Travis County District Attorney, Margaret Moore and Former Travis County District Attorney Rosemary Lehmberg, and Travis County, Texas*

*/s/ Jennifer R. Ecklund*

56